

1     FOR PUBLICATION

2     UNITED STATES BANKRUPTCY COURT

3     EASTERN DISTRICT OF CALIFORNIA

4

5     ERIK SUNDQUIST and RENÉE          )
      SUNDQUIST,                        )
6                        Plaintiffs,    )
      v.                                )Adv. Pro. No.   14-02278
7                                       )
      BANK OF AMERICA, N.A.;            )
      RECONTRUST COMPANY, N.A.; BAC     )
8     HOME LOANS SERVICING, LP,         )
                         Defendants.    )
9     _____      )
                                        )
10    In re: ERIK SUNDQUIST and RENÉE   )
      SUNDQUIST,                        )Case No. 10-35624-B-13J
11                          Debtors.    )
      _____      )
12

13                     OPINION

14    Before: Christopher M. Klein, Bankruptcy Judge

      _____

15
      Dennise Henderson, Sacramento, California, for Plaintiffs.
16
      John S. Siamas, Jonathan R. Doolittle, Reed Smith LLP, San
17    Francisco, California, for all Defendants.[1]

18                     _____

19    CHRISTOPHER M. KLEIN, Bankruptcy Judge:

20

21        Franz Kafka lives.  This automatic stay violation case

22    reveals that he works at Bank of America.

23        The mirage of promised mortgage modification lured the

24    plaintiff debtors into a kafkaesque nightmare of stay-violating

25    foreclosure and unlawful detainer, tardy foreclosure rescission

26    _____

27        [1]Recontrust Company, N.A., is a wholly-owned subsidiary of
      Bank of America, N.A.  BAC Home Loans Servicing, LP, has been
28    absorbed as a division of Bank of America, N.A.

kept secret for months, home looted while the debtors were dispossessed, emotional distress, lost income, apparent heart attack, suicide attempt, and post-traumatic stress disorder, for all of which Bank of America disclaims responsibility.

The case migrated to federal court after a state appellate court ruled that the federal damages remedy for stay violations, 11 U.S.C. § 362(k)(1), preempts state wrongful foreclosure damage actions that are based solely on such violations.  Although that appeal established, as a matter of nonbankruptcy law, that the plaintiffs' state-court complaint stated actionable claims against Bank of America for deceit, promissory estoppel, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, assumed liability of mortgage brokers, unfair competition, and negligence, the plaintiffs focus here on the § 362(k)(1) remedy.

The plaintiffs filed a civil action in the United States District Court in this district (No. 2:14-cv-01151), which action was referred to this bankruptcy court as a core proceeding to be heard and determined by a bankruptcy judge.

The stay violations being undeniable, the key questions of law are whether, and for how long, "actual damages" under § 362(k)(1) continue to accrue after the automatic stay expires? The answer has two facets.  First, damages continue to accrue until full restitution is made.  Second, applicable tort concepts teach that damages encompass all consequences proximately caused by the stay-offending conduct for so long as those consequences continue, regardless of whether the stay has expired.

This nightmare also presents § 362(k)(1) "appropriate circumstances" for awarding punitive damages and the concomitant

problem of how to vindicate the societal norm implicit in
punitive damages without creating an excessive windfall.

### Facts[2]

In 2008, plaintiffs Erik and Renée Sundquist recognized that
they needed to downsize by 50 percent.[3]  They sold their home in
a "short sale" and bought a less expensive home in Lincoln,
California, also through a short sale.  They made a down payment
of $125,000.00 and executed a $587,250.00 note at 6 percent fixed
interest.  The note and deed of trust were promptly purchased by
Countrywide Home Loans, which soon merged into defendant Bank of
America, N.A.  The loan has been serviced at all relevant times
by Bank of America as successor by merger to BAC Home Loans
Servicing, LP.

The Sundquists were reluctant to agree to the new loan

---

[2]Some procedural facts are derived from the decision of the
Court of Appeal of the State of California, Third Appellate
District, in Sundquist v. Bank of America, N.A., et al., No.
C070291, filed Sep. 5, 2013, of which this court took judicial
notice (as to authenticity) at the request of the parties.  As
the issue in that appeal was whether the complaint stated various
state-law claims, some facts assumed in that decision varied from
the evidence adduced at trial in this court, which is using only
facts consistent with evidence actually adduced at trial.

[3]An important source of evidence is the testimony of Renée
Sundquist, whom the court found to be a credible witness.  She
began "Journaling as a way to deal with the insanity of the
communications with Bank of America." Renée Sundquist Decl. ¶ 22.
Extracts of the journal begin at paragraph 25 of her declaration.
A more complete version is B of A Exs. OOO-VVV.  The court
believed her live testimony and believed her declaration
testimony (as to which defendant had full and fair opportunity to
cross-examine), which incorporates the journal entries.  She is
commended for having the courage to expose private personal and
potentially-embarrassing feelings and actions that reveal the
human cost of Bank of America's loan modification process.

because monthly payments on the loan were higher than what they had been seeking, but they were stampeded into closing the transaction by the threat of a sale to an all-cash buyer and by the promise of their loan broker (whom they trusted based on his work for them on two prior refinances and a business loan) that they could refinance or modify the loan immediately.

Bank of America owns for its own account the beneficial interest in the mortgage note.[4]

The Sundquists, who were current on their $4,557.72 ($3,520.86 principal and interest) mortgage payments (and able to remain current indefinitely with assistance from Mrs. Sundquist's mother) but struggling financially, defaulted on loan payments in March 2009 because Bank of America said that it would not consider any loan modification request (and would not send application forms) unless and until they ceased making payments.[5]

Their sole reason for defaulting, which they did with considerable reluctance (their credit score had been above 800), was acquiescence in Bank of America's demand that they default as

---

[4]When Bank of America foreclosed, it purchased the property for the full amount of the debt, and there was no third party investor to notify.  Its post-foreclosure notes reflect: "Results of Sale: Prop Reverted to Plaintiff; Successful Bidder: BAC; Sale Amount: $652,217.20; Notify Investor of Sales Results: N/A."  B of A Ex. II-001.

[5]"I began to call and send letters to Bank of America asking for help to reduce or delay our payments.  I was finally told by representatives of Bank of America that the only help was modification and I had to stop making payments for three months in order to receive a modification."

Renée Sundquist Decl. ¶¶ 20-22. The court believes, and so finds as fact, this testimony.  The statements attributed to Bank of America are non-hearsay statements by an opposing party.  Fed. R. Evid. 802(d)(1).

a precondition for loan modification discussions with Bank of America.[6]

The Sundquists expected to be able to cure (with Renée Sundquist's mother's assistance) any default once a loan-modification was achieved.  They further expected that Bank of America would deal with them in good faith and make a reasonably prompt decision.

Those expectations of prompt and good-faith dealings turned out to be improvident.

Bank of America started a multi-year "dual-tracking" game of cat-and-mouse.  With one paw, Bank of America batted the debtors between about twenty loan modification requests or supplements that routinely were either "lost"[7] or declared insufficient, or

---

[6]From the Renée Sundquist Journal:

"I called and finally was able to have them send me a packet if I promised not to make a payment for three months.  The struggle to make the decision to agree to not make payments was excruciating.  We are not people who walk away from debt nor supported it."

Renée Sundquist Decl. ¶¶ 23-24.  The court believes, and so finds as fact, this testimony.  The statements attributed to Bank of America are non-hearsay statements by an opposing party.  Fed. R. Evid. 802(d)(1).

[7]Example from the Renée Sundquist Journal:

"First part of February 2009, calling to ask for modification for the fourth time; now we are two months behind.  Finally received the modification packet one and half months after requesting it. I filled it out in an hour and took it down to the post office. I was told we were not allowed to fax anything to the bank because they said 'they lose everything.'  A week passed since I sent the modification documents.  I called the bank to see if they received them.  The said they didn't receive the documents, but I was looking at the signature from the bank when they received them.  No reason to argue.  Called bank and they said they would resend the modification packet.  Called a week later

5

incomplete, or stale[8] and in need of re-submission, or denied

without comprehensible explanation[9] but without prejudice to yet

another request.[10]  With the other paw, Bank of America

and they still had not sent it.  Bank said they lost the original
documents after signing for them."

Renée Sundquist Decl. ¶¶ 33-42. The court believes, and so finds
as fact, this testimony. The statements attributed to Bank of
America are non-hearsay statements by an opposing party.  Fed. R.
Evid. 802(d)(1).

[8]Example from the Renée Sundquist Journal:

"March 2009 received the loan modification documents filled
them out quickly took it to UPS.  Confirmed they received packet.
Confirmed they did not need anything more.  After several weeks
we received a request for pay stubs.  They had been sent with the
first and second packets.  This time I was told I could fax them
which I did previously this was not allowed therefore overnight
fees.  Bank calls requesting 2009 taxes which were already sent
twice.  I sent them again. Called to confirm that they received
the faxed confidential documents and no one could find them.  We
were told to call the HOPE department.  Received another call
from the Bank that they did not receive our taxes.  They were
sent twice by mail and twice by fax."

Renée Sundquist Decl. ¶¶ 43-50. The court believes, and so finds
as fact, this testimony.  The statements attributed to Bank of
America are non-hearsay statements by an opposing party.  Fed. R.
Evid. 802(d)(1).  The statements attributed to Bank of America
are non-hearsay statements by an opposing party.  Fed. R. Evid.
802(d)(1).

[9]Example from the Renée Sundquist Journal:

"In May still have not been advised as to status of the
modification.  When I call bank now they just hang up on me.
Today when I called I was lectured by the bank that I should know
how many modifications they are working on and the I should not
expect an update."

Renée Sundquist Decl. ¶¶ 56-58. The court believes, and so finds
as fact, this testimony.  The statements attributed to Bank of
America are non-hearsay statements by an opposing party.  Fed. R.
Evid. 802(d)(1).

[10]Example from the Renée Sundquist Journal:

6

repeatedly scheduled foreclosures.[11]

It was of no consequence to Bank of America that Renée Sundquist's mother, who held a second deed of trust on the residence, advised that she had funds sufficient to enable the Sundquists to cure the arrearage once the loan was modified.[12]

Bank of America actually told Renée Sundquist that mortgage modification was "not real."[13]

---

"Early August 2009 the bank does not have our modification after all this time.  Another call to them and they admit we are now too past due we are not eligible for a modification. September 2009 the bank tells us that the modification is under review."

Renée Sundquist Decl. ¶¶ 72-74. The court believes, and so finds as fact, this testimony.  The statements attributed to Bank of America are non-hearsay statements by an opposing party.  Fed. R. Evid. 802(d)(1).

[11]Example from the Renée Sundquist Journal:

"I was told that by the bank 'when the property forecloses that is when you will know you did not get a modification.'" Renée Sundquist Decl. ¶ 56. The court believes, and so finds as fact, this testimony.  The statements attributed to Bank of America are non-hearsay statements by an opposing party.  Fed. R. Evid. 802(d)(1).

[12]From the Renée Sundquist Journal:

"My mother sent a letter to the bank advising them she was an investor and wanted to make sure she did not lose her investment.  She advised she had funds to pay for the foreclosure.  I called to confirm that the bank had received the letter from my mother and they said they were converting their system and all documents were lost."

Renée Sundquist Decl. ¶¶ 89-90.  The court believes, and so finds as fact, this testimony.  The statements attributed to Bank of America are non-hearsay statements by an opposing party.  Fed. R. Evid. 802(d)(1).

[13]From the Renée Sundquist Journal:

"Called the bank talked to a representative who said the

The Sundquists filed a chapter 7 bankruptcy case that operated to clear away debt following the closure of Mr. Sundquist's construction and development businesses due to the Great Recession, which filing delayed a scheduled foreclosure sale. They made clear in that chapter 7 case that they intended to retain their residence and pay Bank of America.[14]

They reasonably believed that shedding unsecured debt by way of the chapter 7 discharge would enhance their ability to pay Bank of America on a modified loan. But, upon the completion of that chapter 7 case, Bank of America gave the Sundquists no credit for their improved debt profile and resumed its dual-tracking strategy of using mortgage modification applications to distract borrowers from the bank's march to foreclosure.

Faced with imminent foreclosure, the Sundquists filed chapter 13 case no. 10-35624 in this court on June 14, 2010, at 5:17 p.m., thereby triggering the automatic stay under 11 U.S.C. § 362. They intended to use a chapter 13 plan to cure the Bank of America default and move forward with the loan modification that they were still expecting to occur.

Bank of America concedes that it received notice of the

---

modifications were not real. When I told her my mother could pay it off the representative advised against because the modification doesn't mean anything and it is just a way to create funds for the banks before foreclosure."

Renée Sundquist Decl. ¶¶ 91-92. The court believes, and so finds as fact, this testimony. The statements attributed to Bank of America are non-hearsay statements by an opposing party. Fed. R. Evid. 802(d)(1).

[14]Case No. 09-44647, Chapter 7 Individual Debtor's Statement of Intention, Bank of America's Request for Judicial Notice of Filed Documents, Ex. A.

8

bankruptcy on June 14, 2010, and concedes that on June 14 it transferred the loan to its Bankruptcy Department.[15]

Despite knowing of the bankruptcy case, Bank of America did not stop the trustee's sale on June 15, 2010, at which it purchased the property for its own account by credit bidding the full amount of the debt ($652,217.20).

Bank of America on June 16, 2010, further adjusted its records to reflect that the bankruptcy case was filed June 14.[16]

Bank of America has a written procedure for dealing with situations when a foreclosure occurs in violation of the automatic stay in ignorance of a bankruptcy case filing.  Upon discovery of the problem, the procedure requires "immediate" rescission.[17]

---

[15]In addition to the concession during trial, Bank of America's Loss Mitigation Home Base Work Action History database has the entry: "06/14/2010 ... Daphne English ... Customer Claims Bankruptcy."  B of A Ex. KK & Sundquist Ex. 71.  And, its Loss Mitigation Home Base II database has the entry: "transfer[r]ed to bk dept ... 06/14/2010 ... Daphne English."  B of A Ex. JJ & Sundquist Ex. 71.

[16]Bank of America Representative Deloney testified that Bank of America personnel did not code the loan in its computer system as being "in bankruptcy" (code 03) until June 16, 2010.

Servicing Activities History: "HO filed for BK on 06/14/10, chapter 13, case # 201035624 Submitted BK Notification. Information has been changed on June 16, 2010."  Sundquist Ex. 59.

[17]Bank of America's "Rescind Sale" procedure: "Perform this [rescission] procedure immediately after learning that the borrower filed for bankruptcy, but the filing was not discovered until after the sale was completed or Trustee Services receives notice that a Bankruptcy has been filed and a claim that the sale is not valid."

"If the Trustee's Deed has already been recorded, the technician must print the appropriate Rescission of Trustee's

Bank of America did not follow its own procedure and, instead, treated the foreclosure as valid.  Nor did it offer an excuse for not "immediately" following its rescission mandate to correct its mistaken foreclosure once the loan was coded in its computer system as being in bankruptcy.

The automatic stay-violating foreclosure was thereafter apparent to anyone at Bank of America who cared to look.  Nobody at Bank of America cared to look.

Bank of America committed at least six further automatic stay violations by the end of August 2010 as it bulled forward.

On June 16, with knowledge of the automatic stay, Bank of America ordered that eviction proceedings be commenced.[18]

On June 23, 2010, with knowledge of the automatic stay, Bank of America permitted its wholly-owned subsidiary and foreclosure trustee, ReconTrust, to execute the Trustee's Deed Upon Sale and to record it with the Placer County Recorder on June 25.

On multiple occasions between June 14 and September 7, 2010, Bank of America, with knowledge of the automatic stay, caused its agents to enter the Sundquists' gated community, sometimes on

---

Deed document and send it to the title company for recordation, and restart the file at the next appropriate task."

B of A Ex. QQ at pp. 002-003.

[18]B of A Ex. II-002.  In the "File Transfer" entry dated June 16, 2010, the comment is excised with the notation "Redacted."  Although this court did not compel disclosure of what was already crawling around under that rock within 24 hours of the foreclosure sale, this court, as trier of fact, is entitled to (and does) infer that it tends further to confirm that Bank of America knew of the Sundquist chapter 13 case.

false pretenses, and lurk about the Sundquist home.[19]  Without

identifying themselves, they staked out the premises, tailed the

Sundquists, knocked on doors, knocked on windows, and rang

doorbells, all to the terror of the Sundquist family.[20]

On July 8, with knowledge of the automatic stay, Bank of

---

[19]Orders directed by Bank of America to Countrywide Field
Service Corporation to inspect the Sundquist property ("Monthly
Bankruptcy") were dated July 7, 2010; July 26, 2010; and August
24, 2010.  B of A Ex. FF-001.

[20]From the Renée Sundquist Journal:

"[July 2010] A very strange man walked around our house and
banged on our sliding glass door while [10 yr-old twin son] was
playing piano. [Son] was so scared, he came running down the hall
screaming and crying.  The man was yelling at him to open the
glass door.  I called our development security.  Can't sleep.  I
bet this man is bank related.  Security said he was sitting on
our street for over two hours."  Renée Sundquist Decl. ¶¶ 113-18.

"[July or August 2010] Returned home with the boys after
school pick up. [10 yr-old twin son] noticed someone across the
street and said 'someone is casing the joint' Where did he hear
that.  First I wanted to laugh then I ran upstairs to my closet
and sobbed.  I hate being so scared, but I can't show that to my
children."  Renée Sundquist Decl. ¶¶ 124-127.

"[August 2010] Today someone tailgated us right to our
driveway and then sped off. [10 yr-old twin sons] were really
nervous, I tried to make it like a car chase scene.  They circled
around and parked outside our house until I called security.  I
bet this is Bank of America."  Renée Sundquist Decl. ¶¶ 129-31.

"[August 2010] Came home again today to someone stalking our
home.  I am so scared to step out of my car sometimes.  I now
pull into our garage with my finger on the garage door closer to
get the door down fast.  Last night I dreamt that I closed the
door fast, but the man was standing inside my garage and I locked
him in.  I woke up out of breath."  Renée Sundquist Decl. ¶¶ 132-
36.

The court believes, and so finds as fact, the events and
reactions related in this testimony and concludes that the
surveillance and harassment was by Countrywide Field Service
Corporation as agent of Bank of America.

America caused its agent to serve a Notice to Quit (the premises) by leaving a copy at the premises and by mail.

On July 23, with knowledge of the automatic stay, Bank of America commenced an unlawful detainer action, BAC Home Loans v. Sundquist, No. M-CV-47015, Superior Court of California, County of Placer, in which complaint Bank of America asserted that it had valid and perfected title due to the June 15 trustee's sale, which plainly had violated the automatic stay.

Although Bank of America's counsel, Miles, Bauer, Bergstrom & Winters, LLP, had an affirmative duty under California Code of Civil Procedure § 128.7 to confirm, after an inquiry reasonable under the circumstances, that an unlawful detainer action was warranted in law and in fact, that law firm (which commonly appears in this bankruptcy court) did not conduct a reasonable inquiry. A reasonable inquiry under the circumstances required checking public, free computer databases that show the pendency of bankruptcy cases. That check, if it had been performed, would have revealed that the filing of an unlawful detainer action would violate the automatic stay and that the foreclosure sale was void as having offended the automatic stay.[21]

Upon learning that some type of lawsuit was pending in state court, the Sundquists unsuccessfully tried between August 10 and 12, 2010, to find out from the state court what was going on.[22]

---

[21]It is not clear why Miles, Bauer, Bergstrom & Winters, LLP has not been targeted for § 362(k)(1) damages in this action.

[22]On August 10, 2010, Renée Sundquist sent the following email to her counsel: "I need help. I am having difficulty maneuvering through the court to get the documents regarding the Notice of Restricted Access that Bank of America filed.

On or about August 19, with knowledge of the automatic stay, Bank of America caused its agent to serve on the debtors a Three-Day Notice To Quit (by throwing the papers against the door so hard that they ricocheted some feet from the door[23]) creating the impression in the minds of the Sundquists that they must move within three days or the sheriff would physically remove them and their property from the premises.[24]

Their bankruptcy attorney called Bank of America on August 20, 2010, and asked why the Sundquists were being evicted after their home had been sold in violation of the automatic stay.

Bank of America's notes of that August 20 phone call (Ex. GG) reflect that it notified its agent ReconTrust that "this is

---

And on August 12: "I waited for some time this morning attempting to get copies of the case file, ha! The judge has sealed the file and they don't have access to give me copies."

Sundquist Ex. 100; B of A Ex. KKK.

[23]From the Renée Sundquist Journal:

"[August, 2010] Today a letter was thrown at our front door. It was such a loud bang I could hear it in the kitchen. I opened the door slowly, couldn't see anything from our peep hole. A random envelope on the cement the force of the throw caused the letter to fly far away from the doorstep. Having to step outside and find it was an 'unlawful detainer' not even sure what the document is stating. I just stood shaking and could barely call Erik. One thing for sure the document looks court official and the worst option was to leave our house in three days. Erik sent the document to our bk attorney. B of A steals another night from my family. Horrid night topped off by some weird car across the street looking at the house. [10 yr-old son] was too scared to sleep. I let him sleep in our room. What a horrible night for Erik to be in LA."

Renée Sundquist Decl. ¶¶ 143-54. The court believes, and so finds as fact, the events and reactions related in this testimony.

[24]B of A Ex. DD; Testimony of R. Sundquist.

an active bk and any sale date is invalid."[25]

Although Bank of America recognized on August 20 that "immediate" corrective action was required because the trustee's sale was invalid and had to be rescinded pursuant to its written procedure regarding sales that offended the bankruptcy automatic stay,[26] it did not inform the Sundquists that they could ignore the Three-Day Notice to Quit, it did not dismiss the eviction action, and it did not tell the Sundquists or their counsel that it would rescind the invalid sale and that they need not move.

The failure by Bank of America to inform the Sundquists or their counsel on August 20, 2010, that it would be rescinding the foreclosure and not pursuing the unlawful detainer action led to a further human toll, especially on Renée Sundquist.[27]

---

[25]Bank of America computer record:

"DT-08202010 Advised Kristin Warner from Recon that this is an active bk and any sale date is invalid.  Per Yassin, Ivonne, H/O called and stated that they received 3 day notice and notification that house sold in June."

B of A Ex. GG.

[26]B of A Ex. QQ.

[27]From the Renée Sundquist Journal:

"[August 20, 2010] I will never forget today it is etched in my being.  I received a call at 5:10 p.m., I stepped out of the pros room at the rin[k].  I was just about to go teach on the ice when our attorney called.  She said you won't believe this b of a sold your house.  Time stood still and life has changed forever and forever.  I felt as though I couldn't breathe, everything inside of me wanted to scream and then die.  I started asking our attorney so many questions, all of which she couldn't answer. She said B of A responded that they have no idea [h]ow to untangle this web and admitted their mistake in selling our house while we were in bankruptcy.  My head was spinning, I have one minute to get my head clear and instruct a class of tots.  As I write, I don't even remember how I walked onto the ice.  Tots

14

1   Driven to their wits' end and fearing the traumatic effect

2   that an actual eviction would have on their 10-year-old twins and

3   unaware that Bank of America would be rescinding the trustee's

4   sale and unaware that the unlawful detainer action had to be

5   withdrawn,[28] the Sundquists responded to the Three-Day Notice To

6   Quit by leasing other premises for $4,000.00 per month with the

7   help of Renée Sundquist's mother as co-lessee (their monthly

8

9

10   _____

11   whirling around me in a maze.  I do remember throwing up in the
     garbage can on the other side of the ice.  The embarrassment, one
12   of my little 5 year olds asked if I was ok.  Will not be sleeping
     tonight.  So sad, we can't even stay if the bank made a mistake,
13   if the sheriff comes and throws us out that would be even more
     horrifying for my children to experience.  We are going to have
14   to switch schools again.  Erik is going to be so upset, how are
     we going to make it through this mess.  I feel like dying."
15

16   Renée Sundquist Decl. ¶¶ 155-70.  The court believes, and so
     finds as fact, this testimony regarding her reaction.
17
         [28]From the Renée Sundquist Journal:
18
         "Last night [10 yr-old son] was scared again.  Tonight I was
19   just obsessing if a knock on the door would result in us getting
     kicked out of our house.  I realized at 2 am this morning that
20   the letter that our attorney received and the modification packet
     sent out was when they had sold the house and we no longer owned
21   it.  How can they do a modification[?] I need professional help
     to get past this.  What a horrid pit [in] my stomach and my head
22   hurts so badly too."  Renée Sundquist Decl. ¶¶ 173-77.
23
         "All I do is cry.  Today we discussed moving again and
24   renting a home.  This is way too stressful; I feel sick every
     day.  I could barely breath[e] all night.  Erik decided nothing
25   is worth the stress of staying in our home.  Erik wrote to our
     attorney and told her we have to move quickly or someone in our
26   family is going to die.  He didn't tell her that part but it is
     true."  Renée Sundquist Decl. ¶¶ 185-91.
27
28   The court believes, and so finds as fact, this testimony.
     The court believes, and so finds as fact, this testimony.

mortgage payment was $4,557.72).[29]

They moved to the rental during Labor Day Weekend (September 4-6, 2010),[30] leaving the premises, including all major appliances, window coverings, and carpets, in good order and locked the doors.  In Renée Sundquist's words while testifying, the lawn and shrubbery were "beautiful."  As Erik Sundquist testified, they "felt evicted."

Until this point, the Sundquists had been making on-going requests for loan modification, (with frequent follow-up calls from the debtors), but Bank of America did not give them coherent explanations of reasons for denials or for the long intervals of apparent inaction by the bank on loan modification applications. Often, after Bank of America sat on requests for months, it

---

[29]Bank of America obtained from the lessor a copy of a one-year lease for $3,900.00 per month.  The Sundquist testimony is that they paid $4,000.00 per month, had an agreement to stay for three years with a lessor they found on the internet in a transaction that was inexpertly documented, and ultimately had to renegotiate the term down to eighteen months.  This court believed the Sundquist testimony.  The $4,000.00 payment is consistent with paying $100.00 in miscellaneous costs in addition to the nominal monthly rent.

[30]From the Renée Sundquist Journal:

"September we just threw everything we could in boxes, we needed to move quickly.  We found a place to lease for $4000 a month.  How stupid we can't get loan modification but we can't pay that amount to B of A.  I am so sick, and I have such a headache, threw up again today from my head.  Moving is rough, so tired, my heart is pounding. I can never sleep anymore.  Fixated on all the bank[']s wrongdoing.  Had to take so much medication because the pain is horrific with fibromyalgia.  I can't take a step without pain.  I don't want my boys to get anymore messed by the move so I will medicate to get moving.  Our attorney confirmed that B of A sold our house back to themselves."

Renée Sundquist Decl. ¶¶ 192-201.  The court believes, and so finds as fact, this testimony.

16

declared their information stale and sent them back to square one.  Catch 22.

Ultimately, Bank of America, ignoring the Sundquists' representations that they would be able to cure the default as soon as the mortgage was modified, took the position that the arrearage was too great to consider a loan modification.  Yet, Bank of America still dangled more loan modification applications in front of them.

On September 7, 2010, Bank of America's notes reflect that purportedly "immediate" rescission of the trustee's sale was in process.[31]  The Sundquists were not so advised.

Although Bank of America's written procedures require that rescission be "immediate," the bank took 18 days after August 20 to start the rescission process and another 114 days until the rescission was recorded on December 30, 2010.

Bank of America, however, did not inform the Sundquists or their bankruptcy attorney that rescission was in process.[32]

Although Bank of America knew on August 20, 2010, and beyond cavil by September 7, 2010, that the foreclosure would be

---

[31]Bank of America computer record:

"DT-09072010   Received response from Paredes, Beatrice F @ Recontrust that rescission process started and will advise once the rescission has been sent to record."

B of A Ex. GG.

[32]Sundquist Ex. 96, p. 2.  Bank of America internal inquiry: "Recon Trust confirmed the following.  We don't [sic] send anything directly to the borrower.  We send the document to title and they send them to the county for recording.  This confirms that Recon Trust is no [sic] required to inform the borrower of the rescission."

17

rescinded, it did not withdraw the unlawful detainer action or
tell the Sundquists the action would be dismissed.  The state-
court docket of the action reflects zero activity between August
12, 2010, and February 7, 2011, when counsel for Bank of America
filed a voluntary dismissal without prejudice.[33]

The Sundquists, having given up and moved, assumed that the
nightmare was over, that they were finished with their now-former
residence, that they could forget (but not forgive) Bank of
America's loan modification run-around, and that they were moving
on to a new life.  Hence, they directed that their chapter 13
case be voluntarily dismissed because its primary object of
saving their house had come to naught.

The chapter 13 case was dismissed on September 20, 2010, at
which time the § 362 automatic stay expired as a matter of law
pursuant to 11 U.S.C. § 362(c)(2).

The Sundquists had no reason to suspect that they would
secretly be placed back in title on their residence as of
December 30, 2010, and that the Bank of America loan modification
process would again rear its head.  As noted, the Notice of
Rescission of Trustee's Deed Upon Sale pursuant to Civil Code
Section 1058.5 was recorded December 30, 2010.[34]

---

[33]Bank of America's Request for Judicial Notice of Filed
Documents, Ex. C.

[34]Recital No. 5 on the Notice of Rescission includes the
following self-serving and disingenuous explanation:

"5.) THAT THE TRUSTEE has been informed by the Beneficiary that
the Beneficiary desires to rescind the Trustee's Deed recorded
upon the foreclosure sale which was conducted in error due to a
failure to communicate timely, notice of conditions which would
have warranted a cancellation of the foreclosure sale which did

Neither the Sundquists nor their bankruptcy counsel were
informed of the rescission.  They had no inkling, and no reason
to suspect, that they were back in title on their residence as of
then.

On February 7, 2011, also without notice to the Sundquists,
Bank of America obtained dismissal without prejudice of its
unlawful detainer action.[35]

Nevertheless, on February 10, 2011, despite the rescission
of the trustee sale, Bank of America (BAC Field Services
Corporation) was on the premises removing the trees it had
allowed to die, removing personal property, and capping exposed
wires and gas and water lines.[36]

After the undisclosed rescission, Bank of America started
sending the Sundquists monthly mortgage statements and related
notices dunning them for defaults.  They were not only puzzled by
the statements, they were stimulated to seek counsel to work with
them to seek redress from Bank of America.

On March 21, 2011, Erik Sundquist discovered in the Placer
County records the rescission of the foreclosure sale deed, which

---

occur on 06/15/10;"

Notice of Rescission of Trustee's Deed Upon Sale pursuant to
Civil Code Section 1058.5 ¶ 5; Sundquist Ex.53.

This explanation is truthful only to the extent that the
"failure to communicate" was an internal failure of Bank of
America to communicate with itself.

[35]B of A Request for Judicial Notice of Filed Documents for
Trial, Exs. D-F.

[36]B of A Exs. AA & BB & CC.  Work order 45674424-2, ordered
02/04/2011 (Ex. AA-004), completed 02/10/11 (Ex. AA-006).
Exhibits include 12 photos dated 02/10/2011.

19

rescission had been recorded on December 30, 2010.

The Sundquists, in the presence of counsel, called Bank of America in early April 2011 and asked about the status of the property.  For the first time, Bank of America told the Sundquists that it had rescinded the foreclosure sale three months earlier.  Counsel asked if they could have the keys.  The keys were delivered to the Sundquists on April 5, 2011.[37]

When the Sundquists re-entered the premises, they discovered that major appliances (cooktop, oven, built-in refrigerator, washer, dryer), window coverings, and carpet had been removed. The front lawn and shrubbery were dead.  Verdera Homeowners Association (HOA) had made a $20,000.00 assessment on account of the dead landscaping.  Bank of America disclaimed responsibility.

Further, Bank of America demanded that the Sundquists pay all mortgage expenses and maintenance fees for the six-month period during which Bank of America was in title on the property.

Bank of America rebuffed the Sundquists' requests for compensation for the lost property and for adjustments to reflect Bank of America's ownership and the rental expenses incurred in consequence of the unlawful foreclosure and the unlawful detainer action in violation of the bankruptcy automatic stay.

One particularly vexing issue for the Sundquists related to the failure by Bank of America to have paid all the Homeowners

_____

[37]B of A Ex. YY & from the Renée Sundquist Journal: "April 2011 Our attorney called the bank and was told the house was in our names.  The keys to the house back."

Renée Sundquist Decl. ¶¶ 192-201.  The court believes, and so finds as fact, this testimony.

Association Fees during the period that it was in title to the property.  The bank made one payment to the HOA for $562.50 and, contemporaneous with its decision to rescind the sale, ceased making HOA payments.[38]  In addition, the bank let the front yard landscaping die, which triggered a $20,000.00 assessment by the HOA that the Sundquists say is Bank of America's problem.[39]

Nor did Bank of America inform the HOA that it was rescinding the trustee's sale and restoring the Sundquists to title.  In April 2011, the HOA was still sending monthly bills to BAC Home Loans Servicing.[40]

The HOA issue has festered ever since, with the incidental consequence that the HOA, which consists of individual neighbors in the community, is angry at the Sundquists.  The landscaping is dead.  The Sundquists question the $20,000.00 as an unwarranted penalty and contend that, if owed, Bank of America should pay.[41]

The Sundquists have insisted that Bank of America should

---

[38]Sundquist Exs. 76 & 81 & 89.  Internal Bank of America payment request dated 9/17/2010 to pay $562.50 HOA invoice dated 8/11/2010.

[39]Sundquist Ex. 89.  Bank of America Servicing Activities History entry dated 11/19/2010: "Received correspondence from Verdera community assoc regarding Bal due $20498.50 dated Oct 19, 2010."

[40]On April 22, 2011, Bank of America received a $22,633.50 HOA bill for assessments for April and May 2011 ($235.00/mo) plus late fee ($15.50) plus balance carried forward ($22,168.00).  Sundquist Ex. 29.

[41]The Sundquists' state of mind is revealed by the following from Renée Sundquist: "[HOA] told our neighbors the dollar amount we owed, and that we were embarrassing in a board meeting! My neighbor emailed me to let me know they were planning an ambush had we attended the meeting/hearing.  It is in dispute exactly what maintenance is done on a dead lawn? And, all the dead scrubs and trees."  Sundquist Ex. 100, p. 8.

hold them harmless and compensate for the losses directly
attributable to the period that the bank was in title and for the
three months after December 30, 2010, during which Bank of
America failed to disclose rescission of the foreclosure sale.

They have been asking, and still are asking, what the
correct payoff amount of the loan is after the adjustments that
they believe are appropriate.  This court believes their
testimony (and finds as fact) that they still intend to pay their
mortgage debt once the legitimate amount is determined.

In June 2011, at loggerheads with Bank of America over the
correct loan balance, the Sundquists filed a lawsuit in a
California superior court naming as defendants the original loan
broker, his loan brokerage, the original lender, its loan
officer, Bank of America, ReconTrust (foreclosure agent for Bank
of America), and BAC Home Loans Servicing, LP ("BAC").  As
against the Bank of America entities, the complaint alleged
causes of action for deceit, breach of fiduciary duty, aiding and
abetting breach of fiduciary duty, negligence, assumed liability,
civil conspiracy, promissory estoppel, wrongful foreclosure, and
unfair competition in violation of California Business and
Professions Code § 17200.[42]

In November 2011, the state trial court dismissed the action
as to all counts on the motion of Bank of America (acting for
itself, ReconTrust, and BAC) on the theory that the complaint did
not state any cause.  The Sundquists appealed.

While the state-court appeal was pending, the Sundquists

[42]Sundquist v. Bank of America, N.A., Memorandum Opinion,
No. C070291 (Cal. App. 3d Dist. 9/5/13) at p. 5.

ended their tenancy in the leasehold premises and re-occupied their residence in January 2012. They did so because their leasehold was expiring and their attorney advised them that they should mitigate damages by not incurring unnecessary rent.

Returning to the house was a difficult experience for Mrs. Sundquist.[43] The personal items that she came across after returning triggered even more trauma.[44]

_____

[43]From the Renée Sundquist Journal:

"January 2012 the attorney told us to move back into the home since our lease is ending soon. I can't even imagine returning to that house with all the pain I suffered. I took medicine just to get to our driveway in Lincoln. Erik helped me walk in the front door. I couldn't even look at the yard it is al[l] dead. The front door is ruined. The antique door knocker was still hanging on the door. We had to move so fast. They damaged the door and the locks when they changed the locks. I just started shaking. Next it turned into anger when I saw that our appliances, window coverings carpet [are missing] that is after walking past everything dead in our front yard. All that sadness came flooding back all that pain of leaving, losing, sickness and pain. I am stuck and my life will never be the same. My head hurts so bad, I am so sick."

Renée Sundquist Decl. ¶¶ 269-83. The court believes, and so finds as fact, the events and reactions related in this testimony.

[44]From the Renée Sundquist Journal:

"[On finding personal items that had been left behind when they moved in September 2010] Sometimes it is like I am living outside my body, I can't pull it together to be a wife or mother or daughter! How can I let a bank steal my life? I am too smart for this. I am crying so hard right now, I keep trying to convince myself it was just material things I left, but it wasn't really, it was a card from my dying mother and it could never be replaced had I not found it again. And, even more startling, I didn't miss it because I am so messed up over this horrid bank crap. That is horrible how side tracked I am all the time! I also found my childhood stuff animal boogsie, that stuff animal was with me when I won the Italian National Championships and earned a spot on the World Team. I didn't miss that either? [Son's] entire top shelve of his closet was filled with his

1    The return to the house led to frustrating discussions with

2  Bank of America, which refused to take responsibility for the

3  damage and missing property.  The Sundquists wanted the missing

4  property restored, including appliances, and a determination of

5  what the correct adjusted amount of the mortgage should be after

6  adjusting for all the stay violation damages.  And, Bank of

7  America still was threatening foreclosure.

8    Bank of America's hard-line stance in February 2012 denying

9  responsibility for damages resulting from its stay violations

10  came at a particularly fragile moment in Mrs. Sundquist's life.

11  Her mother lay dying.[45]

12  _____

13  stuff, I didn't notice that either.  I actually though I checked
   the house when we left, guess not well enough!  OMG ... I won't
14  sleep tonight."

15  B of A Ex. RRR; accord, Renée Sundquist Decl. ¶¶ 292-97.

16    [45]From the Renée Sundquist Journal:

17    "[February 2012] I hate that any second of my life is spent
   thinking about a lawsuit or the bank right now when my Mother is
18  dying!  What a horrid waste of time.  The fact that one second is
   spent worrying about the bank horridness and unethical behavior
19  is not why I am on earth.  My Mom is so certain I need to fight
   the bank, but, what if I can't.  Bad, bad, bad, day!  More stupid
20  letters that make no sense from the bank of holy hell.  Like does
   anyone read in that bank office?  More importantly, do they hire
21  anyone that can read?"

22    "Today I spent the day watching my Mom labor every breath, I
23  can barely write tonight.  Some b/a jerk CEO representative tells
   me I need to list the items stolen from my home.  I am thinking
24  why waste the time, your office loses EVERYTHING.  Like isn't 3
   years of paperwork enough for you all.  I hate the bank.  I know
25  I am going to look back and regret being side tracked by the bank
   while my Mom is dying.  Who am I kidding, I am already regretful
26  about today!  God help me.  Please don't let my Mom go.  I need
27  her..."

28    "Today I hit an all-time low with b/a because I typed a
   letter at my Mom's hospital bed on my ipad listing all the items

24

At trial, counsel for Bank of America asked Mrs. Sundquist why, if this was so upsetting, did she not just walk away and let the house be foreclosed. She stammered incoherent. Her real answer lies in Bank of America's Exhibit RRR-001 – it was her mother's dying wish that she not give in to Bank of America.[46]

For a brief moment after their return, there was a glimmer that the bank was willing to pay for the stolen items. But that

---

taken from our house after we moved out. She actually had a moment of clarity, and got really mad when she figured out what I was doing. I started to cry so hard, even when she is dying I can't hide anything from her. I hope I can be as great as her someday. She touched my face, and said she was going to miss me. OMG! I wonder why my mom is dying and the bank goes on! I need my Mom, I can't do this without her. She was clear to say she didn't want me to lose my inheritance that went into the house. Ugh! This is what we are going to think about during her last days? NO, it can't beeeeeeeeeeeee!!!"

"The wors[t] day of my life, I watch for hours my Mom barely breathing. I can barely write, or breathe myself, she is dead. I will never get back all the hours, days, years I have spent fighting this f'ing bank, all the time wasted where I couldn't even think straight to not waste time with my Mom. No one cares. No one cares. I promised her I wouldn't quit fighting the bank, I might not make it! She was so strong always, and it is so very dark now. My life will never be the same. How does one journal their Mother has died. I feel so sick. Please God take care of my mother, let her fly free and have no more pain. Speechless gratitude for her, she was the bone of my spine, keeping me straight and true. My Mother is irreplaceable."

B of A Exs. RRR & SSS; accord, Renée Sundquist Decl. ¶¶ 301-05.

[46]From the Renée Sundquist Journal:

"[Late January 2012] My Mom so very sick, wish she was well enough to talk, I miss and need her so much. She had very few words today, but did make it a point to remind me to never give up on the lawsuit because the 'the bank was wrong'. This was one of her last coherent thoughts.

B of A Ex. RRR-001; accord Renée Sundquist Decl. ¶ 299.

was too good to be true.  The offer was quickly withdrawn.[47]

The reality is that Bank of America did not intend to
negotiate with the Sundquists in good faith.  The evidence
includes an internal Bank of America document in which it
concedes that its loan modification process dating back to before
the filing of their chapter 13 case had been a charade in which
Bank of America sent loan modification request packages to the
Sundquists intending to deny them when submitted.[48]

---

[47]From the Renée Sundquist Journal:

"Not even a day has passed since my Mom died, and more
stupid letters from the bank.  I ripped the asinine letter up in
so many pieces today, it stated that the bank would pay for my
lost house items.  Like that will ever happen!  Better chance of
my Mom coming back!  I had this amazing thought today, my Mom is
somewhere where she doesn't have to worry about our family and
what the bank is doing any longer.  That makes me quiet.  Some
b/a CEO, managers, and representatives are going home tonight,
overlooking their dishonesty when they look in the mirror,
clearly, they didn't have a great mother like mine to teach them
right from wrong.  The dishonesty makes me crazy, but I WIN,
cause I don't lie like the bank of holy hell!  The world is
upside down.  I am trying to plan a funeral, I mean really?  Go
to hell b/a!."

"A call today from the bank's CEO office, they are
retracting their offer for our lost items, they told us to 'file
an insurance claim and to replace our own yard'.  In years past I
would have tried to reason, today I just write another letter and
hope they rot in hell.  I hate them.  If I could I would spit on
them.  I hate them.  I am not a daughter, I am not a wife, I am
not a mother, and I am invisible with pain, pain, pain!  A house,
not really, it is so much more, it is our lives they took!  Rot
in hell, rot in hell, rot in hell.  And ... who ever stole my
window coverings can rot in hell too!"

B of A Ex. SSS; accord, Renée Sundquist Decl. ¶¶ 306-10.

[48]On June 13, 2012, Bank of America made the following two
entries in its "HomeSaver - Workout Notes":

"Note ID: 87
Reasearch[sic]- customer filed bk 6/14/2010, fcl sale date

26

In September 2013, the California Third District Court of Appeal ruled in favor of the Sundquists, holding that their complaint stated claims against Bank of America for deceit, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, assumed liability, promissory estoppel, and unfair competition (but not negligence and conspiracy).[49]

As to the claim for wrongful foreclosure, however, the appellate court invoked what is known in federal practice as "conflict preemption."[50]  It ruled that Bankruptcy Code § 362(k)(1) preempts state-law wrongful foreclosure claims that are based solely on violation of the automatic stay, which it

---

was 6/15/2010 we didnt [sic] get the bky till 6/16/2010 and foreclosed on the home.  It was recinded [sic] and the bky was dismissed 9/25/2010. [C]ustomer is stating that we illegally foreclosed on the home. [T]he customer says that the amount that is due is incorrect. [A]nd state they have a lawsuit in process with litegations [sic]. [T]hey want to try a modification but the loan is fha and becuase [sic] its over 12 months due no mha is available."

    "Note ID: 88
    11/2009 declined mod Surplus income will not support a repayment plan and a mod will not get approved becuase [sic] the amount has gotten larger with no payment and will agin [sic] be declined but we are more than happy to resubmit but it will be declined."

Sundquist Ex. 73 (emphasis supplied).

    [49]Sundquist v. Bank of America, N.A., Memorandum Opinion, No. C070291 (Cal. App. 3d Dist. 9/5/13); the Ninth Circuit has likewise held that a loan modification charade can yield a viable cause of action under California's unfair competition statute. CAL. BUS. & PROF. CODE § 17200; Oskoui v. J.P. Morgan Chase Bank, N.A., ___ F.3d ___, ___ (9th Cir. 2017), 2017 Westlaw 957206, slip op. at 10-13.

    [50]Conflict preemption was applied in connection with a § 362 stay violation and a California tax foreclosure sale.  40235 Washington St. Corp. v. Lusardi (In re 40235 Washington St. Corp.), 329 F.3d 1076, 1083-86 (9th Cir. 2003).

deemed to be a matter of exclusive federal jurisdiction.  Hence, the state court sent the Sundquists to federal court for relief on that count.

Accordingly, the Sundquists filed this § 362(k)(1) proceeding as a civil action in the United States District Court, which referred the matter to this bankruptcy court.

The Sundquists continued to attempt to negotiate and reason with Bank of America, even while the litigation was pending. They complained to the Office of the Comptroller of the Currency (OCC), which declined to intervene.  And they complained to the federal Consumer Financial Protection Bureau (CFPB).

The Bank of America response to CFPB is noteworthy for two false statements made by the Office of the Bank of America CEO and President.  It falsely asserts that there was no foreclosure of the Sundquist residence.[51]  And, it falsely asserts that the

---

[51]Bank of America's CEO's office wrote in response to the Consumer Financial Protection Bureau inquiry:

"According to our records, on June 14, 2010, the borrower filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court.  The account was flagged for bankruptcy and any foreclosure proceedings were placed on hold."

Bank of America Office of the CEO and President, Executive Customer Relations, ltr to CFPB in CFPB case no. 130304-000049 (Erik and Renée Sundquist), May 23, 2013.  Sundquist Ex. 84.

It is beyond cavil that Bank of America's statement to CFPB that the "account was flagged for bankruptcy and any foreclosure proceedings were placed on hold" was false.  There was an actual foreclosure on June 15, 2010, which violated the automatic sale and was, as a matter of law, void ab initio.  This litigation is about that foreclosure and everything else thereafter that was not placed on hold.

28

Sundquists are not in active litigation with Bank of America.[52]
Both statements were materially false.[53]

Throughout the dispute between the Sundquists and Bank of America, interest has been continuing to accrue on the $584,893.97 principal balance at the contract rate of 6 percent, or $35,093.64 per year ($96.15 per day).

The Sundquists entered their ordeal with Bank of America as physically strong people. Throughout the chapter 13 phase of the ordeal, a significant emotional and physical toll debilitated them. They had been elite athletes. He had been a member of a NCAA National Championship Soccer Team. She was an ice skater on Italy's Olympic team and was teaching ice skating. He emerged from the ordeal restricted to exercising only on an elliptical trainer and had attempted suicide. She was hospitalized with

_____

[52]Bank of America's CEO's office wrote:

"Additional research shows that the borrower's [sic] are not in active litigation therefore we cannot supply you with the requested documents from the courts."

Bank of America Office of the CEO and President, Executive Customer Relations, ltr to CFPB in CFPB case no. 130304-000049 (Erik and Renée Sundquist), May 23, 2013. Sundquist Ex. 84.

At the time that Bank of America made that statement to CFPB on May 23, 2013, there was pending in the Court of Appeal of the State of California, Third Appellate District, case no. C070291, Sundquist v. Bank of America, N.A., which was not decided until September 5, 2013. There were numerous court documents that could have been supplied to CFPB.

[53]Cf. 18 U.S.C. § 1001; Hubbard v. United States, 514 U.S. 695, 699-708 (1995) (history of false statement statute explained). The maximum fine for a corporate violator of 18 U.S.C. § 1001 is $500,000.00. 18 U.S.C. § 3571(c)(3). Regardless of how prosecutors may exercise their discretion, Bank of America's false statements to CFPB regarding the Sundquists are probative of its bad faith regarding the Sundquists.

heart attack symptoms that were found to be stress-related, has been diagnosed with post-traumatic stress disorder, and was left with near-daily debilitating migraine headaches that persist into the present and that constrain her ability to engage in a wide range of activities.

Throughout, the conduct of Bank of America has been intentional.

Further findings of fact are stated in the ensuing analysis of the violations of the automatic stay.

## Jurisdiction

Federal subject-matter jurisdiction is founded on 28 U.S.C. § 1334. Enforcement of the automatic stay arises under Bankruptcy Code § 362 and is a core proceeding that may be heard and determined by a bankruptcy judge. 28 U.S.C. § 157(b)(1)(G).[54]

---

[54]There is also federal subject-matter jurisdiction by way of 28 U.S.C. § 1367 over the state-law causes of action (deceit, promissory estoppel, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, assumed liability of mortgage brokers, unfair competition, and negligence) as to which the California Third District Court of Appeal ruled that the Sundquists had stated claims and remanded to the trial court. The state-court action was dismissed without prejudice. Such causes of action, if they were to be alleged in this federal civil action in an amended complaint (which could happen if this litigation were to become prolonged as a result of being vacated or reversed on appeal) would constitute non-core proceedings that would be subject to 28 U.S.C. § 157(c) and potentially subject to trial by jury. The state appellate decision may be viewed as law of the case as to whether state-law claims have been stated. If this court's § 362(k)(1) judgment were to be vacated on appeal as to remedy, there would not be a final judgment eligible to trigger claim preclusion, and it could be argued that this action is amenable to amendment of pleadings to assert those other causes of action.

1   Jurisdiction over automatic stay violation remedies survives
2   dismissal or closing of the case.  Carraher v. Morgan Elecs.,
3   Inc. (In re Carraher), 971 F.2d 327, 328 (9th Cir. 1992); Davis
4   v. Carrington (In re Davis), 177 B.R. 907, 911-12 (9th Cir. BAP
5   1995).  Hence, the bankruptcy case has not been reopened.

6      To the extent that this proceeding may ever be determined to
7   be a matter that cannot be heard and determined of right by a
8   bankruptcy judge, the parties are nevertheless agreed that it may
9   be heard and determined by a bankruptcy judge.  28 U.S.C.
10  § 158(c)(2).

11
12                            Discussion
13     First, the law.  Then, application of the facts to the law.
14  The Second Amended Complaint alleges two counts: automatic stay
15  violation on account of foreclosure and automatic stay violation
16  on account of unlawful detainer action.

17
18                                I
19     The legal effect of an act in violation of the automatic
20  stay is well-understood in this circuit.

21
22                                A
23     The fundamental rule is that any act done in violation of
24  the automatic stay is void from the outset, not merely voidable.
25  Schwartz v. United States (In re Schwartz), 954 F.2d 569, 570-72
26  (9th Cir. 1992).

27     The court's statutory power to annul the automatic stay
28  under § 362(d) does not make a stay violation merely voidable.

                                31

Schwartz, 954 F.2d at 572-73.   Rather, the offending act is void from the outset for all purposes unless and until annulled.   Id.

Subsequent dismissal of the case does not vitiate a stay violation.   40235 Washington St. Corp., 329 F.3d at 1080 n.2 (tax sale in violation of automatic stay remains void despite subsequent dismissal of chapter 11 case as bad faith filing).

Nor is § 549(c) an exception to the rule that the act in violation of the stay is void ab initio.   40235 Washington St. Corp. 329 F.3d at 1080.

The automatic stay arose with the filing of the Sundquist chapter 13 case on June 14, 2010.   The conclusion is inescapable that, under Schwartz and 40235 Washington St. Corp., the foreclosure by Bank of America on June 15, 2010, violated the automatic stay and was void ab initio.

B

Cognizable effects of a violation of the automatic stay may linger after the formal expiration of the stay.   For example, the stay with respect to an individual debtor expires upon entry of discharge or dismissal of the case.   11 U.S.C. § 362(c)(2).

Nevertheless, consequences directly attributable to the violation of the stay before its expiration may continue to be visited upon a debtor for an additional period of time.   Snowden v. Check Into Cash of Wash., Inc. (In re Snowden), 769 F.3d 651, 659 & 662 (9th Cir. 2014).

Hence, liability for a stay violation continues at least until full restitution is actually made or, if after the expiration of the stay, the court orders full restitution.

Snowden, 769 F.3d at 659 & 662 (ambiguous settlement offer does not terminate accrual of liability for stay violation).

II

The consequences for violating the automatic stay are, first, contempt, and, second, statutory damages for individuals injured by any willful violation of the automatic stay.  Havelock v. Taxel (In re Pace), 67 F.3d 187, 191-94 (9th Cir. 1995).

General civil contempt remedies are available to all victims of stay violations, individuals and non-individuals alike.  Pace, 67 F.3d at 193-94.

Concurrent with the restructuring of bankruptcy courts in 1984 to resolve Constitutional issues,[55] Congress supplemented the automatic stay provision by adding a new subsection § 362(h) providing that any individual victim of a willful stay violation may recover actual damages, including costs and attorneys' fees, as well as punitive damages:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1), first enacted as § 362, Pub. L. 98-353, § 304, 98 Stat. 333 (July 10, 1984); Pace, 67 F.3d at 191-92.

This case primarily implicates the § 362(k)(1) damages remedy and its boundaries.

---

[55]Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87-89 (1982).

A

A settled body of the law of this circuit covers the key elements of the § 362(k)(1) (formerly § 362(h)) damages remedy.

1

A "willful violation" does not require specific intent to violate the automatic stay. Rather, the "willfulness" question is whether Bank of America knew of the automatic stay and whether actions in violation of the stay were intentional actions. <u>Pace</u>, 67 F.3d at 191; <u>Goichman v. Bloom (In re Bloom)</u>, 875 F.2d 224, 227 (9th Cir. 1989).

Willfulness is a question of fact, reviewed for clear error. <u>Eskanos & Adler, P.C. v. Leetien (In re Leetien)</u>, 309 F.3d 1210, 1213 (9th Cir. 2002).

2

A good faith belief that an actor has a right to the disputed property is (with an exception not pertinent here[56]) not relevant to whether an act offending the stay is "willful" or whether compensation should be awarded. <u>Bloom</u>, 875 F.2d at 227; 11 U.S.C. § 362(k).

---

[56]The exception is for a good faith belief that the stay has terminated with respect to personal property because the debtor has not timely redeemed such personal property from a lien, reaffirmed such personal property debt, or assumed an unexpired personal property lease. 11 U.S.C. § 362(h), Pub. L. 109-8, § 305, 119 Stat. 41 (April 20, 2005). This case does not involve personal property debt.

B

Actual damages under § 362(k)(1) include both physical damages and economic damages. <u>Dawson v. Washington Mut. Bank, F.A. (In re Dawson)</u>, 390 F.3d 1139, 1149 (9th Cir. 2004).

There are numerous examples of items of damages that have been awarded on account of automatic stay violations. <u>See generally</u>, Remedies and Damages for Violation of the Automatic Stay Provisions of the Bankruptcy Code by Parties Other Than the Federal Government, 153 ALR Fed. 463 (1999 & 2016 Supp.).

Readily ascertainable damages items commonly include value of personal property lost, payment improperly taken, cost of towing, cost of replacement vehicle, lost wages, lost vacation, travel expenses, value of inventory and fixtures sold, alternative transportation expense, alternative housing expense, value of items stolen while dispossessed, mileage to and from attorney's office, and state-court litigation expenses. <u>Id</u>.

More speculative damages have included lost business, loss of promotion in business workplace, and loss of business opportunity. <u>Id</u>.

Emotional distress damages are also commonly the subject of awards of actual damages. <u>E.g.</u>, <u>Dawson</u>, 390 F.3d at 1146.

The common element in actual damages awards appears to be the "but for" analysis familiar in tort law. If a consequence would not have occurred "but for" the automatic stay violations, then courts make awards based on that consequence.

C

Damages for emotional distress are available as actual

35

damages under § 362(k)(1), regardless of whether there are financial damages.  _Dawson_, 390 F.3d at 1149.

Three elements are required for emotional distress damages: (1) significant harm; (2) clearly established; and (3) with a causal connection between the stay violation and the harm (as distinct from anxiety and pressures inherent in the bankruptcy process).  _Snowden_, 769 F.3d at 656-57; _Dawson_, 390 F.3d at 1149.

Evidence probative of the elements of emotional distress damages may come from a wide variety of sources assessed on a case-by-case basis, limited only by the genius of counsel and the Federal Rules of Evidence.

There is the testimony of the individual victims.  Medical evidence may be helpful.  In addition to experts, family members, friends, or coworkers may testify to manifestations of mental anguish consistent with significant emotional harm.  Egregious conduct (such as a gun held to one's head) that logically triggers mental anguish may speak for itself.  Or, less-than-egregious circumstances may nevertheless make it obvious that a reasonable person would suffer significant emotional harm.  _Dawson_, 390 F.3d at 1149-50.

In the end, it all adds up to a question of proof for the trier of fact.  If the court, in its capacity as trier of fact, is persuaded that significant harm has been clearly established and that there is a causal connection between the stay violation and the harm, then § 362(k)(1) damages are appropriately awarded.

D

Attorneys' fees and costs are a mandatory component of the

36

§ 362(k)(1) remedy and encompass fees reasonably incurred in prosecuting a damages action for automatic stay violation and defending it on appeal. America's Servicing Co. v. Schwartz-Tallard (In re Schwartz-Tallard), 803 F.3d 1095, 1099-1101 (9th Cir. 2015) (en banc), overruling Sternberg v. Johnson (In re Johnson), 595 F.3d 937 (9th Cir. 2010).

The limiting principle is a rule of reason: the court has discretion to reject fees and costs not reasonably incurred. Schwartz-Tallard, 803 F.3d at 1101.

E

"Appropriate circumstances" for a punitive damages award, also assessed on a case-by-case basis, entail "some showing of reckless or callous disregard for the law or the rights of others." Bloom, 875 F.2d at 228.

This "reckless-or-callous-disregard" standard may be established by proof of conduct that is malicious, wanton, or oppressive. Snowden, 769 F.3d at 657.

Since the "reckless-or-callous-disregard" standard is a lesser degree of conduct than actual bad faith, it follows that proof of Bloom actual "bad faith" conduct suffices as "appropriate circumstances" for § 362(k)(1) punitive damages.

An award of punitive damages is a matter of discretion reviewed for abuse of discretion. Snowden, 769 F.3d at 657.

III

Other general considerations applicable in this case are also noted.

A

As the Ninth Circuit explained in _Dawson_, the choice of Congress to limit the § 362(k)(1) damages remedy to individuals signals a special interest in "redressing harms that are unique to human beings." _Dawson_, 390 F.3d at 1146.

Harms that are unique to human beings are normally the subject of tort law. There is a rich body of primarily state common law regarding tort damages. But those common law principles merely inform the analysis of § 362(k)(1) damages, which are a creation of federal statute and, hence, a matter of federal law.

Where, as here, damages are a question of federal law and there is not controlling formal precedent as to fine points, federal courts commonly find influential the tort damages principles articulated in the American Law Institute's _Restatements of Torts_.

Thus, for example, the Supreme Court in addressing the question of punitive damages in the context of 42 U.S.C. § 1983 looked to the _Restatement (Second) of Torts_ and to Professor Prosser's treatise on torts to note that punitive damages are intended to punish the wrongdoer for intentional or malicious acts and to deter that wrongdoer and others from similar extreme conduct. _Newport v. Fact Concerts, Inc._, 453 U.S. 247, 266-67 (1981), _citing_ RESTATEMENT (SECOND) OF TORTS § 908 (1979) and W. PROSSER, LAW OF TORTS 9-10 (4th ed. 1971).

Accordingly, it is appropriate in this case to construe _Dawson_ and its progeny through the matrix of the Restatements and to apply tort damages principles.

38

B

Emotional harm refers to impairment or injury to a person's emotional tranquility.   RESTATEMENT (THIRD) OF TORTS: PHYSICAL & EMOTIONAL HARM § 45 (2012).

Emotional harm covers a variety of mental states, including fright, fear, sadness, sorrow, despondency, anxiety, humiliation, and depression.   Id. cmt a.   As will be seen, the evidence in this case clearly establishes all seven of those mental states in each of the plaintiffs.

Emotional harm that produces bodily harm may lead to compensable physical injury.   Id. cmt b.   Bodily harm resulting from emotional harm is implicated in this case.

C

One of the risks that a willful stay violator assumes is that an individual victim will be abnormally vulnerable to emotional distress and to abnormal consequences.

The tort-like nature of damages provided by Congress for injured individuals under § 362(k)(1) means that the so-called "thin-skull" or "eggshell plaintiff" rule applies.   That rule means that the willful stay violator takes the victim as found.

This concept is in the mainstream of the law of torts. Formally stated, when an actor's conduct causes harm to a person that, because of a preexisting physical or mental condition or other characteristics of the person, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the person.   RESTATEMENT (THIRD) OF TORTS: PHYSICAL AND EMOTIONAL HARM § 31.

Here, the stay violations were visited upon individuals who had already endured eighteen months of trying to deal with Bank of America in an effort to obtain a mortgage modification. Throughout that period, Bank of America was playing, in bad faith, a "dual tracking" game of talking loan modification while actually moving towards foreclosure. That process was so trying that it produced in the Sundquists a state of battle-fatigued demoralization.

The battle fatigue existing at the time of the stay violation is relevant to assessing the magnitude of the emotional distress inflicted by Bank of America after the stay violations occurred. While the cause of the Sundquists' preexisting conditions are not relevant, there is irony and justice inherent in the fact that Bank of America itself caused those fragile states of mind that did not respond well to the bank's stay violations.

D

The nature of the evidence adduced at the trial of this adversary proceeding is worthy of separate comment.

Although there are medical aspects to the plaintiffs' case regarding their physical and mental condition as to which one ordinarily would expect corroborating expert medical opinion testimony and evidence of medical bills, such corroborating medical evidence was not provided.

Instead, the plaintiffs' case consisted of their testimony in open court corroborated by a 494-paragraph declaration by Renée Sundquist that recited the contents of a journal that she

maintained in which she articulated deeply personal thoughts,[57]
introspections, and embarrassing facts, as they were occurring.[58]

The medical aspects are but one example of thin evidence regarding damages.  Another example of sparse evidence relates to lost business.

While experienced litigation lawyers would regard the incomplete evidentiary presentation as risky, <u>Dawson</u> unambiguously permits proof of significant harm to be established by testimony alone and by reference to egregious conduct. <u>Dawson</u>, 390 F.3d at 1149-50.  In such circumstances, everything turns on the degree to which the trier of fact is persuaded by the evidence that is presented.

Here, the court, in its capacity as trier of fact, found Renée Sundquist to be an exceptionally credible witness.  She displayed considerable courage in revealing her very private

---

[57]If this case ultimately needs to be re-tried following an appeal, the evidentiary presentation regarding damages likely would be more thorough.

[58]The 494-paragraph Renée Sundquist Declaration, which the court has in its discretion made part of the record, is presented in a more complete and readable form in Defendant's exhibits OOO-VVV, because it is in the format in which it was originally written on a computer.  Before oral argument commenced, the court noted that those exhibits had not been admitted and proposed admitting them and offered Bank of America an opportunity to cross examine her further.  Bank of America's counsel agreed to their admission and declined the court's offer of further examination.  They were admitted.  An hour later, after hearing the plaintiffs' closing argument, Bank of America changed its mind and attempted to renege on admitting its exhibits, saying that they had only been intended as rebuttal exhibits and that no rebuttal was needed.  Too late; the exhibits remain part of the evidentiary record.  In any event, any error in this respect is likely to be harmless as the subject exhibits do not contradict the less-readable extracts in the 494-paragraph Renée Sundquist Declaration, which the court has elected to admit in evidence.

journal and exposing herself to cross-examination and public
exposure of her all-too-human traits.  The journal, which squares
with other objectively ascertainable facts in a manner that
confirms its veracity, corroborates her testimony in a manner
that permits one to follow her state of physical and emotional
distress as the relevant events transpired.[59]  The court believed
her testimony.

Likewise, the court believed the testimony of Erik Sundquist
regarding his physical and mental state.

Bank of America did not, with the exception of testimony
about the term and rate of the lease executed when they moved,
call into question the credibility of the Sundquists' testimony
and did not present evidence to counter their testimony.

In short, although the evidence is lacking in specifics as
to such special damages as medical bills and legal bills, the
evidence is adequate to enable resolution of the overall stay
violation dispute, albeit that some components of actual damages
will be less than what might have been proved with more precise
evidence.


E

Why on Earth would Bank of America be so passive aggressive
with the Sundquists and so reluctant to reach closure with them?

First, a finance professional would point out that the 6
percent contract interest rate on the note that keeps accruing at

---

[59]At this time [January 2010], I began Journaling as a way
to deal with the insanity of the communications with Bank of
America.  Renée Sundquist Decl. ¶ 22.

an annual pace of $35,093.64 on the $584,893.97 principal balance is higher than what would result if the note were to be paid in full and the funds lent to another borrower.

Second, the collateral is in a premium location in a gated community and is likely to be sufficient to cover the full debt indefinitely.  When Bank of America foreclosed in 2010, it bid the full amount of the debt as if it believed the residence was worth at least $584,893.97; property values have since rebounded to a level that likely is greater than the debt.

Bank of America has little financial incentive to kill a goose that keeps laying 6 percent golden eggs when the federal funds rate is 0.39 percent[60] and the average mortgage rate is 3.45 percent for a 30-year fixed rate.[61]

## IV

The "willful violation" predicate for an award of actual damages under § 362(k)(1) has been satisfied.  This court is persuaded by the preponderance of evidence that Bank of America acted willfully in all of its actions, beginning June 15, 2010, and also is persuaded that all such actions were intentional.

## A

Every act by Bank of America taken after June 14, 2010, was

---

[60]Board of Governors of the Federal Reserve System (US), Effective Federal Funds Rate [FEDFUNDS], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/FEDFUNDS, August 17, 2016.

[61]Primary Mortgage Market Survey, U.S. Weekly Average, Aug. 11, 2016.   http://www.freddiemac.com/pmms/.

taken with notice of the chapter 13 case.  Bank of America
concedes that it received verbal notification of the case on June
14.  Its computer records reflect that on June 16 it coded the
loan as in bankruptcy as of June 14.  It even filed in the case a
Request for Service of Notice.  Dkt. # 14 (July 1, 2010).

Notice of the chapter 13 case filing equates with notice of
the automatic stay.  Leetien, 309 F.3d at 1215.

"Internal disorder" does not excuse noncompliance with the
automatic stay.  Leetien, 309 F.3d at 1215 (creditor blames its
process server).

Bank of America's explanation that it took 48-hours for it
to enter into its computer a code indicating that the Sundquists
had filed a bankruptcy case is unavailing and not persuasive.

The my-computer-made-me-do-it excuse is merely a form of the
sort of "internal disorder" that is no defense.  Assoc. Credit
Servs., Inc, v. Campion, 294 B.R. 313, 317 (9th Cir. BAP 2003).

A business organization that elects to use computers to
control acts that are in the line of fire of the automatic stay
is no less exposed to damages for "willful" stay violations than
entities that rely on real people to direct action.  In other
words, Bank of America is responsible for (1) the structure of
its software and procedures, (2) the accuracy and timeliness of
data entry and implementation, and (3) the efficiency and
accuracy of its personnel.

B

Nor is this an instance of a single willful stay violation.
The record teems with stay violation.  There was a string of more

44

1  than six willful stay violations over a period of more than two
2  months, each of which exacerbated its predecessors.   There comes
3  a point at which this case is reminiscent of Watergate: the
4  denial and cover-up becomes worse than the crime.

5

6                                    1

7       The first stay violation – the June 15, 2010, trustee's sale
8  the day after the June 14 chapter 13 bankruptcy case filing –
9  might, if promptly and voluntarily reversed as a mere oversight
10  or mistake, have yielded only negligible damages.   But that is
11  not what happened.

12       Everything that follows is the fruit of the poisoned
13  foreclosure.

14       On June 16, 2010, Bank of America ordered counsel to
15  initiate eviction proceedings in violation of the automatic stay.

16       On June 23, 2010, Bank of America's agent executed the
17  trustee's deed effectuating the June 15 foreclosure sale to
18  itself.

19       On June 25, 2010, Bank of America's agent recorded the
20  trustee's deed in the Placer County records.

21       On July 8, 2010, Bank of America caused a Notice to Quit the
22  premises to be sent to the Sundquists.

23       On July 23, 2010, Bank of America caused an unlawful
24  detainer action to be filed in Placer County Superior Court.

25       On or about August 19, 2010, Bank of America caused a three-
26  day Notice to Quit to be served at the premises.

27       These are six separate and distinct "willful" violations of
28  the automatic stay.   Each of these acts were intentional.

45

2

In addition, on multiple occasions throughout July, August, and September, Bank of America caused its agents to enter without permission the gated community in which the premises are located to trespass, surveil, and harass the Sundquists in a fashion that so thoroughly spooked them that they felt compelled to move.

In this respect, Bank of America crossed the line from passive "inspection" that does not ordinarily offend the automatic stay to active intimidation that does violate it.

The behavior of Bank of America's agents in overtly tailing the Sundquists' vehicle in a threatening manner and beating on a sliding door adjacent to a child who was practicing piano goes far beyond what is appropriate for the usual monthly "drive-by inspection" checks on properties in default.

Rather, Bank of America's agents were treating the Sundquists as criminals.  That conduct is consistent with Bank of America acting as if it were the owner of the residence as a result of the June 15, 2010, foreclosure and that the Sundquists were illegal squatters who deserved to be intimidated.

Bank of America's program of intimidation and unlawful detainer succeeded in driving the Sundquists out of the property. Having been surveilled, tailed, and harassed, they were frightened into a precipitous move in fear that the sheriff really was about to throw them onto the street.

In short, the court is persuaded that the actions by Bank of America during each of its "inspections" between the time the Sundquist chapter 13 case was filed on June 14, 2010, and the time it was dismissed on September 20, 2010, were intentional

acts in furtherance of the June 15, 2010, foreclosure that helped frighten the Sundquists into moving into a rented residence.

These "willful" violations of the automatic stay were intentional and are separate and distinct from the six violations previously identified.

Thus, the stay violations were "willful" within the meaning of § 362(k)(1) so as to be eligible for a damages award, which subdivides into actual damages and punitive damages.

3

As a matter of procedure, the pleadings are amended to conform to the evidence adduced at trial in accordance with Federal Rule of Civil Procedure 15(b)(2).

The Second Amended Complaint alleges only two counts of stay violation – the foreclosure in violation of the automatic stay and the filing of the unlawful detainer action in violation of the automatic stay.  But the evidence presented by both parties focused on the entire course of events that includes all of the other stay violations identified above.

While these other stay violations are arguably capable of being subsumed within the two counts in the Second Amended Complaint, the reality is that they are separate stay violations that deserve to be treated as such.

All of them were litigated by the parties in the context of the § 362(k)(1) stay violation remedy.  There was no objection to evidence of any of the stay violations.  Hence, it is fair to infer that they were tried by implied consent.  Fed. R. Civ. P. 15(b)(2), as incorporated by Fed. R. Bankr. P. 7015.

V

As noted above, actual damages include both physical damages and economic damages, all of which must be established by a preponderance of evidence persuasive to the trier of fact.

A

In light of the focus by Congress on damages to individuals, damages for individuals who are victims of automatic stay violations are assessed in accordance with tort damage principles, which primarily are addressed to injuries suffered by people.  Here, one is looking for the fruit of the poisoned foreclosure.  The useful shorthand is "but for" causation.

In the context of automatic stay violations, many of the harms compensable as actual damages are "economic" damages.

By "economic" damages this court applies the definition of "economic loss" adopted by the American Law Institute in its current project to revise the Restatement of Torts to address liability for economic harm: "'economic loss' is pecuniary damage not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property."  RESTATEMENT OF THE LAW (THIRD) TORTS: LIABILITY FOR ECONOMIC HARM, § 2 (Tentative Draft No. 1, approved 2012).

B

Actual economic damages for a wrongfully displaced victim of an automatic stay violation include alternative housing expense.

The Sundquists rented alternative housing for eighteen months at a net rental expense exceeding $4,000.00 before they

48

1   moved back into their home.

2       They testified that the term of the rental was hastily
3   arranged over the internet, that the net rental expense exceeded
4   $4,000.00,[62] that they agreed to stay for more than one year, and
5   that they ultimately returned to their home out of a sense of a
6   duty to mitigate damages.

7       Bank of America questions the accuracy of the testimony
8   regarding rent.  It unearthed a twelve-month lease for $3,900.00
9   per month.  The lease included extension provisions for
10  subsequent years with a 5 percent escalator (to $4,095.00).

11      The lease also required the Sundquists to maintain the pool
12  and garden and have a professional do the work and required them
13  to water garden, landscaping, trees, and shrubs.  It reflects
14  that the Sundquists also purchased a one-year home warranty.
15  These items easily account for the difference between the nominal
16  rent in the lease and the net rental expense asserted by the
17  Sundquists.

18      Hence, the court (finding the Sundquist testimony credible)
19  concludes that the net monthly rental expense was $4,000.00 for
20  the first year and $4,200.00 thereafter.

21      Bank of America questions the extent to which the Sundquists
22  mitigated damages.  It argues that the one-year initial term of
23  the lease means that they could have vacated the rental and moved
24  back into their home six months earlier than they did.

25      The duty to mitigate damages in the context of § 362(k)(1)

26

27          [62]Erik Sundquist testified the rent was $4,200.00; Renée
28  Sundquist testified the rent was $3,900.00 for the first year and
    $4,200.00 for the second year.

1  recognizes that it is not appropriate to exploit a stay-violation
2  liability situation merely to pocket a higher recovery.  Eskanos
3  & Adler v. Roman (In re Roman), 283 B.R. 1, 12 (9th Cir. BAP
4  2002); cf. Dawson, 390 F.3d at 1152 (stay violation attorney's
5  fees must be reasonable); Computer Commc'ns, Inc. v. Codex Corp.
6  (In re Computer Commc'ns, Inc.), 824 F.2d 725, 731 (9th Cir.
7  1987) (stay violation contempt damages must be reasonable).

8      The § 362(k)(1) mitigation obligation is a duty to act
9  reasonably under the circumstances.  Roman, 283 B.R. at 12.  The
10  court determines what is reasonable as a matter of discretion.
11  Dawson, 390 F.3d at 1145 & 1152; Roman, 283 B.R. at 7.  It
12  normally is not reasonable to exploit a stay violation primarily
13  as a profit-making opportunity.

14      The relevant circumstances here include the on-going threats
15  by Bank of America to foreclose, the unresolved arrearage with
16  the HOA and the $20,000 penalty that the HOA imposed for events
17  that occurred while Bank of America held title to the property,
18  and Bank of America's unwillingness to provide any relief for the
19  personal property stolen during its watch.  These problems
20  created a cloud of uncertainty about whether the Sundquists could
21  prudently return to the house.

22      This court is persuaded that not returning to the premises
23  until nine months after first learning that the foreclosure had
24  been rescinded was reasonable under the circumstances.  The duty
25  to mitigate § 362(k)(1) damages was not offended.

26      The calculation of the alternative housing component of
27  actual damages is straightforward.  The court finds as fact that
28  the actual monthly expense was $4,000.00 for the first twelve

months and $4,200.00 for the next six months.

Moving expenses incurred vacating the foreclosed property and later moving back in are a component of alternative housing expense. The Sundquists assert that moving expenses were $10,000.00. That sum is credible and was not questioned.

Hence, actual damages for alternative housing expense are $73,200.00 in rent, plus $10,000.00 in moving expenses, for a total of $83,200.00.

C

Section 362(k) designates attorneys' fees as an element of damages, rather than an item separate from damages.

Such fees are regarded as "mandatory." Schwartz-Tallard, 803 F.3d at 1099-1101; Snowden, 769 F.3d. at 657.

While there are a variety of ways to determine attorney's fees, the common denominator regarding fees in bankruptcy courts is that fees should not exceed the "reasonable" value of services rendered. See, e.g., 11 U.S.C. §§ 328(a), 329(b), 330(a)(1)(A), 502(b)(4), 503(b)(4) & 506(b) ("reasonable").

The "reasonable" value of services, of necessity, is determined on a case-by-case basis in light of the peculiar circumstances of each case, as modulated by the sound discretion of the bankruptcy court.

1

This case is atypical because there were successive state and federal actions. This invites inquiry into whether the multiple actions were necessary.

1    The key circumstance is Bank of America's institutional
2 obstinance and dishonesty (including lying to the CFPB regarding
3 the status of the state-court litigation) in refusing all
4 recompense after the Sundquists discovered that Bank of America
5 had secretly restored them to title after they moved and was
6 demanding that they pay for damages resulting from Bank of
7 America's incompetent stewardship of its illegally-acquired
8 property.

9    The Sundquists' general practice lawyer recognized that the
10 overall situation implicated several state-law causes of action
11 and elected to sue in state court on multiple theories, including
12 the automatic stay violation, on the theory that more
13 comprehensive relief would be available in the state forum.

14    Twenty-twenty hindsight reveals that the state appellate
15 court deemed the automatic stay violation theory to be a matter
16 of exclusive federal jurisdiction, which would have permitted
17 immediate resort to federal court.  But it is also significant
18 that other causes of action stated in the state-court action were
19 deemed meritorious.

20    The Sundquists would not have commenced that state-court
21 action "but for" the actions of Bank of America regarding the
22 automatic stay.  The evidence is that they did not consult the
23 counsel who filed the state-court lawsuit for them until after
24 Bank of America had secretly rescinded the foreclosure and
25 started sending them bills and notices of delinquency.  What
26 finally provoked them to sue was Bank of America's refusal to
27 make amends for the stolen appliances and window coverings and
28 for the HOA expenses after it had belatedly and secretly

1  rescinded its illegal foreclosure.

2      The assertion of the wrongful foreclosure action in state
3  court premised on Bank of America's violation of the automatic
4  stay was merely the first step in obtaining the § 362(k)(1)
5  remedy.  As such, the legal fees associated with that cause of
6  action qualify as § 362(k)(1) damages.

7      While reasonable legal professionals might disagree as to
8  the efficacy of the initial strategy, it was reasonable to pursue
9  state-law causes of action against Bank of America that
10  potentially encompassed damages greater that what might be
11  anticipated from a mere § 362(k) stay violation.

12      Hence, this court cannot say that the fees paid by the
13  Sundquists to state-court counsel for the state-court phase of
14  the litigation exceeded the reasonable value of services under
15  the circumstances.  In any event, Bank of America is in no
16  position to complain because its conduct necessitated the fees.

17

18                      2

19      Federal Rule of Bankruptcy Procedure 2016(b) implements 11
20  U.S.C. § 329 by requiring that every attorney for a debtor,
21  regardless of whether the attorney plans to apply for
22  compensation, must file a statement of compensation paid or
23  agreed to be paid in connection with a bankruptcy case.  11
24  U.S.C. § 329(a); Fed. R. Bankr. P. 2016(b).

25      As § 329(a) applies to all agreements or payments "made
26  after one year before the date of the filing of the petition,"
27  the requirement applies to post-bankruptcy enforcement of
28  bankruptcy law and extends even to services rendered in state

court that bear a nexus to enforcing bankruptcy law.

If the compensation exceeds the reasonable value of services, then the court has the power to cancel the agreement and to order the return of payments.  11 U.S.C. § 329(b).

Here, the key cause of action in the state-court was premised on violation of 11 U.S.C. § 362, which is at the heart of enforcement of bankruptcy law.  Accordingly, the Sundquists' state-court counsel was required to file his Rule 2016(b) statement.

Likewise, the Sundquists' counsel in this adversary proceeding also must comply with Rule 2016(b).[63]

a

The Sundquists' state court counsel filed a Rule 2016(b) statement (after this court called the requirement to his attention) in which he reported having received $17,882.00.[64]

This court has reservations about the quality of performance by that counsel and the wisdom and efficacy of his strategy. Nevertheless, it cannot say, in the face of the nature of the litigation strategy of Bank of America, that $17,882.00 exceeded the reasonable value of services within the meaning of § 329(b).

Those services led to a state appellate determination of the theretofore open question whether California's remedies for

---

[63]These requirements imposed by § 329(a) and Rule 2016(b) also apply to counsel representing the debtor in a bankruptcy appeal.  Hence, an appellate counsel representing the debtor in any appeal from the judgment rendered in this adversary proceeding will need to comply.

[64]Disclosure of Compensation of Attorney for Debtors, No. 10-35624, Dkt. #68.

54

wrongful foreclosure can be premised on nothing other that a
violation of the federal bankruptcy automatic stay.  That, at a
minimum, clarified the law in a murky area and redirected the
Sundquists to this court.  In addition, the Sundquists were
provoked to consult state court counsel because Bank of America
secretly rescinded its illegal foreclosure and tried to leave the
Sundquists holding the bag for expenses attributable to its
incompetent stewardship of the Sundquists' residence.

It follows that the services rendered in the state court
litigation have a sufficient nexus to the § 362 stay violation to
qualify as § 362(k) damages.

Hence, the component of § 362(k)(1) attorney's fee damages
attributable to the state-court litigation is $17,882.00.

b

The Sundquists engaged different counsel to prosecute this
adversary proceeding.  That attorney, who was also their counsel
in the chapter 13 case, complied with 11 U.S.C. § 329 by filing
the supplemental statement required by the last sentence of Rule
2016(b) for any payment or agreement not previously disclosed.
Her initial statement had been made contemporaneous with the
filing of the chapter 13 case in 2010.

In the subsequent statement, she reported having taken the
stay violation case on a contingency fee basis.[65]

A copy of the actual contingency fee agreement was filed

[65]Disclosure of Compensation for Attorney for Debtors, No.
10-35624, Dkt. #69.

55

1   pursuant to court order.[66]

2       The agreed contingency fee is the higher of 30 percent of

3   the total recovery or the amount of fees that the court orders

4   paid by the other side.[67]

5

6                                     i

7       If the agreed compensation for debtors' counsel exceeds the

8   reasonable value of services, the court may cancel the agreement.

9   11 U.S.C. § 329(b).

10      In principle, contingent fees are permissible in bankruptcy

11  cases.  Trustees and committees are expressly authorized to

12  employ professionals on a contingency fee basis.  11 U.S.C.

13  § 328(a).  There may even be scenarios in which contingency fees

14  are appropriate for counsel representing a debtor.

15      Contingency fees for debtor's counsel in § 362(k)(1) stay

16  violation disputes, however, present logical difficulties.

17  Attorneys' fees are an element of § 362(k)(1) damages.  A simple

18  contingency fee agreement in a situation in which attorneys' fees

19  are an element of damages leads to contingency fees on

20  contingency fees, which would set up a repetitive loop in which

21  fees would increase to infinity.

22      While it may be possible to draft a debtors' counsel

23  contingency fee agreement that might solve the problem described

24  here, the specific contingency fee agreement in this case does

25  _____

26      [66]Order that Dennise Henderson File Copy of Contingency Fee
    Agreement and Justify Agreement under 11 U.S.C. §§ 329(b) and
27  362(k)(1), No. 10-35624, Dkt. #70.

28      [67]Attorney-Client Retainer and Fee Agreement, No. 10-35624,
    Dkt. #74.

1 | not do so.

2 | It follows that the agreement between counsel and the
3 | debtors calls for fees that exceed the reasonable value of
4 | services.  Accordingly, pursuant to § 329(b) the portion of the
5 | Attorney-Client Retainer and Fee Agreement calling for a
6 | contingency fee is cancelled to the extent that it calls for
7 | excessive compensation.  11 U.S.C. § 329(b).

8 |

9 | ii

10 | The consequence of the § 329(b) cancellation of the
11 | excessive portion of the fee agreement means that the court must
12 | determine the portion of the fee that is not excessive.

13 | In response to this court's order to justify the contingency
14 | fee under §§ 329(b) and 362(k)(1), the Sundquists' counsel
15 | restated her fees on the hourly lodestar basis commonly used in
16 | fee award cases.

17 | Lodestar fees consistent with § 330 are presumptively
18 | reasonable for purposes of § 329 so long as they are proportional
19 | in terms of time, rate, and the nature and amount of the
20 | controversy.  11 U.S.C. §§ 329(b)-330.

21 | Here, the statement of lodestar fees in the hourly fee
22 | application documents 207.56 hours devoted to representation of
23 | the Sundquists in the stay violation matter and uses an hourly
24 | billing rate of $300.00, the product of which is $62,268.00.
25 | Counsel also has documented costs of $6,606.55.

26 | This court, having presided over the entire stay violation
27 | litigation, is persuaded that $68,874.55 does not exceed the
28 | reasonable value of services rendered within the meaning of

§ 329(b).  If anything, as implied by comments elsewhere in this opinion, counsel could have taken more time, effort, and expense to prepare a more complete evidentiary presentation.

The component of § 362(k)(1) damages based on attorney fees is $70,000.00, which sum includes the documented fees and expenses, together with an additional sum to compensate for the time spent preparing the statement of fees.[68]

D

Lost income is another element of § 362(k)(1) economic damages, which subdivides into the income of the respective plaintiffs.

1

Renée Biagi Sundquist has a bachelor's degree in marketing and finance.  She stopped working in the finance industry about 1999 when her twin sons were born.

She is an ice skater.  As a youth, she competed in the United States, was National Champion of Italy, and qualified for the 1980 Italian Olympic Team but was unable to compete because of illness.  This background matters in this case because it connotes the mental toughness inherent in individual performance athletes who are able to compete at national and Olympic levels.

In January 2010, she was working as a figure skating coach

---

[68]If there is an appeal of this court's order in which the Sundquists prevail, they will be entitled to fees reasonably incurred in defending the appeal.  The Best Service Co. v. Bayley (In re Bayley), No. 15-55142 (9th Cir. Feb. 27, 2017), slip op. at 3, citing Schwartz-Tallard, 803 F.3d at 1099 (en banc).

at Skatetown (Roseville Sportworld Inc.) in Roseville,
California, at $20.00 per hour.  In addition, she taught private
lessons for $79.00 to $100.00 per hour.

In August 2010, she accepted employment as Skating Director
at Skatetown on a job-share basis in which her share of the job's
annual salary was $37,500.00.  And she was able to teach private
lessons.  Her IRS Form W-2 for 2010 reflects compensation from
Roseville Sportworld Inc. of $22,732.29.  The court infers that
her lesson-based income was about $7,100.00 in 2010.[69]

She found the work increasingly difficult because the stress
of dealing with Bank of America was draining her physical and
emotional resources.  Migraine headaches, diagnosed by her
neurologist as stress-induced,[70] interfered with her ability to
work.

In August 2011, she was offered the Skating Director
position at Skatetown on a full-time basis with an annual salary
of $80,000.00.  But the effect of the stress of dealing with Bank
of America and concomitant migraine headaches prevented her from
accepting the job.[71]

Her IRS Form W-2 for 2011 reflects compensation from
Roseville Sportworld Inc. of $47,491.68.

By 2012, her income as skating instructor dwindled as her

---

[69]Five months of income at an annual rate of $37,500.00 is
$15,625.00.  The remaining $7,107.29 probably reflects hourly
income.

[70]The court believes her testimony regarding headaches and
diagnosis.

[71]The court believes her testimony about the offer and
rejection of the full-time position.

physical reactions to the situation with Bank of America worsened.

Her IRS Form W-2 for 2012 reflects compensation from Roseville Sportworld Inc. of $7,397.00.

Tax returns for 2013 and 2014 reflect that she had no income during those years.

She testified that her health is now "terrible" and that she is unable to work and has insufficient prior work credits to qualify for Social Security disability. Migraine headaches are near daily occurrences. Multiple rounds of migraine medication make her slow. Anti-seizure medication makes it hard for her to speak.[72]

The court is persuaded that Renée Sundquist was unable to accept the $80,000.00 Skating Director position in August 2011 because of the stress induced by the difficulties resulting from the stay violation by Bank of America and its refusal to redress the stay violation by eliminating inappropriate charges. It is further persuaded that, "but for" the conduct of Bank of America regarding its stay violation, she would have been successful in that job and would still be employed in that position.

The court is not persuaded that she actually lost a material amount of income in 2010 due to the stay violation.

Nor is the court persuaded that lost income should be projected beyond the date of trial without the benefit of expert medical opinion evidence regarding her long-term prospects.

Her lost income proximately caused by Bank of America's stay

---

[72]The court believes, and so finds as fact, this testimony.

violation and its aftermath is: 2011 $8,908;[73] 2012 $72,603;[74]
2013 $80,000; 2014 $80,000; 2015 $80,000; 2016 $80,000.[75]  Hence,
her total lost income for purposes of § 362(k)(1) actual damages
is $401,511.00.

2

After Erik Sundquist graduated from the University of
California at Berkeley, he joined, and eventually succeeded to
ownership of, the construction company founded by his father in
the 1960s.  He also formed some development-related businesses.

A downturn in construction business led him to wind up the
construction firm.  The development businesses, Finn-Am, Inc.,
Sundquist Custom Design Build, Sundquist Associates, and
Chandelle, LLC, fizzled out during the Great Recession.

On the downslope, his earnings were $154,238.00 in 2007,
$87,178.00 in 2008, and $20,125.00 in 2009.[76]

He also has engaged in professional acting, but that
endeavor produced negligible income during the period relevant to

---

[73]Eight months of $37,500 ($25,000) as job-sharing Skating
Director + 4 months of $80,000 Skating Director ($26,667) + eight
months of $7,100 teaching income ($4,733) - Actual W-2 income
($47,492) =

[74]$80,000 - Actual W-2 income ($7,397) = $72,603.

[75]The court is not persuaded that, in the absence of expert
testimony that her inability to work will persist, it should
award future damages after 2016.

[76]B of A Ex. AAA & B of A Request for Judicial Notice of
Filed Documents for Trial, Ex. A, p. 36.

this stay violation matter.[77]

In 2012, he developed a consulting business based on his status as a Reserve Specialist certified by the Community Associations Institute.  That business, SMA Reserves, LLC, advises homeowner associations on the reserves that need to be established in light of long-term maintenance and construction needs.  These so-called reserve studies are then used by the client HOA for budget purposes.  Tax return documents in evidence reflect that through SMA Reserves, LLC, he earned $39,776.00 in 2012, $67,931.00 in 2013, and $85,899.00 in 2014.[78]  SMA Reserves, LLC, is taxed as a partnership in which Erik Sundquist has a 60 percent share.

He testified that his HOA clients have primarily been in the San Francisco Bay market area and that he has found himself frozen out in the Sacramento market area.

Erik Sundquist asserts that Kocal Management Group: A Division of The Management Trust,[79] the large management company that manages the HOA for the Sundquist residence and a number of other HOAs in the Sacramento area, has blackballed him on account of the dispute between the Sundquists and Bank of America.

This explanation rings true.  The record reflects considerable hostility directed by the HOA towards the Sundquists

---

[77]His 2011 IRS Form 1040 reflects $32.00 from the Screen Actors Guild.

[78]According to its website, SMA Reserves, LLC, performs reserve studies according to the National Reserve Study Standards published by the Community Associations Institute.  Erik Sundquist is certified as a Reserve Specialist by the Community Associations Institute.  www.smareserves.com.

[79]Sundquist Ex. 29.

62

because of their stance that Bank of America is responsible to pay the HOA monthly charges and the $20,000.00 fine that accrued during the time that Bank of America owned their residence.  The issue has festered because it is about more than money.  The eyesore of the dead landscaping has been an annoyance because the standoff with Bank of America has made the Sundquists reluctant to invest in landscaping if they are going to be unable to keep the house.  That, in turn, infuriates the HOA leadership.[80]

The court concludes that Bank of America's refusal to pay HOA charges during the time that it owned the residence in 2010 has had the consequence of reducing the number of engagements by HOAs for reserve studies that Erik Sundquist's firm is asked to do.

The problem becomes how to determine the amount of loss

---

[80]From the Renée Sundquist Journal:

[July 2015] "I worried all day, and was so mad about our homeowners association calling a hearing to discuss our lawn. After the bank sold our home, they forgot to water, now we are supposed to pay the association penalties and replace our lawn and s[h]rubs.  How will all this wrong be right?"

"Really excited we were given an opportunity for a lynch mob Association meeting to discuss, oh, I mean embarrass us into paying fees we don't owe.  We found out that man recently blocking my garage and pounding on our door for 20 mins is from the association board.  Life is good.  Still dealing with my children's fear and my pounding heart.  So upset tonight, the bank takes no responsibility and the board is run by crazy folks. How I really wanted to respond to the board emails was, hey stupid, my husband's name is spelt with a 'k' not 'c', and you parked on private property, blocked my car from leaving, and disrupted my children's life again.  A page right out of the bank's book."

B of A Ex. UUU.

1  caused by Bank of America.  No evidence has been presented
2  regarding the market for reserve studies, the degree of
3  competition, or other logically relevant factors.  Ordinarily,
4  one would expect to see expert testimony on the point.

5       While some might believe that this leaves the court in the
6  uncomfortable position of needing to speculate, that is
7  incorrect.  The court can and, based on the evidence of the
8  business success in the nearby San Francisco Bay area, does have
9  the ability to fashion an award.  But it will be done in a
10  conservative fashion that will award less than what likely could
11  have been proved with a more focused evidentiary presentation.

12      The concrete evidence is the income actually received
13  through SMA Reserves, LLC, for 2012, 2013, and 2014.  These sums
14  are sufficiently modest as to warrant the inference the firm has
15  excess capacity – i.e. the ability to undertake additional
16  reserve studies.

17      The question is how much additional reserve study business
18  would have ensued if Erik Sundquist had not been frozen out of
19  his home market.  While an expert focusing in on the numerous
20  intangibles might be able to make a case for more than an
21  additional 50 or 100 percent, the court concludes that an
22  appropriately conservative number, giving Bank of America the
23  benefit of the doubt, is 25 percent.

24      Although there is a pattern of steady year-to-year increase
25  in business for SMA Reserves, LLC, the court's conservative
26  approach does not assume, in the absence of evidence, any
27  increase for 2015 and 2016.  Similarly, the court regards
28  projection of lost income into years after 2016 as unduly

64

speculative without actual evidentiary support.

Accordingly, the computation of lost business damages under § 362(k)(1) is: 2012 - $9,944.00 (= $39,776.00 x .25); 2013 - $16,982.75 (= $67,931.00 x .25); 2014 - $21,474.75 (= $85,899.00 x .25); 2015 - $21,474.75; 2016 - $21,474.75.   Total $91,351.00.

E

Lost property warrants an award of § 362(k)(1) actual damages.   During the time that Bank of America owned the Sundquist residence pursuant to its stay-violating foreclosure, the major appliances (cooktop, oven, built-in refrigerator, washer, dryer), window coverings, and carpet went missing through no fault of the Sundquists.

The court believes the Sundquists' testimony that they left the premises in good order and did not take any of the subject property.

The personal property would not have been lost "but for" the actions of Bank of America in violating the automatic stay by foreclosing and thereafter prosecuting an unlawful detainer action that had the effect of driving the Sundquists out of their home and into a rental property.

The court also believes the Sundquist testimony that the value of the lost personal property was $24,000.00.

Hence, actual damages for lost property are $24,000.00.

F

HOA fees are an item for § 362(k)(1) damages.   Those fees are in two categories: monthly assessments and one-time charges.

The Verdera Homeowners Association assessed a charge of $20,000.00 because Bank of America permitted the landscaping to die while it owned the Sundquist residence pursuant to its stay-violating foreclosure.

Bank of America is also liable for all HOA fees that accrued during the time that it owned the Sundquist residence.

And Bank of America is liable for all HOA fees – $235.00 + $15.50 late fee per month – that accrued between the time it rescinded the foreclosure sale on December 30, 2010, and the time that the Sundquists moved back in during late January 2012, a total of 13 months.

Placing liability on Bank of America for HOA fees between December 30, 2010, and January 31, 2012, is appropriate for two independent reasons.  First, the bank permitted the rescission to remain secret until the Sundquists' curiosity about the resumed billing got the better of them and prompted them to look at the land records on March 21, 2011.  Bank of America was content to permit the rescission to remain secret through January 31, 2012, if the Sundquists had not taken the initiative.  If the bank had foreclosed during that period, it would have been liable for the accrued HOA fees.

Second, the Sundquists were locked into a lease for their alternative housing.  The reason they were in alternative housing was Bank of America's activity violating the automatic stay by foreclosing and thereafter prosecuting an unlawful detainer action in order to force the Sundquists to move.  "But for" the stay violations by Bank of America, the Sundquists would not have moved and would have paid their monthly assessments.

66

One related item relates to the landscaping.  The HOA
assessment of $20,000.00 in 2010 presumably was an approximation
of the cost of lawn and landscaping.  Prices have risen nearly 10
percent in the interim and likely will be subject to further
increases before the Sundquists actually recover.  Accordingly,
an extra $2,000.00 will be awarded to enable replacement of the
landscaping that Bank of America permitted to die.  This is yet
another fruit of the poisoned foreclosure tree; "but for" the
stay violations by Bank of America, the Sundquists would not have
moved and would not have suffered the landscaping penalty charge.

The § 362(k)(1) actual damages attributed to HOA fees,
charges, assessments, and penalties total $26,637.50.[81]

G

The record is replete with descriptions of the many
occasions after June 14, 2010, that the Sundquists sent loan
modification applications and supporting materials to Bank of
America.[82]  These application packages typically consisted of

---

[81]The accrued balance as of the May 2011 HOA assessment was
$22,633.50.  Sundquist Ex. 29.  Since the monthly assessment and
late fee was $250.50, the eight months remaining total through
January 31, 2012, is $2,004.00.  Thus, the HOA total is
$22,633.50 + $2004.00 = $24,637.50.  Adding the $2,000.00
increased cost of replacing landscaping yields $26,637.50.

[82]E.g., From the Renée Sundquist Journal:

"[August 2010] Sent another modification packet to b/a, this
has to be over twenty modification packets at this point.  I was
fixated on the amount of papers that included over the years!  I
was fixated on the amount of papers that included over the years!
OMGosh, the environment!  That times 20 !!!!!!!!!!!!"

B of A Ex. OOO; accord Renée Sundquist Decl. ¶ 120.

more than thirty pages.[83]

A persistent feature of the loan modification situation is that the payoff statements from Bank of America include a demand that the Sundquists pay expenses of $5,696.61 incurred by Bank of America during the time that it was in title to the Sundquist residence in 2010 pursuant to its stay violations.  The Sundquists take umbridge at the demand that they pay Bank of America's expenses incurred when Bank of America owned the property by virtue of its stay-violating void foreclosure.

That $5,696.61[84] includes, for example, "HOA fee $562.50," which was the payment by Bank of America on September 17, 2010, of the HOA invoice dated August 11, 2010.[85]  It includes $450.00 for yard maintenance that occurred while Bank of America was in possession of the property.  It includes $120.00 in property inspection fees incurred before the rescission of the foreclosure on account of the stay violations.

---

"[2012] Called and left a message for [CEO Representative] Lexi asked why we needed to sent the modification so many times and asked for the current payoff.

Renée Sundquist Decl. ¶ 393.

"Today we received another random loan modification packet to be completed.  There must be a rule to send out a bogus denial or send out a new modification packet."

Renée Sundquist Decl. ¶¶ 394-95.

The court believes, and so finds as fact, the facts asserted in this testimony.

[83]B of A Ex. U (transmittal from Sundquist attorney faxing 32-page modification application).

[84]B of A Ex. WWW-002.

[85]Sundquist Exs. 76 & 81 & 89.

1   When one compares the payoff statement dated March 3, 2016,
2   with the payoff statement dated June 12, 2012, the additional
3   charges confirm the Sundquists' contention that Bank of America
4   has been continuing to demand to be reimbursed for expenses it
5   ran up during the period it owned the property.[86]  This has been
6   a major sticking point in loan modification efforts from the
7   standpoint of the Sundquists.

8       The court agrees with the Sundquists that it is both wrong
9   and in bad faith for Bank of America to continue to demand that
10  Bank of America be reimbursed for the fruits of its own
11  misconduct.

12      This unreasonable and unconscionable position by Bank of
13  America is the main reason that there has been a six-year
14  standoff with the Sundquists.  During that time, there has been
15  no meaningful effort by Bank of America to atone for its stay
16  violations.  Hence, these are fruits of the poisoned foreclosure
17  and unlawful detainer.

18      The court finds that in the six years since the stay
19  violation there have been twenty loan modification requests and
20  finds that Bank of America's insistence on reimbursement of fees
21  and expenses incurred after its stay-violating foreclosure and
22  stay-violating unlawful detainer is not consistent with its
23  obligation of good faith and fair dealing.  It follows that all
24  of its loan modification invitations to the Sundquists were made
25  with no intention to reach agreement.

26      The Sundquists had the burden of preparing repetitive

27

28

[86]Compare B of A Ex. WWW, with Sundquist Ex. 14.

69

applications with extensive documentation that, the court finds, they faithfully completed and submitted, like Sisyphus, hoping that this time would be different. The fact (which the court finds as fact) that Bank of America had no intention of seriously entertaining the applications that included requests for adjustments on account of Bank of America's stay violations created a burden that appropriately is included as actual damages for stay violation.

Actual damages for each incidence of bad faith refusal to entertain loan modification requests adjustments on account of Bank of America's stay violations are $1,000.00 per incidence. Hence, § 362(k)(1) actual damages on this account are $20,000.00.

H

Medical expenses are also an item for § 362(k)(1) actual damages.

1

Renée Sundquist testified that after moving to the house in Folsom over Labor Day weekend 2010 she was distracted, confused, and angry at what seemed to her (and to him) as an eviction. She started having trouble breathing and suffered panic attacks.

Erik Sundquist testified that he came home one day and found his wife unable to breathe and rushed her to a hospital emergency room, where she underwent "the full heart attack protocol."

Renée Sundquist confirmed that her husband took her to Mercy Hospital Folsom on October 23, 2010. She had labored breathing. Her heart rhythm was bad. The hospital kept her two days to

70

determine whether she was having a heart attack.

The ultimate conclusion was that the symptoms resulted from stress.  The prescribed treatment included Xanex and Valium.

She had been suffering from occasional migraine headaches that had begun about one year before the move to the rental. Beginning in September 2010, their incidence increased noticeably to about one per week.  Since then, they have become chronic and nearly daily.  Sometimes she has four three-day migraine headaches in a month.  She is under the care of a neurologist and finds that the prescribed medication – Amatrex – has debilitating side effects.  She understands that stress is at the root of the migraines.

She testified that she has incurred medical bills totaling $30,000.00.[87]  There is no evidence of medical bills for Erik Sundquist.

The court believes her testimony and finds that Bank of America's stay violating activity in 2010 was the "but for" cause of her medical issues that led to $30,000.00 in medical bills. They are fruits of the poisoned foreclosure and unlawful detainer.

Once again, however, the problem is that the evidentiary presentation is weak.  One would expect to see, at a minimum, medical bills and medical records and perhaps hear from medical experts.  With such evidence, the award likely would be greater than what can be awarded on this evidentiary record.[88]

---

[87]Sundquist Ex. 15.

[88]If the case were to need to be retried, the Sundquist evidence likely would be considerably more robust.

71

The award of § 361(k)(1) actual damages on account of medical bills that would not have been incurred "but for" the automatic stay violations of Bank of America is $30,000.00.

2

Erik Sundquist testified that he suffered physical injury during the move over Labor Day weekend 2010 – he hurt his back due to the heavy lifting and now suffers from a herniated disc.

The treatment for what is now chronic back pain includes steroid injections, ibuprofen and prescription opioids.[89]

Although the court is persuaded that at least some of his back condition is attributable to having been propelled by Bank of America to move during Labor Day weekend, the difficulty is that there is no evidence of medical bills that this court can use as a basis for making an award of medical expenses. Accordingly, there is no § 362(k)(1) actual damages award for Erik Sundquist's medical expenses.[90]

I

Actual damages under § 362(k)(1) may include personal injury when a personal injury is the proximate result of a stay violation. Erik Sundquist's back injury is eligible for such an award.

Previous to the move induced by Bank of America's continued

---

[89]The court believes, and so finds as fact, the facts asserted in this testimony.

[90]If the case were to need to be retried, the Sundquist evidence likely would be considerably more robust.

prosecution of its stay-violating unlawful detainer action consequent to its stay-violating foreclosure, Erik Sundquist had always been healthy and had no prior back injury.

This court believes his testimony and finds as fact that Erik Sundquist hurt his back for the first time in the course of the Bank of America-induced move in September. 2010. It further finds that the injury is a material factor in his current condition.

Before the move, Erik Sundquist was an athlete who played soccer, skied, ran, and cycled. His athletic history included membership on UCLA's NCAA National Championship soccer team in 1985.

After the move, he lost the physical ability to play soccer, ski, run, or cycle. His exercise is restricted to using an elliptical machine. He cannot sit for long periods of time. He is in chronic pain from a herniated disc.

The court is persuaded that there is a lingering and chronic pain back injury proximately caused by the heavy lifting and twisting that commonly occurs in connection with moving household furniture and that was occasioned by the move induced by Bank of America's stay violations.

The injury significantly degraded his ability to continue his habitual athletic activity. For an athletically-inclined man with 10-year-old twin sons at the time of the injury, the loss is significant.

Once again, however, the lack of medical opinion evidence hampers the ability of the court to determine damages. There is the possibility that other factors — such as the ravages and

accretions of the aging process - have also been at work. Without such evidence, the court will adopt a conservative approach and make an award that is less than what would be likely if there were to be a better evidentiary presentation.

In these circumstances, actual § 362(k)(1) damages for the back injury to Erik Sundquist is $10,000.00.[91]

J

Emotional distress is an additional basis for actual § 362(k)(1) damages.

As noted, proof of egregious conduct causing emotional distress suffices. Alternatively, proof of less-than-egregious circumstances suffice if it is obvious that a reasonable person would suffer significant emotional harm. <u>Dawson</u>, 390 F.3d at 1149-50.

Here, the relevant proof comes from the testimony of Renée Sundquist, which the court believed, and from her remarkably self-revealing journal that she has had the courage to expose to the world.

1

Renée Sundquist descended to depths of emotional despair during the six years between Bank of America's illegal foreclosure in violation of the automatic stay and the time of trial. In later stages of that ordeal, she reacted to the

_____

[91]If this matter were to need to be retried following an appeal, the Sundquist evidentiary support likely would be more robust.

74

doorbell by hiding under the clothes hanging in her closet, developed suicidal thoughts, and responded to written communications from Bank of America by cutting herself with a razor and bleeding all over the bathroom.

The process of how Bank of America drove her into the status of an "eggshell plaintiff" warrants review.

By the time that the stay violation occurred in June 2010, her prior dealings with Bank of America had been nothing short of frustrating.  Bank of America had induced the Sundquists to default on their mortgage on the representation that a mortgage modification would be entertained in good faith.  Yet their application papers were repeatedly declared to be "lost" or "not received" or "stale," while Bank of America simultaneously pursued foreclosure.

Throughout, the Sundquists were acting in good faith, not realizing that Bank of America had no intention of acting in good faith.  The elimination of business debt concomitant to obtaining a chapter 7 discharge following the closing of Erik Sundquist's construction business was of no moment to Bank of America.  Nor was Bank of America impressed by the fact that Renée Sundquist's mother was in a position, once a modified mortgage was agreed upon, to cure the mortgage default that Bank of America had induced.

The chapter 13 case was filed on the eve of a scheduled foreclosure in the belief that the chapter 13 process would enable the bank-induced default to be cured and a mortgage modification agreed upon.

She did not anticipate that Bank of America would disregard

the automatic stay, pursue an unlawful detainer, drive the
Sundquist family out of their home, cause a $20,000 HOA liability
while it was in title, permit the home to be looted before
secretly restoring them to title and then try to saddle them with
liability for Bank of America's conduct.

Her journal reveals the central role that Bank of America
assumed in her life during those six years.  She kept submitting
and resubmitting mortgage information in response to requests by
Bank of America.

But, unlike Camus' conclusion about Sisyphus,[92] she became
increasingly unhappy.  Early entries connote optimism;[93] later
entries resignation.[94]

---

[92]"One must imagine Sisyphus happy" ("Il faut imaginer
Sisyphe heureux").  Albert Camus, THE MYTH OF SISYPHUS (Penguin
Books, London, 2000), at 89 (tr. Justin O'Brien).

[93]From the Renée Sundquist Journal:

"[Fall 2009] Bank sends out new modification packet.  The
representative at bank's HOPE department told me that they
are actually modifying loans and we should fill out the
modification again.  For some strange reason I felt
hopeful."

Renée Sundquist Decl. ¶¶ 78-80.  The court believes, and so
finds as fact, this testimony.

[94]From the Renée Sundquist Journal:

"August 2010 sent another modification packet to bank this
has to be over 20 modification packets at this point.
. . .
we received an email from our bk attorney today, apparently,
the bank says they want to discuss options outside of
bankruptcy.  I try to remain optimistic, however, I am a
seasoned loan modification filler outer.  I know better."

Renée Sundquist Decl. ¶¶ 120-23.  The court believes, and so
finds as fact, this testimony.

She began to realize that Bank of America was animated by bad faith.[95]

She started hiding in the closet when there was activity at the door.[96]  As time went by, this reaction to activity and the front door persisted.[97]  Eventually, it was viewed as a symptom

---

[95]From the Renée Sundquist Journal:

"I realized at 2 am this morning that the letter that our attorney received and the modification packet sent out was when they had sold the house and we no longer owned it.  How can they do a modification.  I need professional help to get past this.  What a horrid pit in my stomach and my head hurts so badly too."

Renée Sundquist Decl. ¶¶ 174-76; accord, B of A Ex. QQQ-001 ("when our attorney received a letter from b/a stating they wanted to work with us on a modification, they had already sold our house when they sent that email! I hope God is watching!  I predicted they wouldn't work with us, I didn't predict they would sell our home while in bk!  Wow, I need professional help to get past this! What a horrid pit in my stomach.  My head hurts so badly too! We were just were [sic] instructed by b/a to submit another loan modification. ahhhhhhh really, we don't own the house any longer!!!!!!!!!!!!!!!!!! I hate them!").  The court believes, and so finds as fact, this testimony.

[96]From the Renée Sundquist Journal:

"[August 2010] [Son] noticed someone across the street and said 'someone is casing the joint' Where did he hear that. First I wanted to laugh then I ran upstairs to my closet and sobbed.  I hate being so scared, but I can't show that to my children."

Renée Sundquist Decl. ¶¶ 125-27.  The court believes, and so finds as fact, this testimony.

[97]From the Renée Sundquist Journal:

"May 2011 the doorbell rings m[y] heart races.  I am in the rental and still react with horror.
. . .
March 2012 I am having a hard time living in the house. Every time the doorbell rings I hide in my closet under my hanging clothes."

of Post-Traumatic Stress Disorder.[98]

Suicidal thoughts began to be articulated in her journal and became more frequent.[99]

The cutting is evident in the journal and worsened as time

---

Renée Sundquist Decl. ¶¶ 254-55 & 313-14.  The court believes, and so finds as fact, this testimony.

[98]From the Renée Sundquist Journal:

"[2015] Met with the doctor today, she says I have PTSD and its not weird that when the doorbell rings I hide in the closet"

Renée Sundquist Decl. ¶¶ 489.  The court believes, and so finds as fact, this testimony.  If there needs to be another trial following an appeal, the medical evidence is likely to be robust.

[99]From the Renée Sundquist Journal:

"[Feb. 2012] Thought of driving off a cliff toady [today] as I went to pick up [sons]"

"Strange day; could not talk to anyone I have lost my life."

"[2013] My life is stuck like I am in quicksand but not going under to die and finally done with this pain."

"I thought a long while about killing myself tonight.  I feel so sad, I would miss my family so much, I just don't know how to get through this bank crap, it seems it won't ever end."

"[June 2014] There was blood all over the bathroom.  Erik tried to help, I feel my life is gone."

"If I were to die tonight I know I would regret all the time lost worrying about this stupid house, and how wrong the situation is, but we are so broken."

Renée Sundquist Decl. ¶¶ 312, 325, 408, 412, 442 & 468; accord, B of A Ex. SSS-001 ("Thought about driving off the cliff today as I went to pick up [sons] from school.  I will never be okay that the bank took moments from me while my Mom died.  I will never forgive myself that my Mom worried one second about what the bank of holy hell was doing.  At least my Mom doesn't have to deal with hearing about their crap anymore.").  The court believes, and so finds as fact, this testimony.

passed.[100]   And, was corroborated by Erik Sundquist in his

---

[100]From the Renée Sundquist Journal:

"[Dec. 2012] Trying not to cut myself."

"July 2013 My head and the cutting is so bad I need a break."

"Sometimes getting a migraine and sadly cutting myself is the only relief from this horrible bank pain."

"So very sad, I cut myself after the doorbell rang and the delivery of this paperwork.  I hate that this is happening. Cutting is the only way the pain from the bank stops and all [of] the sudden I have physical pain from the cutting.  This cannot be my life.  It's almost like [I] am looking at myself from afar.  My arm stings in the shower.  The cuts are bad.  Blood everywhere."

"[Nov. 2013] Lots of cutting today, crumbling under bank pressure."

"[Dec. 2013] took [?] upset the cutting is awful our family is falling apart."

"[Jan. 2014] Received an email from Trustee Sale, I cut myself so bad today.  The bad news has to stop, I hate all my scars, and dream I could have them treated some day.  I am so embarrassed and people judge you, good thing I don't see my friends anymore.  I will never wear shorts again."

"June 2014 Today was awful I am getting a headache and cut myself so bad it took so long to stop bleeding.  There was blood all over the bathroom.  Erik tried to help, I feel my life is gone."

"[Nov. 2014] The doorbell rang today, Erik cautiously open door it is an orange slip.  I hid in the bathroom and cut myself."

"[Jan 2015] The doorbell rang today another orange note.  I tried so hard not to cut myself today but after the note came it was too much."

"March 2015 the doorbell rang and I ignored it.  Later in the day I got the orange slip off the door, I threw it in Erik's office.  Too much too long blood all over the bathroom floor."

testimony, which the court believed.

This emotional distress is the human cost proximately resulting from the conduct of Bank of America in stringing out the Sundquists and constitutes § 362(k)(1) actual damages.

Nor can Bank of America's conduct be chalked off to low-level employees who were not paying attention. Rather, the record implicates senior executives. There are a number of communications to the Sundquists from the office of the Bank of America Chief Executive Officer. Those communications disclaimed responsibility for its illegal foreclosure in violation of the automatic stay and its refusal to adjust for the ensuing consequences.

The Bank of America executive staff even lied to the CFPB in an astonishingly brazen manner, denying the existence of the Sundquist state-court litigation. Their appeal was then pending at the California Third District Court of Appeal and was soon to be decided in their favor on such questions as whether they had stated a claim for fraud.

This court finds as fact that Bank of America's brazen conduct towards the Sundquists, done in a heartless manner and in their plain view, inflicted a significant emotional toll on Renée Sundquist. This emotional distress would not have occurred but for Bank of America's course of conduct following upon its violation of the automatic stay.

---

"July 2015 doorbell rang, I cut."

Renée Sundquist Decl. ¶¶ 328, 365, 385, 399-402, 434, 435, 438-43, 461, 480, 486-87, 490. The court believes, and so finds as fact, this testimony.

While evidence probative of the appropriate amount of emotional distress damages is thin, the fact of severe emotional distress is so clear that this court can make an award.  As with other damage components in this case, the amount of the award will be less than what likely would have been awarded if the evidentiary record had been more complete.[101]

The emotional distress damages for Renée Sundquist are $200,000.00.

2

Erik Sundquist ultimately was driven by Bank of America's conduct, and its effect upon his wife, to attempting suicide.

In testimony that the court believed, he related how he felt driven to act and how one of his school-age sons helped locate him before it was too late.[102]

His wife's journal captures the incident from her perspective.[103]

---

[101]If the case were to need to be retried, the Sundquist evidence likely would be considerably more robust.

[102]A plausible case could be made that the two Sundquist minor children also suffered emotional distress as a proximate result of Bank of America's stay-violating conduct.  However, they are not, at least not as yet, parties.  If this case were to need to be retried following an appeal, it is conceivable that they might be permitted to intervene.

[103]From the Renée Sundquist Journal:

"[2015] Yesterday was worst day Erik sends me a text, I love you and the boys goodby.  I freaked, he turned off his phone.  I screamed for [son] to help find him.  He was able to find him through his IPAD.  We drove madly to where we would see he was.  We could see he went into a CVS and came out.  We get to the car and he is asleep, groggy, alive.  I am screaming and crying, [son] is crying. [Son] gets in car

1  The court finds as fact that the Bank of America ordeal

2

3  _____

4  with Erik and talks to him for a long time.  I sat on the
   pavement staring."

5  Renée Sundquist Decl. ¶¶ 470-78; accord, B of A Ex. VVV-001
   ("Yesterday was one of the worst days of my life.  Dear God.
6  Erik and I were just in a horrid place in the morning, too much
   stress, were are both so ready to move on from the current state
7  of house and lawsuit limbo.  I texted him awful stuff about the
   past five years, at some point, when I can't call up the bank of
8  holy hell and scream, I guess I decided to scream in a text to
   Erik.  I received a text from him later in the afternoon where he
9  apologized for our life, and wrote he would always love me and
   the boys and then wrote goodbye.  Oh my God! My life stopped.
10 That moment - where you read the word 'goodbye', all of a sudden
   I couldn't hear, I couldn't breathe, I couldn't think, and I most
11 certainly couldn't move! After the longest 20 seconds of my life
   I screamed for [son] and immediately asked him to text his
12 father.  I knew instinctively this was my only hope for Erik to
   read a text message from his son, and my only hope for Erik not
13 to hurt himself.  Oh my God is all I was thinking.  Oh my
   God!!!!!  I didn't tell [son] much, other than we need to find
14 Dad quick. [Son] knew I was serious.  What seemed like hours, no
   response from Erik, we figure out his phone was shut off!!! [Son]
15 then ran to the car where he started tracking Erik's ipad
   location, we could see he was in a CVS drug store.  Dear Lord.
16 Usually Erik and I are always so mad at [Son] with all his
   technology, yesterday I was so grateful he had the knowledge to
17 track his dad.  Erik's location started moving, and eventually we
   could tell he drove and parked nearby, our worst nightmare, what
18 did he buy in CVS and will we get there in time before he
   swallows too much?  Oh my God!  It is truly so hard to write in
19 words what that 20 minute car ride felt like while imagining Erik
   did something horrible to himself.  What seemed like forever, we
20 finally got to the parking lot and saw Erik's car, as we pull up
   he was asleep.  I just remember screaming and pounding on his
21 window, thank God he could open the window, but had taken way too
   much of something.  I just kept screaming, finally he showed me
22 the bottle of pills, my god, I am thinking at least he is awake
   and breathing. [Son] is crying, I am screaming, we ascertain what
23 Erik has swallowed, oh my god, what a mess.  Just in time, we are
   unclear just what he was prepared to continue ingesting if we
24 didn't find him.  I just sat and sobbed.  Really, what can I
   write, no words can explain what I was feeling, what a complete
25 mess!!! [Son] jumped in Erik's car and sat there for over an
   hour, I am not entirely sure of all the [exhibit ends in mid-
26 sentence])"  The court believes, and so finds as fact, this
   testimony.

27

28

82

occasioned by its unrepentant disregard of the consequences of
its illegal violation of the automatic stay was a material factor
in the emotional state of mind that brought Erik Sundquist to the
brink of suicide.  This emotional distress would not have
occurred but for Bank of America's course of conduct following
upon its violation of the automatic stay.

While evidence probative of the appropriate amount of
emotional distress damages for Erik Sundquist is thin, the fact
of severe emotional distress is so clear that this court can make
an award.  As with other damage components in this case, the
amount of the award will be less than what likely would have been
awarded if the evidentiary record had been more complete.[104]

The emotional distress damages for Erik Sundquist are
$100,000.00.

VI

Congress authorized punitive damages under § 362(k)(1) in
"appropriate" cases when individuals are victimized by willful
violation of the automatic stay.

A

Unlike most punitive damages situations, this is a federal
punitive damages statute.  Congress has given no specific
guidance about punitive damage boundaries under that statute
other than that they be awarded "in appropriate circumstances."
11 U.S.C. § 362(k)(1).

---

[104]If the case were to need to be retried, the Sundquist
evidence likely would be considerably more robust.

83

Some threshold basics have been identified.  An "appropriate" case for punitive damages under § 362(k)(1) entails some showing of reckless or callous disregard for the law or for rights of others.  <u>Bloom</u>, 875 F.2d at 228.

Proof of conduct that is malicious, wanton, or oppressive suffices to satisfy <u>Bloom</u>'s "reckless-or-callous-disregard" standard.  <u>Snowden</u>, 769 F.3d at 657.

Beyond these basics, there is comparatively little judicial precedent grappling with complexities of this punitive damages statute.  While there are plentiful small-case decisions, there is a paucity of larger cases that have necessitated probing the depths of punitive damages under § 362(k)(1).

In other words, at this late date there is still much about the law of § 362(k)(1) punitive damages that amounts to writing on a clean slate.

By any measure, this case presents an "appropriate" case for punitive damages as authorized by § 362(k)(1).  The magnitude of the case requires more careful consideration of punitive damages.

B

The leading Supreme Court cases involve common law punitive damages.  <u>Philip Morris USA v. Williams</u>, 549 U.S. 346 (2007); <u>State Farm Mut. Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003); <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. 559 (1996).  None of these cases deal with a federal punitive damages statute. They are, nevertheless, instructive to the extent that Congress has not dictated a different result.

Three guideposts mark the way: (1) the degree of

84

reprehensibility of the defendant's misconduct; (2) the disparity
between the actual or potential harm suffered by the plaintiff
and the punitive damages award; and (3) the difference between
the punitive damages awarded and the civil penalties authorized
or imposed in comparable cases.  State Farm, 538 U.S. at 418,
citing Gore, 517 U.S. at 575.

1

The first Supreme Court guidepost focuses on degree of
reprehensibility.  This case may constitute the paradigm case of
the "reckless or callous" disregard for the law and for the
rights of others and of malicious, wanton, or oppressive conduct
contemplated by Bloom and Snowden in order to present an
"appropriate" case for § 362(k)(1) punitive damages.

a

Black-letter law provides that § 362 automatically stays
foreclosures and stays subsequent acts to implement foreclosures.
Case law in this circuit establishes that all acts in
violation of the stay are void from the outset, not merely
voidable.  E.g., Schwartz, 954 F.2d at 572-73.  Similarly,
subsequent dismissal of a case does not ratify an act that was
void from the outset.  40235 Washington St. Corp., 329 F.3d at
1080 n.2.  And, liability continues until a stay violation has
been corrected.  Snowden, 769 F.3d at 659 & 662.
It is beyond cavil that Bank of America, as a sophisticated
creditor (indeed, one of the most sophisticated creditors
operating in the United States economy), knew and knows the

85

black-letter statutory law and the concomitant case law.

b

Bank of America's actions, however, tell a story that smacks of cynical disregard for the law when dealing with the Sundquists.

Let us enumerate the ways in which Bank of America intentionally disregarded the law in the course of the Sundquist saga.

Knowing of the existence of the automatic stay, Bank of America nevertheless foreclosed on the Sundquist residence.

Knowing of the existence of the automatic stay, Bank of America nevertheless recorded a trustee's deed transferring title to itself.

Knowing of the existence of the automatic stay, Bank of America nevertheless filed an unlawful detainer action in state court.

Knowing of the existence of the automatic stay, Bank of America nevertheless conducted open and notorious harassing inspections of the Sundquist residence, including, by way of example, terrorizing one of the Sundquists' minor children by beating on a sliding door in the rear of the house and demanding entry and, by way of further example, openly and notoriously tailing Sundquist vehicles to their garage at the residence.

Knowing of the existence of the automatic stay, Bank of America nevertheless gave notices in the state-court unlawful detainer action consistent with imminent eviction that panicked the Sundquists into moving into leasehold premises.

86

Knowing that the foreclosure was void as a violation of the automatic stay, Bank of America nevertheless failed to inform the Sundquists before they vacated the premises in panic that it realized the foreclosure was void and must be rescinded.

Knowing that its state-court unlawful detainer action was void as a violation of the automatic stay, Bank of America nevertheless failed to dismiss the unlawful detainer action before the Sundquists vacated the premises in panic.

Knowing that the foreclosure was void as a violation of the automatic stay and must under Bank of America's written procedures be rescinded "immediately," Bank of America dallied nearly four months before recording the rescission.

Knowing that the foreclosure was void as a violation of the automatic stay and must be rescinded, Bank of America failed to inform either the Sundquists or their counsel that it would be taking such action.  In fact, Bank of America never would have informed them if the Sundquists and their counsel had not inquired of Bank of America about the state of title.

Knowing that the foreclosure was void as a violation of the automatic stay and that it had been rescinded, Bank of America failed for approximately three months after recording the rescission of the trustee deed of foreclosure to inform either the Sundquists or their counsel that it had restored them to title.

Knowing that the foreclosure was void as a violation of the automatic stay and must be rescinded, Bank of America failed promptly to dismiss the state-court unlawful detainer action seeking to enforce the void foreclosure.

Knowing that the foreclosure was void as a violation of the automatic stay and had been rescinded, Bank of America failed for an additional two months after recording the rescission of the trustee deed of foreclosure to dismiss the state-court unlawful detainer action seeking to enforce the void foreclosure.

Knowing that there was a pending appeal in a California state court, the office of the Chief Executive Officer of Bank of America responded to an official inquiry by the Consumer Financial Protection Bureau by falsely stating that no litigation was pending and that the court papers requested by the CFPB did not exist.

Knowing that HOA charges were incurred during the period that Bank of America held title to the residence, Bank of America refused to pay those charges and continues to demand that the Sundquists reimburse it for the HOA charges that it did pay.

Knowing that a $20,000.00 charge was levied by the HOA because Bank of America did not water the lawn and shrubbery during the period that Bank of America held title to the residence and that the Sundquists had vacated at the demand of Bank of America and in fear of Bank of America's threatened eviction, Bank of America refuses to make any adjustment and insists that the $20,000.00 charge is the Sundquists' problem. Bank of America's refusal has precipitated a hateful animus of the HOA towards the Sundquists.

For these reasons, Bank of America has been acting toward the Sundquists in knowing and reckless disregard of the § 362 automatic stay.  Further, this conduct has been callous; nay, cruel.

In the calculus of reprehensibility, Bank of America's intentional conduct adds up to reckless and callous disregard for the rights of others. Bloom, 875 F.2d at 228. It has been wanton and oppressive. Snowden, 769 F.3d at 657. This equates with a high degree of reprehensibility. State Farm, 538 U.S. at 418, citing Gore, 517 U.S. at 575.

2

Passing on to the second Supreme Court guidepost, the disparity between actual harm and the punitive damages award, this is a case of substantial actual harm where simplistic ratios are of limited utility.

The high degree of reprehensibility, coupled with the significant involvement by the office of the Bank of America Chief Executive Officer, calls for punitive damages of an amount sufficient to have a deterrent effect on Bank of America and not be laughed off in the boardroom as petty cash or "chump change."

It is apparent that the engine of Bank of America's problem in this case is one of corporate culture. The evidence is replete with so many communications from the office of Bank of America's Chief Executive Officer that the oppression of the Sundquists cannot be chalked off to rogue employees betraying an upstanding employer. This indicates that the engine is driven by direction from senior management.

Nor can Bank of America hide behind some alleged fiduciary duty to a third-party investor that constrains its ability to do the right thing. Bank of America owned the Sundquist mortgage for its own account. When it foreclosed, it noted that there was

1  no investor to notify.

2      It follows that a sum greater than a modest multiple of the

3  actual damages suffered by the Sundquists is necessary to serve

4  the deterrent function.

5

6                                    3

7      The Supreme Court's third guidepost focuses upon the

8  relationship between the punitive damages awarded and the civil

9  penalties authorized or imposed in comparable cases.

10     It happens that Bank of America has a long rap sheet of

11 fines and penalties in cases relating to its mortgage business.

12 In March 2012, Bank of America agreed to pay $11.82 billion to

13 settle litigation prosecuted by federal and state regulators

14 regarding its foreclosure and mortgage servicing practices.  In

15 June 2013, Bank of America agreed to pay $100 million to settle

16 litigation regarding mortgage loan origination issues.  In

17 December 2013, Bank of America agreed to pay $131.8 million to

18 settle litigation with the Securities Exchange Commission

19 regarding the structuring and sale of mortgage securities to

20 institutional investors.  In March 2014, Bank of America was

21 fined $9.5 billion by the Federal Housing Finance Agency for

22 defrauding Fannie Mae and Freddie Mac regarding mortgage-backed

23 securities.

24     In an environment in which Bank of America has been

25 settling, i.e. terminating exposure to higher sums, for billions

26 and hundreds of millions of dollars, a few million dollars

27 awarded as § 362(k)(1) punitive damages award in a real case

28 involving real people, in which the human element of the

1  consequences of Bank of America's behavior comes to the fore for

2  the first time is appropriate and proportional.

3

4                                    4

5      After <u>Gore</u> and <u>State Farm</u>, the Supreme Court ruled in

6  <u>Williams</u> that adequate notice of punitive damages is essential

7  and that punitive damages awarded under state law must be focused

8  on redressing harm caused to the parties before the court, not to

9  other persons.  Harm to others is relevant mainly to the question

10 of degree of reprehensibility.  <u>Williams</u>, 549 U.S. at 355.

11     Bank of America had ample notice in this case that

12 substantial punitive damages might be awarded.  It was taking the

13 position that any stay violation liability terminated at the

14 dismissal of the Sundquist chapter 13 case and no later than the

15 time of the rescission of the foreclosure sale.  On multiple

16 occasions during pretrial conferences, this court, as prospective

17 trier of fact, noted to counsel for Bank of America that it

18 needed to be mindful that substantial damages, actual and

19 punitive, might be awarded if the facts alleged and the

20 Sundquists' theory of the case were to turn out to be correct.

21     By nevertheless choosing to go to trial, Bank of America

22 knowingly assumed the risk of substantial punitive damages.[105]

23 _____

24     [105]<u>Williams</u> also prompts a clarification of the record.  In
   the course of ruling on evidentiary objections during the bench

25 trial, this court noted that the Sundquists' testimony about Bank
   of America's loss and mishandling of their many loan modification

26 applications was consistent with testimony that this court had
   heard literally hundreds (perhaps thousands) of times regarding

27 various mortgage lenders since the onset of the mortgage crisis
   and the Great Recession.  <u>See, e.g.</u>, <u>In re Roderick</u>, 425 B.R.

28 556, 560 (Bankr. E.D. Cal. 2010) (Wells Fargo Home Mortgage).  In
   context, this court was noting on the record for the benefit of

C

A conceptual problem arises at this juncture regarding how punitive damages are awarded.

It is settled that, in addition to extra recompense for plaintiffs, punitive damages serve legitimate governmental and societal interests in punishing unlawful conduct and deterring its repetition.  <u>Gore</u>, 517 U.S. at 568; <u>Newport</u>, 453 U.S. at 266-68; <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 350 (1974).  But, how are those societal interests to be vindicated?

To the extent that legitimate societal interests are to be served, the remedy needs to fit the wrong.  The award should be sufficient to serve those interests, which may be an "eye-popping" sum in the view of bystanders not possessed of great wealth.

When a large award is necessary, the problem arises of why plaintiffs should be allowed to appropriate to themselves unrestricted use of the governmental and societal component of a large punitive damages award – beyond a few multiples of compensatory damages.

---

Bank of America's counsel that the Sundquist testimony about their own experience was not inherently incredible to the trier of fact and needed to be taken seriously as Bank of America cross-examined and presented its defense.  It was probative of witness credibility and invited refutation, which was not forthcoming.  Mindful of <u>Williams</u>, 549 U.S. at 355, this court emphasizes that it is <u>not</u> punishing Bank of America for what it may have done to other people.  This court's knowledge of Bank of America's loan modification practices, gained in open court with Bank of America as a party, served two evidentiary purposes in this trial: (1) relevant to degree of reprehensibility; and (2) probative of credibility.

1

This case illustrates the problem.  Simplistic damage multiples that are not tied to economic reality would produce punitive damages that do not accurately serve their purposes.

In 2015, Bank of America earned net income of $15,900,000,000 and paid its top seven executives $80,500,000, which sum included $50,000,000 to the positions of Chief Executive Officer, Chief Operating Officer, and Head of Global Wealth and Investment Management.  2016 Proxy Statement, Bank of America, at pp. ii & 39 (March 17, 2016).[106]

To award punitive damages measured by a conventional multiplier of three to six times of the Sundquist compensatory damages would be laughed off in Bank of America's boardroom as a mere "cost of doing business" payable out of the petty cash account.

If the punitive damages award does include an amount sufficient to serve the legitimate societal interests justifying punitive damages but can only be directed to the Sundquists, the award to them would be greater than what principles of fairness would justify.

Conversely, why should Bank of America be permitted to evade the appropriate measure of punitive damages for its conduct?  Not being brought to book for bad behavior offensive to societal norms merely incentivizes future bad behavior.

---

[106]The equity-based compensation is subject to clawback for "detrimental conduct."  2016 Proxy Statement, Bank of America, at p. 49.

2

Several responses to the problem of economically efficient allocation of punitive damages have emerged in recent years.[107]

The Ohio Supreme Court, dealing with Ohio law, treated society as a de facto party.  It recognized that there is a "philosophical void between the reasons we award punitive damages and how the damages are distributed" and ordered a remittitur according to which it reduced a $49 million punitive damages jury award for bad faith denial of coverage to a cancer victim down to $30 million on the condition that the excess over $10 million (plus attorney's fees) be distributed to a cancer research fund sponsored by the State of Ohio.  Dardinger v. Anthem Blue Cross & Blue Shield, 98 Ohio St. 77, 102-04, 2002-Ohio-7113, 781 N.E.2d 121, 144-45 (Ohio 2002).

The Ohio judicial innovation redirecting part of a punitive damages award to a public purpose linked to the defendant's bad conduct was a matter of Ohio common law.  As such, it was justified by the "common law evolution" rationale.  See Li v. Yellow Cab Co., 532 P.2d 1226, 1238-39 (Cal. 1975).

In principle, the realm of federal common law is subject to the same common law evolution doctrine.

Legislatures have also innovated with enactment of so-called split recovery statutes.[108]  According to these schemes, which are

---

[107]See Catherine M. Sharkey, Punitive Damages as Societal Damages, 113 YALE L.J. 347 (2003).  See also, Note, Uncle Sam and the Partitioning Punitive Problem: A Federal Split Recovery Statute or a Federal Tax, 40 PEPP. L. REV. 785 (2013); Note, An Economic Analysis of the Plaintiff's Windfall from Punitive Damage Litigation, 105 HARV. L. REV. 1900 (1992).

[108]See Note, 40 PEPP. L. REV. at 802-05.

designed to ameliorate the perceived problem of the plaintiff windfall, the lion's share of punitive damages are redirected to public purposes for the benefit of society.

An example relevant in this judicial circuit is <u>Engquist v. Oregon Dep't of Agriculture</u>, 478 F.3d 985 (9th Cir. 2007).  The Ninth Circuit affirmed, against challenges under constitutional and common law theories, Oregon's statutory allocation of 60 percent of a punitive damages award in a tort case to the Oregon Criminal Injuries Compensation Account pursuant to state statute. Or. Rev. § 31.735; <u>Engquist</u>, 478 F.3d at 999-1007.

As a matter of procedure, the Ninth Circuit ruled that for purposes of execution under Federal Rule of Civil Procedure 69(a) it was sufficient for the State of Oregon to be identified in the judgment as a judgment creditor without the need formally to intervene as a party.  <u>Engquist</u>, 478 F.3d at 1001.

VII

Having concluded that punitive damages are "appropriate" in this case and having noted a trend toward calibrating punitive damages to serve their intended purposes, the question becomes how to determine the appropriate amount and allocation under the federal punitive damages statute in Bankruptcy Code § 362(k)(1).

A

Congress has given no guidance on the question regarding the federal statutory punitive damages authorized by § 362(k)(1), presumably leaving the answer to trial court decisions filtered through the appellate process.

95

1   Where Congress authorizes punitive damages in a general
2   manner, as in § 362(k)(1), it may be presumed that it intends
3   that punitive damages be in an amount that serves the full
4   panoply of interests, including societal interests, that are
5   vindicated by punitive damages.

6   In the context of the Bankruptcy Code, a key societal
7   interest underlying § 362(k)(1) is to have a self-executing
8   private law mechanism to enforce the automatic stay that is
9   crucial to effective operation of the bankruptcy system.   The
10  statutory punitive damages remedy evinces a public purpose that
11  the automatic stay not be a toothless tiger that can be flouted
12  with impunity.

13  It also may be presumed that Congress meant to tolerate a
14  certain degree of perceived windfall to victims (not always
15  debtors) of willful violations of the automatic stay.   One might
16  say that in the ordinary punitive damages situation the perceived
17  plaintiff windfall implicit in punitive damages functions as an
18  acceptable byproduct of the effort and risk of privately
19  enforcing the mandate of Congress.   One might even say that the
20  plaintiff is being compensated for acting as the equivalent of a
21  private attorney general.

22

23                              B

24  The problem becomes how to deal with the unusual situations
25  in which there is a gap between the large amount of punitive
26  damages that is both necessary and appropriate to serve the
27  purposes intended by § 362(k)(1) as to the wrongdoer and the
28  smaller amount that is appropriate for a plaintiff without

96

conferring an excessive windfall.  In other words, how is one to proceed when the punitive damages are not excessive per se, but the windfall to the plaintiff is perceived as excessive?


1

To let a defendant escape well-deserved punitive damages that are needed to vindicate the societal interests served by the law authorizing the award merely because a plaintiff would be receiving too much money is not a satisfactory answer.

Here, the law is poorly developed.  Appellate jurisprudence regarding "excessive" punitive damages tends to conflate the distinct concepts of the appropriate amount of the punitive damages award that the defendant's conduct justifies (i.e. whether the award itself is "excessive" in light of the conduct) and of the amount that the plaintiffs ought to be allowed to receive (i.e. whether the non-excessive punitive damages are nevertheless "excessive" in the hands of the plaintiff).  This is a byproduct of our case-law system in which appellate courts are prisoners of the facts determined in the trial court in the particular case on appeal and generally decline to consider issues not raised, and arguments not made, at trial.

The "excessive punitive damages" cases that have come before the Supreme Court have not been cases that present the issue of the dichotomy between the deserved amount of punitive damages and the amount that is appropriate to leave in the hands of the plaintiff.  Yet that is the nub of the problem at hand.

A solution based on common sense is to direct to a public purpose the portion of legitimate punitive damages that exceed

97

1  what private victims ought to be allowed to retain — the societal
2  interest component of punitive damages.  This is what the Ohio
3  Supreme Court did as a matter of Ohio common law.  <u>Dardinger</u>, 98
4  Ohio St. at 102-04, 781 N.E.2d at 144-45.

5      Under such a solution, the relevant public purpose should be
6  rationally linked to redressing the underlying conduct that
7  warrants punitive damages in the first place.

8

9                                    2

10     It is apparent that Bank of America's strategy regarding the
11  Sundquists has been infused with a sense of impunity.  The
12  reasons for this attitude of impunity no doubt are complex and
13  overdetermined.  The governmental regulatory system has failed to
14  protect the Sundquists.  Bank of America held out the Comptroller
15  of the Currency as a source of redress, but that turned out to be
16  a chimera.  The Consumer Financial Protection Bureau was thwarted
17  by Bank of America's bald-faced lie that there was no pending
18  litigation with the Sundquists and that there were no litigation
19  papers that could be sent to CFPB.

20     The flaw in the armor of Bank of America's attitude of
21  impunity is the potential for damages in civil litigation.  Even
22  there, however, the field is unbalanced.  The record reflects
23  that Bank of America has been represented in the Sundquist
24  litigation by first-class law firms.  In contrast, the legal
25  representatives serving the Sundquists have not covered
26  themselves in glory.

27     The Sundquists' testimony about their difficulties in
28  locating competent counsel is believable and demonstrates that

1  there is a dearth of consumer lawyers with the resources and
2  skills to be effective when representing consumers against Bank
3  of America.

4

5                                    3

6      It follows that the public purpose of the societal component
7  of punitive damages against Bank of America in this case should
8  be focused on consumer law in the form of better education in
9  consumer law and more robust resources for leading public service
10 consumer law organizations.

11     On the education front, the public law schools in the
12 University of California system are the appropriate
13 beneficiaries.  There are five such law schools: Berkeley Law
14 School, Hastings College of Law, UC-Davis Law School, UC-Irvine
15 Law School, and UCLA Law School.

16     On the consumer legal front, the appropriate beneficiaries
17 are the National Consumer Law Center and the National Consumer
18 Bankruptcy Rights Center.  Both are charitable entities qualified
19 under Internal Revenue Code § 501(c)(3).  One is prominent in the
20 field of general consumer rights, the other is prominent in the
21 field of consumer rights in bankruptcy.

22     The problems presented by this case span issues of general
23 consumer law and of consumer bankruptcy law.  By channeling to
24 these public academic and consumer advocacy institutions the
25 societal portion of legitimate punitive damages, to be earmarked
26 for consumer law purposes, this court is able to fashion a
27 punitive damages remedy that addresses the enormity of the
28 situation.

4

The question becomes how to square this remedy channeling a portion of the punitive damages to public purposes with the operative language of § 362(k)(1): "[A]n <u>individual injured by any willful violation</u> of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, <u>may recover punitive damages</u>." 11 U.S.C. § 362(k)(1).

At first reading of this statute, one might assume that all damages must go to the injured individual. The phrase "individual injured ... <u>shall</u> recover actual damages, including costs and attorneys' fees" appears to require all actual damages to be paid to the injured individual. Yet, few would doubt that Congress expected the attorneys' fees and costs can be channeled to the professionals involved.

The use of the verb form "may" in the phrase "<u>may</u> recover punitive damages" affords more latitude and can be read to connote another element of discretion contemplated by Congress.

It is noteworthy that the language of the statute does not prohibit a court from putting strings on what may be done with a portion of the amount awarded.

It would not offend the statute to make an award of punitive damages to the injured individual, which damages are ordinarily subject to individual taxation, and then to enjoin the injured individual to deliver a portion of the award, net of taxes, to designated entities that stand for the societal interest component of the punitive damages justly attributable to the conduct of the wrongdoer towards the injured individual.

1      This would achieve full vindication of the individual
2  interests and the societal interests that are being vindicated in
3  a substantial award of punitive damages.  From the perspective of
4  the individual, allowing the individual to pocket the societal
5  interest component smacks of too much of a windfall for the
6  individual no matter how deserved the total award may be.  From
7  the perspective of the violator, limiting punitive damages to an
8  amount that is not perceived as too big a windfall to stomach
9  enables the wrongdoer to avoid paying the societal component of
10 punitive damages that are genuinely deserved.

11     This court concludes that § 362(k)(1) permits a portion of
12 punitive damages awarded to an individual injured by willful
13 violation of the automatic stay to be channeled, after receipt by
14 the injured individual and payment of taxes incurred by such
15 receipt, to entities that serve the interests of preventing the
16 willful violator's transgressions in the future.

17

18                                5

19     It is appropriate, as an alternative, to give the willful
20 violator the opportunity to earn a remittitur of the channeled
21 portion of the punitive damages.

22     Thus, in lieu of the sums that are channeled to the
23 designated public service organizations, Bank of America may have
24 a remittitur of those sums if it contributes to those same
25 organizations 75 percent of pre-tax designated amounts with no
26 conditions attached to those contributions other than the sums
27 must be used only for education in consumer law and delivery of
28 legal services in matters of consumer law.

1     For example, if the Sundquists are enjoined to deliver to
2  National Consumer Law Center the post-tax remainder of $10
3  million of the punitive damages awarded to them, then there would
4  be a remittitur of $10 million on the condition that Bank of
5  America contribute $7.5 million to National Consumer Law Center
6  to be used only for education in consumer law and delivery of
7  legal services in matters of consumer law.

8

9                                VIII

10     The § 362(k)(1) actual damages for the willful stay
11  violation that Bank of America committed and has heretofore
12  declined to remedy total, as described above, $1,074,581.50.

13     Of the $1,074,581.50 in actual damages, the Sundquists are
14  enjoined to deliver to their attorney, Dennise Henderson,
15  $70,000.00 (less sums previously paid to her for this adversary
16  proceeding) on account of attorneys' fees and costs that comprise
17  an item in the actual damages award.

18     The appropriate amount of § 362(k)(1) punitive damages to be
19  awarded to the Sundquists is $45,000,000.00.

20     Of the $45,000,000.00 in punitive damages, the Sundquists
21  are enjoined to deliver to:

22     National Consumer Law Center $10,000,000.00 (minus all
23  taxes, if any, the Sundquists must pay on account of that sum);

24     National Consumer Bankruptcy Rights Center $10,000,000.00
25  (minus all taxes, if any, the Sundquists must pay on account of
26  that sum);

27     University of California, Berkeley School of Law,
28  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay

1  on account of that sum);

2      University of California-Davis, School of Law, $4,000,000.00
3  (minus all taxes, if any, the Sundquists must pay on account of
4  that sum);

5      University of California, Hastings College of the Law,
6  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay
7  on account of that sum);

8      University of California-Irvine, School of Law,
9  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay
10  on account of that sum);

11      University of California-Los Angeles, School of Law,
12  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay
13  on account of that sum).

14      It is the intention of this court that the six designated
15  entities shall have standing to participate in requests for post-
16  trial relief in this court and to participate in any appeal from
17  the judgment in this adversary proceeding.

18      There shall be a remittitur of the § 362(k)(1) punitive
19  damages to $5,000,000.00 if, and only if, Bank of America
20  contributes:  $7,500,000.00 to National Consumer Law Center;
21  $7,500,000.00 to National Consumer Bankruptcy Rights Center;
22  $3,000,000.00 to University of California, Berkeley School of
23  Law; $3,000,000.00 to University of California-Davis, School of
24  Law; $3,000,000.00 to University of California, Hastings College
25  of the Law; $3,000,000.00 to University of California-Irvine,
26  School of Law; and $3,000,000.00 to University of California-Los
27  Angeles, School of Law.  All such contributions are to be used
28  only for education in consumer law and delivery of legal services

in matters of consumer law and be subject to no other condition imposed by Bank of America.

As intended beneficiaries of the punitive damages award, the National Consumer Law Center, National Consumer Bankruptcy Rights Center, and the five University of California law schools have standing to appear and participate in all post-judgment proceedings and appeals.

## IX

Finally, there is the question of the Sundquist mortgage, which Bank of America admits that it holds for its own account. The principal balance due is $584,893.97, with interest accruing from February 1, 2009,[109] at the contract rate of 6 percent.[110]

Throughout, the Sundquists have maintained that they are prepared to honor their legitimate mortgage obligation, but only after the correct amount is determined. Bank of America's intransigence in seeking reimbursement of expenses incurred by Bank of America, such as HOA fees and penalties, during the time that Bank of America held title and the Sundquists were ousted from possession has been the impediment to moving forward.

It is now appropriate definitively to state the remaining amount due on the mortgage and additional charges amounts that may be included.

In view of Bank of America's pattern of failure to deal with the Sundquists in good faith and with fair dealing, as required

---

[109]B of A Ex. WWW.

[110]B of A Ex. L.

by California law, justice requires disapproving all charges and
penalties other than interest at the contract rate of 6 percent
and reimbursement of taxes actually paid by Bank of America by
way of escrow advance.

The mortgage is reinstated with the debt fixed at the
$584,893.97 owed as of February 1, 2009, plus interest at 6
percent simple interest since February 1, 2009, plus
reimbursement of property taxes actually paid by Bank of America
since February 1, 2009.

The court does not regard this measure as inequitable
towards Bank of America.  The default occurred solely because
Bank of America induced the initial mortgage default as a
precondition to discussing mortgage modification.  It ignored
information that Renée Sundquist's mother was on the sidelines to
provide funds to cure any default upon mortgage modification.
Thereafter, Bank of America had no compunction about aggressively
pursing foreclosure and unlawful detainer in willful disregard of
the automatic stay.  It led the Sundquists on a not-very-merry
chase by inviting and entertaining mortgage modification
applications that it had no intention of granting.

When the Bank of America Chief Executive Officer's office
became involved, the misconduct strayed across the civil-criminal
frontier when the office of the CEO falsely reported to the
Consumer Financial Protection Bureau that there had not been a
foreclosure and that no active litigation was pending between
Bank of America and the Sundquists.  The fact of the foreclosure
was beyond cavil and an active appeal was under submission and in
the process of being decided by the California appellate court.

1    In contrast, the Sundquists have clean hands and are not
2  free riders seeking free lodging.

3    Despite all of Bank of America's bad behavior, it is winding
4  up with the benefit of its mortgage bargain.  The mortgage is
5  reinstated with its above-current-marker interest rate.  The
6  secular rise in real estate values in the Sacramento area since
7  2009 assures that Bank of America is not under-collateralized.
8  The is no reason to expect the mortgage will not be paid.

9    The history of Bank of America's dealings with the
10 Sundquists suggests that it might aggressively seek to collect
11 the mortgage debt and miss no opportunity to declare a default,
12 while simultaneously resisting paying any of the damages awarded
13 in this case until every avenue of appeal is exhausted.  That
14 nontrivial possibility warrants supervision by this court of
15 payment of the mortgage until this case ends.

16    Bank of America will be enjoined from requiring payments
17 from the Sundquists (who may make voluntary payments), and
18 enjoined from declaring a default, until 60 days after Bank of
19 America pays the Sundquists the full amount of the actual and
20 punitive damages here awarded.

21    For purposes of enforcing the awards made here, this court
22 retains jurisdiction over the mortgage and related obligations.

23

24                        Conclusion

25    Bank of America willfully violated the automatic stay by,
26 among other things, foreclosing on the Sundquist residence,
27 prosecuting an unlawful detainer action, forcing them to move,
28 secretly rescinding the foreclosure, failing to protect the

residence from looting, refusing to pay for Sundquist property lost, and subjecting the Sundquists to a mortgage modification charade.  Pursuant to § 362(k)(1), Bank of America is liable for all damages incurred between the initial violation of the automatic stay and the time the stay violation is fully remedied (which remedy comes in this decision and accompanying judgment).

The actual § 362(k)(1) damages are $1,074,581.50.  The appropriate § 362(k)(1) punitive damages are $45,000,000.00.

The Sundquists are enjoined to deliver $40,000,000.00 (minus applicable taxes) to public service entities that are important in education in consumer law and delivery of legal services to consumers:  National Consumer Law Center ($10,000,000.00), National Consumer Bankruptcy Rights Center ($10,000,000.00), and the five public law schools of the University of California System ($4,000,000.00).

Bank of America may have a remittitur of $40,000,000.00 of the punitive damages if, and only if, it contributes a total of $30,000,000.00 (to be used only for education in consumer law and delivery of legal services to consumers and be subject to no other condition imposed by Bank of America) to National Consumer Law Center ($7,500,000.00), National Consumer Bankruptcy Rights Center ($7,500,000.00), and the five public law schools of the University of California System ($3,000,000.00 each).

This opinion contains findings of fact and conclusions of law.  An appropriate Judgment shall be entered.

Dated: March 23, 2017

UNITED STATES BANKRUPTCY JUDGE

107

## INSTRUCTIONS TO CLERK OF COURT
## SERVICE LIST

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Erik J. Sundquist
Renee Sundquist
1321 Feliz Way
Lincoln CA 96548

Dennise S. Henderson
1903 21st St
Sacramento CA 95811

Jonathan R. Doolittle
101 2nd St #1800
San Francisco CA 94105

John Siamas
101 2nd St #1800
San Francisco CA 94105

Justin E. McGuirk
101 2nd St #1800
San Francisco CA 94105

Le T. Duong
101 2nd St #1800
San Francisco CA 94105

National Consumer Law Center
John Rao, Esq.
7 Winthrop Square
Boston, MA 02110-1245

National Consumer Bankruptcy Rights Center
Tara Twomey, Esq.
1501 The Alameda
San Jose, CA 95126

Dean
Berkeley Law, University of California
225 Boalt Hall
Berkeley, CA 94720-7200

Dean
University of California, Davis
School of Law
King Hall
400 Mrak Hall Drive
Davis, CA 95616-5201

Dean
University of California Hastings
College of the Law
200 McAllister Street
San Francisco, CA 94102

Dean
University of California
Irvine School of Law
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000

Dean
University of California, Los Angeles
School of Law
385 Charles E. Young Drive East
1242 Law Building
Los Angeles, CA 90095