Dennise Henderson, SBN 208640
LAW OFFICE OF DENNISE HENDERSON
1903 21st Street
Sacramento, California 95811
Telephone:    (916) 456-2027
Facsimile:    (916) 456-2035
Email: dshendersonlaw@yahoo.com

Attorneys for appellants
DENNISE HENDERSON and
LAW OFFICE OF DENNISE HENDERSON

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| IN RE ERICK SUNDQUIST, RENEE SUNDQUIST, Debtors | Adv. Pro No.: 14-02278 |
| ERIK SUNDQUIST, RENEE SUNDQUIST, <br><br> Plaintiffs, <br><br> vs. <br><br> BANK OF AMERICA N.A., RECONTRUST COMPANY, N.A., BAC HOME LOANS SERVICING, LP, <br><br> Defendants. | Case No.: 10-35624-B-13J <br><br> **NOTICE OF APPEAL** <br> **AND STATEMENT OF ELECTION** |

TO:     DEBTORS, PLAINTIFFS, DEFENDANTS, AND THEIR COUNSEL OF RECORD:

**Name of appellants:** Dennise Henderson and Law Office of Dennise Henderson

**Position of appellants in the adversary proceeding**: Counsel for debtors and plaintiffs Erik Sundquist and Renee Sundquist.

**Subject of this Appeal:** Appellants appeal the March 23, 2017 judgment and opinion of the bankruptcy court to the extent they invalidate appellants' contingency fee agreement with debtors and plaintiffs Erik Sundquist and Renee Sundquist. See Judgement entered March 23, 2017, docket no. 262, at page 1, lines 24-28, and the bankruptcy court's March 23, 2017 opinion, docket no. 263, at pages 55-58. Copies of the judgment and opinion are attached to this Notice of Appeal and Statement of Election.

**Other Parties to the Appeal and their counsel of record:**

Defendants Bank of America, N., A.,
Recontrust Company, N.A.,
BAC Home Loans Servicing, LP:                     Reed Smith
                                                   Jonathan R. Doolittle, Esq.
                                                   101 Second Street, Suite 1800
                                                   San Francisco, CA 94102
                                                   (415) 543-8700

Debtors and Plaintiffs
Erik and Renee Sundquist:                          Estela Pino
                                                   Pino & Associates
                                                   800 Howe Avenue, Suite 420
                                                   Sacramento, California 95825
                                                   (916) 641-2288

                                                   James L. Stang
                                                   Pachulski Stang Ziehl & Jones LLP
                                                   10100 Santa Monica Boulevard
                                                   Suite 1300
                                                   Los Angeles, California 90067
                                                   (310) 277-6910

**Statement of Election:** Appellants appeal to the United States Bankruptcy Appellate Panel for the Ninth Circuit.

Dated:  April 6, 2017                    LAW OFFICE OF DENNISE HENDERSON

By: /s/ Dennise Henderson
_____
             Dennise Henderson
             Attorneys for Appellants
             Dennise Henderson and
             Law Office of Dennise Henderson

6

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIK SUNDQUIST and RENÉE SUNDQUIST, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) Adv. Pro. No.  14-02278 |
| | ) |
| BANK OF AMERICA, N.A.; RECONTRUST COMPANY, N.A.; BAC HOME LOANS SERVICING, LP, | ) ) ) |
| Defendants. | ) ) |
| In re: ERIK SUNDQUIST and RENÉE SUNDQUIST, | ) ) Case No. 10-35624-B-13J |
| Debtors. | ) ) |

**JUDGMENT**

This Adversary Proceeding having been duly tried before Christopher M. Klein, United States Bankruptcy Judge, and findings of fact and conclusions of law having been rendered in accordance with Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052:

IT IS ORDERED AND ADJUDGED that Erik Sundquist and Renée Sundquist shall recover from Bank of America N.A., the amount of $1,074,581.50 as actual damages pursuant to 11 U.S.C. § 362(k)(1); and

IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and Renée Sundquist are ENJOINED to deliver the amount of $70,000.00 (minus any amounts previously paid as fees or costs in this matter) of the aforesaid $1,074,581.50 to their attorney, Dennise Henderson; and

```
 1        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
 2   Renée Sundquist shall recover from Bank of America, N.A., the
 3   amount of $45,000,000.00 as punitive damages pursuant to 11
 4   U.S.C. § 362(k)(1); and
 5        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
 6   Renée Sundquist are ENJOINED to deliver to National Consumer Law
 7   Center from the aforesaid punitive damages the amount of
 8   $10,000,000.00 (minus all taxes, if any, the Sundquists must pay
 9   on account of that sum); and
10        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
11   Renée Sundquist are ENJOINED to deliver to National Consumer
12   Bankruptcy Rights Center from the aforesaid punitive damages the
13   amount of $10,000,000.00 (minus all taxes, if any, the Sundquists
14   must pay on account of that sum); and
15        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
16   Renée Sundquist are ENJOINED to deliver to University of
17   California, Berkeley School of Law, from the aforesaid punitive
18   damages the amount of $4,000,000.00 (minus all taxes, if any, the
19   Sundquists must pay on account of that sum); and
20        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
21   Renée Sundquist are ENJOINED to deliver to University of
22   California-Davis, School of Law, from the aforesaid punitive
23   damages the amount of $4,000,000.00 (minus all taxes, if any, the
24   Sundquists must pay on account of that sum); and
25        IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and
26   Renée Sundquist are ENJOINED to deliver to University of
27
28                                     2
```

California, Hastings College of the Law, from the aforesaid

punitive damages the amount of $4,000,000.00 (minus all taxes, if

any, the Sundquists must pay on account of that sum); and

IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and

Renée Sundquist are ENJOINED to deliver to University of

California-Irvine, School of Law, from the aforesaid punitive

damages the amount of $4,000,000.00 (minus all taxes, if any, the

Sundquists must pay on account of that sum); and

IT IS FURTHER ORDERED AND ADJUDGED that Erik Sundquist and

Renée Sundquist are ENJOINED to deliver to University of

California-Los Angeles, School of Law, from the aforesaid

punitive damages the amount of $4,000,000.00 (minus all taxes, if

any, the Sundquists must pay on account of that sum); and

IT IS FURTHER ORDERED AND ADJUDGED that Bank of America,

N.A., may request a REMITTITUR from this court of punitive

damages to the extent of $40,000,000.00 under the terms specified

by this court in its Opinion containing findings of fact and

conclusions of law; and

IT IS FURTHER ORDERED AND ADJUDGED that the amount due on

the debt owed by Erik Sundquist and Renée Sundquist under the

Note owned by Bank of America, N.A., and secured by a Deed of

Trust on the Sundquist residence is DECLARED TO BE $584,893.97,

plus simple interest at 6 percent from February 1, 2009, until

paid, plus reimbursement of property taxes actually paid by Bank

of America after February 1, 2009, AND all defaults are DECLARED

TO BE cured, AND all other charges, penalties, costs, fees and

1   other charges are DECLARED TO BE cancelled and may not be

2   collected in any form; and

3       IT IS FURTHER ORDERED AND ADJUDGED that Bank of America,

4   N.A., is ENJOINED from declaring a default and from requiring

5   payments from Erik Sundquist and Renée Sundquist (who

6   nevertheless may make voluntary payments), until sixty (60) days

7   after Bank of America, N.A., pays the Sundquists the full amount

8   of the actual and punitive damages awarded in this Judgment; and

9       IT IS FURTHER ORDERED AND ADJUDGED that this court retains

10  jurisdiction over the mortgage debt, the potential remittitur,

11  and related obligations.

12

13  Dated:  March 23, 2017

14                                  _____

15                                  UNITED STATES BANKRUPTCY JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28                                4

# INSTRUCTIONS TO CLERK OF COURT
## SERVICE LIST

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Erik J. Sundquist
Renee Sundquist
1321 Feliz Way
Lincoln CA 96548


Dennise S. Henderson
1903 21st St
Sacramento CA 95811

Jonathan R. Doolittle
101 2nd St #1800
San Francisco CA 94105


John Siamas
101 2nd St #1800
San Francisco CA 94105


Justin E. McGuirk
101 2nd St #1800
San Francisco CA 94105


Le T. Duong
101 2nd St #1800
San Francisco CA 94105


National Consumer Law Center
John Rao, Esq.
7 Winthrop Square
Boston, MA 02110-1245

National Consumer Bankruptcy Rights Center
Tara Twomey, Esq.
1501 The Alameda
San Jose, CA 95126

Dean
Berkeley Law, University of California
225 Boalt Hall
Berkeley, CA 94720-7200

Dean
University of California, Davis
School of Law
King Hall
400 Mrak Hall Drive
Davis, CA 95616-5201

Dean
University of California Hastings
College of the Law
200 McAllister Street
San Francisco, CA 94102

Dean
University of California
Irvine School of Law
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000

Dean
University of California, Los Angeles
School of Law
385 Charles E. Young Drive East
1242 Law Building
Los Angeles, CA 90095

1          FOR PUBLICATION

2     UNITED STATES BANKRUPTCY COURT

3       EASTERN DISTRICT OF CALIFORNIA

4
ERIK SUNDQUIST and RENÉE          )
5   SUNDQUIST,                     )
                  Plaintiffs,      )
6   v.                             )Adv. Pro. No.   14-02278
                                   )
7   BANK OF AMERICA, N.A.;         )
RECONTRUST COMPANY, N.A.; BAC      )
8   HOME LOANS SERVICING, LP,      )
                  Defendants.      )
9   _____)
                                   )
10  In re: ERIK SUNDQUIST and RENÉE)
SUNDQUIST,                         )Case No. 10-35624-B-13J
11                  Debtors.       )
    _____)

12

13                    OPINION

14     Before: Christopher M. Klein, Bankruptcy Judge

15
Dennise Henderson, Sacramento, California, for Plaintiffs.
16
John S. Siamas, Jonathan R. Doolittle, Reed Smith LLP, San
17  Francisco, California, for all Defendants.[1]

18

19  CHRISTOPHER M. KLEIN, Bankruptcy Judge:

20

21     Franz Kafka lives.  This automatic stay violation case

22  reveals that he works at Bank of America.

23     The mirage of promised mortgage modification lured the

24  plaintiff debtors into a kafkaesque nightmare of stay-violating

25  foreclosure and unlawful detainer, tardy foreclosure rescission

26  _____

27     [1]Recontrust Company, N.A., is a wholly-owned subsidiary of
Bank of America, N.A.  BAC Home Loans Servicing, LP, has been
28  absorbed as a division of Bank of America, N.A.

1   kept secret for months, home looted while the debtors were
2   dispossessed, emotional distress, lost income, apparent heart
3   attack, suicide attempt, and post-traumatic stress disorder, for
4   all of which Bank of America disclaims responsibility.

5       The case migrated to federal court after a state appellate
6   court ruled that the federal damages remedy for stay violations,
7   11 U.S.C. § 362(k)(1), preempts state wrongful foreclosure damage
8   actions that are based solely on such violations.  Although that
9   appeal established, as a matter of nonbankruptcy law, that the
10  plaintiffs' state-court complaint stated actionable claims
11  against Bank of America for deceit, promissory estoppel, breach
12  of fiduciary duty, aiding and abetting breach of fiduciary duty,
13  assumed liability of mortgage brokers, unfair competition, and
14  negligence, the plaintiffs focus here on the § 362(k)(1) remedy.

15      The plaintiffs filed a civil action in the United States
16  District Court in this district (No. 2:14-cv-01151), which action
17  was referred to this bankruptcy court as a core proceeding to be
18  heard and determined by a bankruptcy judge.

19      The stay violations being undeniable, the key questions of
20  law are whether, and for how long, "actual damages" under
21  § 362(k)(1) continue to accrue after the automatic stay expires?
22  The answer has two facets.  First, damages continue to accrue
23  until full restitution is made.  Second, applicable tort concepts
24  teach that damages encompass all consequences proximately caused
25  by the stay-offending conduct for so long as those consequences
26  continue, regardless of whether the stay has expired.

27      This nightmare also presents § 362(k)(1) "appropriate
28  circumstances" for awarding punitive damages and the concomitant

problem of how to vindicate the societal norm implicit in

punitive damages without creating an excessive windfall.

### Facts[2]

In 2008, plaintiffs Erik and Renée Sundquist recognized that they needed to downsize by 50 percent.[3] They sold their home in a "short sale" and bought a less expensive home in Lincoln, California, also through a short sale. They made a down payment of $125,000.00 and executed a $587,250.00 note at 6 percent fixed interest. The note and deed of trust were promptly purchased by Countrywide Home Loans, which soon merged into defendant Bank of America, N.A. The loan has been serviced at all relevant times by Bank of America as successor by merger to BAC Home Loans Servicing, LP.

The Sundquists were reluctant to agree to the new loan

---

[2]Some procedural facts are derived from the decision of the Court of Appeal of the State of California, Third Appellate District, in Sundquist v. Bank of America, N.A., et al., No. C070291, filed Sep. 5, 2013, of which this court took judicial notice (as to authenticity) at the request of the parties. As the issue in that appeal was whether the complaint stated various state-law claims, some facts assumed in that decision varied from the evidence adduced at trial in this court, which is using only facts consistent with evidence actually adduced at trial.

[3]An important source of evidence is the testimony of Renée Sundquist, whom the court found to be a credible witness. She began "Journaling as a way to deal with the insanity of the communications with Bank of America." Renée Sundquist Decl. ¶ 22. Extracts of the journal begin at paragraph 25 of her declaration. A more complete version is B of A Exs. OOO-VVV. The court believed her live testimony and believed her declaration testimony (as to which defendant had full and fair opportunity to cross-examine), which incorporates the journal entries. She is commended for having the courage to expose private personal and potentially-embarrassing feelings and actions that reveal the human cost of Bank of America's loan modification process.

1  because monthly payments on the loan were higher than what they

2  had been seeking, but they were stampeded into closing the

3  transaction by the threat of a sale to an all-cash buyer and by

4  the promise of their loan broker (whom they trusted based on his

5  work for them on two prior refinances and a business loan) that

6  they could refinance or modify the loan immediately.

7       Bank of America owns for its own account the beneficial

8  interest in the mortgage note.[4]

9       The Sundquists, who were current on their $4,557.72

10  ($3,520.86 principal and interest) mortgage payments (and able to

11  remain current indefinitely with assistance from Mrs. Sundquist's

12  mother) but struggling financially, defaulted on loan payments in

13  March 2009 because Bank of America said that it would not

14  consider any loan modification request (and would not send

15  application forms) unless and until they ceased making payments.[5]

16       Their sole reason for defaulting, which they did with

17  considerable reluctance (their credit score had been above 800),

18  was acquiescence in Bank of America's demand that they default as

19  ────────────────────

20  [4]When Bank of America foreclosed, it purchased the property
   for the full amount of the debt, and there was no third party

21  investor to notify.  Its post-foreclosure notes reflect: "Results
   of Sale: Prop Reverted to Plaintiff; Successful Bidder: BAC; Sale

22  Amount: $652,217.20; Notify Investor of Sales Results: N/A."  B
   of A Ex. II-001.

23

24  [5]"I began to call and send letters to Bank of America asking
   for help to reduce or delay our payments.  I was finally told by

25  representatives of Bank of America that the only help was
   modification and I had to stop making payments for three months

26  in order to receive a modification."

27  Renée Sundquist Decl. ¶¶ 20-22. The court believes, and so finds
   as fact, this testimony.  The statements attributed to Bank of

28  America are non-hearsay statements by an opposing party.  Fed. R.
   Evid. 802(d)(1).

4

1  a precondition for loan modification discussions with Bank of

2  America.[6]

3      The Sundquists expected to be able to cure (with Renée

4  Sundquist's mother's assistance) any default once a loan-

5  modification was achieved.  They further expected that Bank of

6  America would deal with them in good faith and make a reasonably

7  prompt decision.

8      Those expectations of prompt and good-faith dealings turned

9  out to be improvident.

10      Bank of America started a multi-year "dual-tracking" game of

11  cat-and-mouse.  With one paw, Bank of America batted the debtors

12  between about twenty loan modification requests or supplements

13  that routinely were either "lost"[7] or declared insufficient, or

14

15      [6]From the Renée Sundquist Journal:

16      "I called and finally was able to have them send me a packet
if I promised not to make a payment for three months.  The
17  struggle to make the decision to agree to not make payments was
excruciating.  We are not people who walk away from debt nor
18  supported it."

19  Renée Sundquist Decl. ¶¶ 23-24.  The court believes, and so finds
as fact, this testimony.  The statements attributed to Bank of
20  America are non-hearsay statements by an opposing party.  Fed. R.
Evid. 802(d)(1).
21

22      [7]Example from the Renée Sundquist Journal:

23  "First part of February 2009, calling to ask for modification for
the fourth time; now we are two months behind.  Finally received
24  the modification packet one and half months after requesting it.
I filled it out in an hour and took it down to the post office.
25  I was told we were not allowed to fax anything to the bank
because they said 'they lose everything.'  A week passed since I
26  sent the modification documents.  I called the bank to see if
they received them.  The said they didn't receive the documents,
27  but I was looking at the signature from the bank when they
received them.  No reason to argue.  Called bank and they said
28  they would resend the modification packet.  Called a week later

1  incomplete, or stale[8] and in need of re-submission, or denied

2  without comprehensible explanation[9] but without prejudice to yet

3  another request.[10]  With the other paw, Bank of America

4  ─────────────────────────

5  and they still had not sent it.  Bank said they lost the original
   documents after signing for them."

6  Renée Sundquist Decl. ¶¶ 33-42. The court believes, and so finds
7  as fact, this testimony. The statements attributed to Bank of
   America are non-hearsay statements by an opposing party.  Fed. R.
8  Evid. 802(d)(1).

9      [8]Example from the Renée Sundquist Journal:

10     "March 2009 received the loan modification documents filled
   them out quickly took it to UPS.  Confirmed they received packet.
11 Confirmed they did not need anything more.  After several weeks
   we received a request for pay stubs.  They had been sent with the
12 first and second packets.  This time I was told I could fax them
   which I did previously this was not allowed therefore overnight
13 fees.  Bank calls requesting 2009 taxes which were already sent
   twice.  I sent them again. Called to confirm that they received
14 the faxed confidential documents and no one could find them.  We
   were told to call the HOPE department.  Received another call
15 from the Bank that they did not receive our taxes.  They were
   sent twice by mail and twice by fax."
16

17 Renée Sundquist Decl. ¶¶ 43-50. The court believes, and so finds
   as fact, this testimony. The statements attributed to Bank of
18 America are non-hearsay statements by an opposing party.  Fed. R.
   Evid. 802(d)(1).  The statements attributed to Bank of America
19 are non-hearsay statements by an opposing party.  Fed. R. Evid.
   802(d)(1).
20

21     [9]Example from the Renée Sundquist Journal:

22     "In May still have not been advised as to status of the
   modification.  When I call bank now they just hang up on me.
23 Today when I called I was lectured by the bank that I should know
   how many modifications they are working on and the I should not
24 expect an update."

25 Renée Sundquist Decl. ¶¶ 56-58. The court believes, and so finds
26 as fact, this testimony.  The statements attributed to Bank of
   America are non-hearsay statements by an opposing party.  Fed. R.
27 Evid. 802(d)(1).

28     [10]Example from the Renée Sundquist Journal:

6

1  repeatedly scheduled foreclosures.[11]

2      It was of no consequence to Bank of America that Renée

3  Sundquist's mother, who held a second deed of trust on the

4  residence, advised that she had funds sufficient to enable the

5  Sundquists to cure the arrearage once the loan was modified.[12]

6      Bank of America actually told Renée Sundquist that mortgage

7  modification was "not real."[13]

8  _____

9      "Early August 2009 the bank does not have our modification
   after all this time. Another call to them and they admit we are
10 now too past due we are not eligible for a modification.
   September 2009 the bank tells us that the modification is under
11 review."

12 Renée Sundquist Decl. ¶¶ 72-74. The court believes, and so finds
   as fact, this testimony.  The statements attributed to Bank of
13 America are non-hearsay statements by an opposing party. Fed. R.
   Evid. 802(d)(1).
14

15     [11]Example from the Renée Sundquist Journal:

16     "I was told that by the bank 'when the property forecloses
   that is when you will know you did not get a modification.'"
17 Renée Sundquist Decl. ¶ 56. The court believes, and so finds as
   fact, this testimony.  The statements attributed to Bank of
18 America are non-hearsay statements by an opposing party.  Fed. R.
   Evid. 802(d)(1).
19

20     [12]From the Renée Sundquist Journal:

21     "My mother sent a letter to the bank advising them she was
   an investor and wanted to make sure she did not lose her
22 investment.  She advised she had funds to pay for the
   foreclosure.  I called to confirm that the bank had received the
23 letter from my mother and they said they were converting their
   system and all documents were lost."
24

25 Renée Sundquist Decl. ¶¶ 89-90.  The court believes, and so finds
   as fact, this testimony.  The statements attributed to Bank of
26 America are non-hearsay statements by an opposing party. Fed. R.
   Evid. 802(d)(1).
27

28     [13]From the Renée Sundquist Journal:

       "Called the bank talked to a representative who said the

7

1    The Sundquists filed a chapter 7 bankruptcy case that
2    operated to clear away debt following the closure of Mr.
3    Sundquist's construction and development businesses due to the
4    Great Recession, which filing delayed a scheduled foreclosure
5    sale. They made clear in that chapter 7 case that they intended
6    to retain their residence and pay Bank of America.[14]

7    They reasonably believed that shedding unsecured debt by way
8    of the chapter 7 discharge would enhance their ability to pay
9    Bank of America on a modified loan. But, upon the completion of
10   that chapter 7 case, Bank of America gave the Sundquists no
11   credit for their improved debt profile and resumed its dual-
12   tracking strategy of using mortgage modification applications to
13   distract borrowers from the bank's march to foreclosure.

14   Faced with imminent foreclosure, the Sundquists filed
15   chapter 13 case no. 10-35624 in this court on June 14, 2010, at
16   5:17 p.m., thereby triggering the automatic stay under 11 U.S.C.
17   § 362. They intended to use a chapter 13 plan to cure the Bank
18   of America default and move forward with the loan modification
19   that they were still expecting to occur.

20   Bank of America concedes that it received notice of the

21   _____

22   modifications were not real. When I told her my mother could pay
     it off the representative advised against because the
23   modification doesn't mean anything and it is just a way to create
     funds for the banks before foreclosure."
24

25   Renée Sundquist Decl. ¶¶ 91-92. The court believes, and so finds
     as fact, this testimony. The statements attributed to Bank of
26   America are non-hearsay statements by an opposing party. Fed. R.
     Evid. 802(d)(1).
27

28   [14]Case No. 09-44647, Chapter 7 Individual Debtor's Statement
     of Intention, Bank of America's Request for Judicial Notice of
     Filed Documents, Ex. A.

8

1  bankruptcy on June 14, 2010, and concedes that on June 14 it
2  transferred the loan to its Bankruptcy Department.[15]

3      Despite knowing of the bankruptcy case, Bank of America did
4  not stop the trustee's sale on June 15, 2010, at which it
5  purchased the property for its own account by credit bidding the
6  full amount of the debt ($652,217.20).

7      Bank of America on June 16, 2010, further adjusted its
8  records to reflect that the bankruptcy case was filed June 14.[16]

9      Bank of America has a written procedure for dealing with
10 situations when a foreclosure occurs in violation of the
11 automatic stay in ignorance of a bankruptcy case filing.  Upon
12 discovery of the problem, the procedure requires "immediate"
13 rescission.[17]

14 _____

15     [15]In addition to the concession during trial, Bank of
   America's Loss Mitigation Home Base Work Action History database
16 has the entry: "06/14/2010 ... Daphne English ... Customer Claims
   Bankruptcy."  B of A Ex. KK & Sundquist Ex. 71.  And, its Loss
17 Mitigation Home Base II database has the entry: "transfer[r]ed to
   bk dept ... 06/14/2010 ... Daphne English."  B of A Ex. JJ &
18 Sundquist Ex. 71.

19     [16]Bank of America Representative Deloney testified that Bank
20 of America personnel did not code the loan in its computer system
   as being "in bankruptcy" (code 03) until June 16, 2010.

21     Servicing Activities History: "HO filed for BK on 06/14/10,
22 chapter 13, case # 201035624 Submitted BK Notification.
   Information has been changed on June 16, 2010."  Sundquist Ex.
23 59.

24     [17]Bank of America's "Rescind Sale" procedure: "Perform this
25 [rescission] procedure immediately after learning that the
   borrower filed for bankruptcy, but the filing was not discovered
26 until after the sale was completed or Trustee Services receives
   notice that a Bankruptcy has been filed and a claim that the sale
27 is not valid."

28     "If the Trustee's Deed has already been recorded, the
   technician must print the appropriate Rescission of Trustee's

1   Bank of America did not follow its own procedure and,

2   instead, treated the foreclosure as valid.  Nor did it offer an

3   excuse for not "immediately" following its rescission mandate to

4   correct its mistaken foreclosure once the loan was coded in its

5   computer system as being in bankruptcy.

6   The automatic stay-violating foreclosure was thereafter

7   apparent to anyone at Bank of America who cared to look.  Nobody

8   at Bank of America cared to look.

9   Bank of America committed at least six further automatic

10  stay violations by the end of August 2010 as it bulled forward.

11  On June 16, with knowledge of the automatic stay, Bank of

12  America ordered that eviction proceedings be commenced.[18]

13  On June 23, 2010, with knowledge of the automatic stay, Bank

14  of America permitted its wholly-owned subsidiary and foreclosure

15  trustee, ReconTrust, to execute the Trustee's Deed Upon Sale and

16  to record it with the Placer County Recorder on June 25.

17  On multiple occasions between June 14 and September 7, 2010,

18  Bank of America, with knowledge of the automatic stay, caused its

19  agents to enter the Sundquists' gated community, sometimes on

20

21

---

22

23  Deed document and send it to the title company for recordation, and restart the file at the next appropriate task."

24  B of A Ex. QQ at pp. 002-003.

25  [18]B of A Ex. II-002.  In the "File Transfer" entry dated
26  June 16, 2010, the comment is excised with the notation
    "Redacted."  Although this court did not compel disclosure of
27  what was already crawling around under that rock within 24 hours
    of the foreclosure sale, this court, as trier of fact, is
28  entitled to (and does) infer that it tends further to confirm
    that Bank of America knew of the Sundquist chapter 13 case.

1  false pretenses, and lurk about the Sundquist home.[19]  Without

2  identifying themselves, they staked out the premises, tailed the

3  Sundquists, knocked on doors, knocked on windows, and rang

4  doorbells, all to the terror of the Sundquist family.[20]

5       On July 8, with knowledge of the automatic stay, Bank of

6

---

7       [19]Orders directed by Bank of America to Countrywide Field
8  Service Corporation to inspect the Sundquist property ("Monthly
   Bankruptcy") were dated July 7, 2010; July 26, 2010; and August
9  24, 2010.  B of A Ex. FF-001.

10      [20]From the Renée Sundquist Journal:

11      "[July 2010] A very strange man walked around our house and
   banged on our sliding glass door while [10 yr-old twin son] was
12 playing piano. [Son] was so scared, he came running down the hall
   screaming and crying.  The man was yelling at him to open the
13 glass door.  I called our development security.  Can't sleep.  I
   bet this man is bank related.  Security said he was sitting on
14 our street for over two hours."  Renée Sundquist Decl. ¶¶ 113-18.

15
        "[July or August 2010] Returned home with the boys after
16 school pick up. [10 yr-old twin son] noticed someone across the
   street and said 'someone is casing the joint' Where did he hear
17 that.  First I wanted to laugh then I ran upstairs to my closet
   and sobbed.  I hate being so scared, but I can't show that to my
18 children."  Renée Sundquist Decl. ¶¶ 124-127.

19
        "[August 2010] Today someone tailgated us right to our
20 driveway and then sped off. [10 yr-old twin sons] were really
   nervous, I tried to make it like a car chase scene.  They circled
21 around and parked outside our house until I called security.  I
   bet this is Bank of America."  Renée Sundquist Decl. ¶¶ 129-31.

22
        "[August 2010] Came home again today to someone stalking our
23 home.  I am so scared to step out of my car sometimes.  I now
   pull into our garage with my finger on the garage door closer to
24 get the door down fast.  Last night I dreamt that I closed the
   door fast, but the man was standing inside my garage and I locked
25 him in.  I woke up out of breath."  Renée Sundquist Decl. ¶¶ 132-
   36.
26

27      The court believes, and so finds as fact, the events and
   reactions related in this testimony and concludes that the
28 surveillance and harassment was by Countrywide Field Service
   Corporation as agent of Bank of America.

America caused its agent to serve a Notice to Quit (the premises) by leaving a copy at the premises and by mail.

On July 23, with knowledge of the automatic stay, Bank of America commenced an unlawful detainer action, <u>BAC Home Loans v. Sundquist</u>, No. M-CV-47015, Superior Court of California, County of Placer, in which complaint Bank of America asserted that it had valid and perfected title due to the June 15 trustee's sale, which plainly had violated the automatic stay.

Although Bank of America's counsel, Miles, Bauer, Bergstrom & Winters, LLP, had an affirmative duty under California Code of Civil Procedure § 128.7 to confirm, after an inquiry reasonable under the circumstances, that an unlawful detainer action was warranted in law and in fact, that law firm (which commonly appears in this bankruptcy court) did not conduct a reasonable inquiry. A reasonable inquiry under the circumstances required checking public, free computer databases that show the pendency of bankruptcy cases. That check, if it had been performed, would have revealed that the filing of an unlawful detainer action would violate the automatic stay and that the foreclosure sale was void as having offended the automatic stay.[21]

Upon learning that some type of lawsuit was pending in state court, the Sundquists unsuccessfully tried between August 10 and 12, 2010, to find out from the state court what was going on.[22]

---

[21]It is not clear why Miles, Bauer, Bergstrom & Winters, LLP has not been targeted for § 362(k)(1) damages in this action.

[22]On August 10, 2010, Renée Sundquist sent the following email to her counsel: "I need help. I am having difficulty maneuvering through the court to get the documents regarding the <u>Notice of Restricted Access</u> that Bank of America filed.

1    On or about August 19, with knowledge of the automatic stay,

2    Bank of America caused its agent to serve on the debtors a Three-

3    Day Notice To Quit (by throwing the papers against the door so

4    hard that they ricocheted some feet from the door[23]) creating the

5    impression in the minds of the Sundquists that they must move

6    within three days or the sheriff would physically remove them and

7    their property from the premises.[24]

8    Their bankruptcy attorney called Bank of America on August

9    20, 2010, and asked why the Sundquists were being evicted after

10   their home had been sold in violation of the automatic stay.

11   Bank of America's notes of that August 20 phone call (Ex.

12   GG) reflect that it notified its agent ReconTrust that "this is

13   _____

14   And on August 12: "I waited for some time this morning
     attempting to get copies of the case file, ha!  The judge has
15   sealed the file and they don't have access to give me copies."

16   Sundquist Ex. 100; B of A Ex. KKK.

17   [23]From the Renée Sundquist Journal:

18   "[August, 2010] Today a letter was thrown at our front door.
     It was such a loud bang I could hear it in the kitchen.  I opened
19   the door slowly, couldn't see anything from our peep hole.  A
     random envelope on the cement the force of the throw caused the
20   letter to fly far away from the doorstep.  Having to step outside
     and find it was an 'unlawful detainer' not even sure what the
21   document is stating.  I just stood shaking and could barely call
     Erik.  One thing for sure the document looks court official and
22   the worst option was to leave our house in three days.  Erik sent
     the document to our bk attorney.  B of A steals another night
23   from my family.  Horrid night topped off by some weird car across
     the street looking at the house. [10 yr-old son] was too scared
24   to sleep.  I let him sleep in our room.  What a horrible night
     for Erik to be in LA."
25
26   Renée Sundquist Decl. ¶¶ 143-54.  The court believes, and so
27   finds as fact, the events and reactions related in this
     testimony.
28
     [24]B of A Ex. DD; Testimony of R. Sundquist.

13

an active bk and any sale date is invalid."[25]

Although Bank of America recognized on August 20 that "immediate" corrective action was required because the trustee's sale was invalid and had to be rescinded pursuant to its written procedure regarding sales that offended the bankruptcy automatic stay,[26] it did not inform the Sundquists that they could ignore the Three-Day Notice to Quit, it did not dismiss the eviction action, and it did not tell the Sundquists or their counsel that it would rescind the invalid sale and that they need not move.

The failure by Bank of America to inform the Sundquists or their counsel on August 20, 2010, that it would be rescinding the foreclosure and not pursuing the unlawful detainer action led to a further human toll, especially on Renée Sundquist.[27]

---

[25]Bank of America computer record:

"DT-08202010 Advised Kristin Warner from Recon that this is an active bk and any sale date is invalid. Per Yassin, Ivonne, H/O called and stated that they received 3 day notice and notification that house sold in June."

B of A Ex. GG.

[26]B of A Ex. QQ.

[27]From the Renée Sundquist Journal:

"[August 20, 2010] I will never forget today it is etched in my being. I received a call at 5:10 p.m., I stepped out of the pros room at the rin[k]. I was just about to go teach on the ice when our attorney called. She said you won't believe this b of a sold your house. Time stood still and life has changed forever and forever. I felt as though I couldn't breathe, everything inside of me wanted to scream and then die. I started asking our attorney so many questions, all of which she couldn't answer. She said B of A responded that they have no idea [h]ow to untangle this web and admitted their mistake in selling our house while we were in bankruptcy. My head was spinning, I have one minute to get my head clear and instruct a class of tots. As I write, I don't even remember how I walked onto the ice. Tots

14

1      Driven to their wits' end and fearing the traumatic effect

2   that an actual eviction would have on their 10-year-old twins and

3   unaware that Bank of America would be rescinding the trustee's

4   sale and unaware that the unlawful detainer action had to be

5   withdrawn,[28] the Sundquists responded to the Three-Day Notice To

6   Quit by leasing other premises for $4,000.00 per month with the

7   help of Renée Sundquist's mother as co-lessee (their monthly

8

9

10   _____

11   whirling around me in a maze.  I do remember throwing up in the
     garbage can on the other side of the ice.  The embarrassment, one
12   of my little 5 year olds asked if I was ok.  Will not be sleeping
     tonight.  So sad, we can't even stay if the bank made a mistake,
13   if the sheriff comes and throws us out that would be even more
     horrifying for my children to experience.  We are going to have
14   to switch schools again.  Erik is going to be so upset, how are
15   we going to make it through this mess.  I feel like dying."

16   Renée Sundquist Decl. ¶¶ 155-70.  The court believes, and so
     finds as fact, this testimony regarding her reaction.
17
     [28]From the Renée Sundquist Journal:
18
     "Last night [10 yr-old son] was scared again.  Tonight I was
19   just obsessing if a knock on the door would result in us getting
     kicked out of our house.  I realized at 2 am this morning that
20   the letter that our attorney received and the modification packet
     sent out was when they had sold the house and we no longer owned
21   it.  How can they do a modification[?] I need professional help
     to get past this.  What a horrid pit [in] my stomach and my head
22   hurts so badly too."  Renée Sundquist Decl. ¶¶ 173-77.
23
     "All I do is cry.  Today we discussed moving again and
24   renting a home.  This is way too stressful; I feel sick every
     day.  I could barely breath[e] all night.  Erik decided nothing
25   is worth the stress of staying in our home.  Erik wrote to our
     attorney and told her we have to move quickly or someone in our
26   family is going to die.  He didn't tell her that part but it is
27   true."  Renée Sundquist Decl. ¶¶ 185-91.

28      The court believes, and so finds as fact, this testimony.
     The court believes, and so finds as fact, this testimony.

                                    15

1   mortgage payment was $4,557.72).[29]

2        They moved to the rental during Labor Day Weekend (September
3   4-6, 2010),[30] leaving the premises, including all major
4   appliances, window coverings, and carpets, in good order and
5   locked the doors.  In Renée Sundquist's words while testifying,
6   the lawn and shrubbery were "beautiful."  As Erik Sundquist
7   testified, they "felt evicted."

8        Until this point, the Sundquists had been making on-going
9   requests for loan modification, (with frequent follow-up calls
10  from the debtors), but Bank of America did not give them coherent
11  explanations of reasons for denials or for the long intervals of
12  apparent inaction by the bank on loan modification applications.
13  Often, after Bank of America sat on requests for months, it

14  _____

15       [29]Bank of America obtained from the lessor a copy of a one-
    year lease for $3,900.00 per month.  The Sundquist testimony is
16  that they paid $4,000.00 per month, had an agreement to stay for
    three years with a lessor they found on the internet in a
17  transaction that was inexpertly documented, and ultimately had to
    renegotiate the term down to eighteen months.  This court
18  believed the Sundquist testimony.  The $4,000.00 payment is
    consistent with paying $100.00 in miscellaneous costs in addition
19  to the nominal monthly rent.

20       [30]From the Renée Sundquist Journal:

21       "September we just threw everything we could in boxes, we
    needed to move quickly.  We found a place to lease for $4000 a
22  month.  How stupid we can't get loan modification but we can't
    pay that amount to B of A.  I am so sick, and I have such a
23  headache, threw up again today from my head.  Moving is rough, so
    tired, my heart is pounding. I can never sleep anymore.  Fixated
24  on all the bank['s] wrongdoing.  Had to take so much medication
    because the pain is horrific with fibromyalgia.  I can't take a
25  step without pain.  I don't want my boys to get anymore messed by
    the move so I will medicate to get moving.  Our attorney
26  confirmed that B of A sold our house back to themselves."

27  Renée Sundquist Decl. ¶¶ 192-201.  The court believes, and so
28  finds as fact, this testimony.

                                16

1  declared their information stale and sent them back to square
2  one.   Catch 22.

3       Ultimately, Bank of America, ignoring the Sundquists'
4  representations that they would be able to cure the default as
5  soon as the mortgage was modified, took the position that the
6  arrearage was too great to consider a loan modification.  Yet,
7  Bank of America still dangled more loan modification applications
8  in front of them.

9       On September 7, 2010, Bank of America's notes reflect that
10 purportedly "immediate" rescission of the trustee's sale was in
11 process.[31]  The Sundquists were not so advised.

12      Although Bank of America's written procedures require that
13 rescission be "immediate," the bank took 18 days after August 20
14 to start the rescission process and another 114 days until the
15 rescission was recorded on December 30, 2010.

16      Bank of America, however, did not inform the Sundquists or
17 their bankruptcy attorney that rescission was in process.[32]

18      Although Bank of America knew on August 20, 2010, and beyond
19 cavil by September 7, 2010, that the foreclosure would be

20

21      [31]Bank of America computer record:
22
23 "DT-09072010  Received response from Paredes, Beatrice F @
   Recontrust that rescission process started and will advise once
24 the rescission has been sent to record."

25 B of A Ex. GG.

26      [32]Sundquist Ex. 96, p. 2.  Bank of America internal inquiry:
   "Recon Trust confirmed the following.  We don't [sic] send
27 anything directly to the borrower.  We send the document to title
   and they send them to the county for recording.  This confirms
28 that Recon Trust is no [sic] required to inform the borrower of
   the rescission."

17

1  rescinded, it did not withdraw the unlawful detainer action or

2  tell the Sundquists the action would be dismissed.  The state-

3  court docket of the action reflects zero activity between August

4  12, 2010, and February 7, 2011, when counsel for Bank of America

5  filed a voluntary dismissal without prejudice.[33]

6      The Sundquists, having given up and moved, assumed that the

7  nightmare was over, that they were finished with their now-former

8  residence, that they could forget (but not forgive) Bank of

9  America's loan modification run-around, and that they were moving

10  on to a new life.  Hence, they directed that their chapter 13

11  case be voluntarily dismissed because its primary object of

12  saving their house had come to naught.

13      The chapter 13 case was dismissed on September 20, 2010, at

14  which time the § 362 automatic stay expired as a matter of law

15  pursuant to 11 U.S.C. § 362(c)(2).

16      The Sundquists had no reason to suspect that they would

17  secretly be placed back in title on their residence as of

18  December 30, 2010, and that the Bank of America loan modification

19  process would again rear its head.  As noted, the Notice of

20  Rescission of Trustee's Deed Upon Sale pursuant to Civil Code

21  Section 1058.5 was recorded December 30, 2010.[34]

22  _____

23      [33]Bank of America's Request for Judicial Notice of Filed

24  Documents, Ex. C.

25      [34]Recital No. 5 on the Notice of Rescission includes the

   following self-serving and disingenuous explanation:

26  "5.) THAT THE TRUSTEE has been informed by the Beneficiary that

27  the Beneficiary desires to rescind the Trustee's Deed recorded

   upon the foreclosure sale which was conducted in error due to a

28  failure to communicate timely, notice of conditions which would

   have warranted a cancellation of the foreclosure sale which did

1   Neither the Sundquists nor their bankruptcy counsel were

2   informed of the rescission.  They had no inkling, and no reason

3   to suspect, that they were back in title on their residence as of

4   then.

5       On February 7, 2011, also without notice to the Sundquists,

6   Bank of America obtained dismissal without prejudice of its

7   unlawful detainer action.[35]

8       Nevertheless, on February 10, 2011, despite the rescission

9   of the trustee sale, Bank of America (BAC Field Services

10  Corporation) was on the premises removing the trees it had

11  allowed to die, removing personal property, and capping exposed

12  wires and gas and water lines.[36]

13      After the undisclosed rescission, Bank of America started

14  sending the Sundquists monthly mortgage statements and related

15  notices dunning them for defaults.  They were not only puzzled by

16  the statements, they were stimulated to seek counsel to work with

17  them to seek redress from Bank of America.

18      On March 21, 2011, Erik Sundquist discovered in the Placer

19  County records the rescission of the foreclosure sale deed, which

20  

21  occur on 06/15/10;"

22  Notice of Rescission of Trustee's Deed Upon Sale pursuant to
    Civil Code Section 1058.5 ¶ 5; Sundquist Ex.53.

23  

24      This explanation is truthful only to the extent that the
    "failure to communicate" was an internal failure of Bank of

25  America to communicate with itself.

26      [35]B of A Request for Judicial Notice of Filed Documents for
    Trial, Exs. D-F.

27  

28      [36]B of A Exs. AA & BB & CC.  Work order 45674424-2, ordered
    02/04/2011 (Ex. AA-004), completed 02/10/11 (Ex. AA-006).
    Exhibits include 12 photos dated 02/10/2011.

1   rescission had been recorded on December 30, 2010.

2        The Sundquists, in the presence of counsel, called Bank of

3   America in early April 2011 and asked about the status of the

4   property.  For the first time, Bank of America told the

5   Sundquists that it had rescinded the foreclosure sale three

6   months earlier.  Counsel asked if they could have the keys.  The

7   keys were delivered to the Sundquists on April 5, 2011.[37]

8        When the Sundquists re-entered the premises, they discovered

9   that major appliances (cooktop, oven, built-in refrigerator,

10  washer, dryer), window coverings, and carpet had been removed.

11  The front lawn and shrubbery were dead.  Verdera Homeowners

12  Association (HOA) had made a $20,000.00 assessment on account of

13  the dead landscaping.  Bank of America disclaimed responsibility.

14       Further, Bank of America demanded that the Sundquists pay

15  all mortgage expenses and maintenance fees for the six-month

16  period during which Bank of America was in title on the property.

17       Bank of America rebuffed the Sundquists' requests for

18  compensation for the lost property and for adjustments to reflect

19  Bank of America's ownership and the rental expenses incurred in

20  consequence of the unlawful foreclosure and the unlawful detainer

21  action in violation of the bankruptcy automatic stay.

22       One particularly vexing issue for the Sundquists related to

23  the failure by Bank of America to have paid all the Homeowners

24

---

25       [37]B of A Ex. YY & from the Renée Sundquist Journal: "April

26  2011 Our attorney called the bank and was told the house was in
    our names.  The keys to the house back."

27
         Renée Sundquist Decl. ¶¶ 192-201.  The court believes, and
28  so finds as fact, this testimony.

20

1 Association Fees during the period that it was in title to the

2 property.  The bank made one payment to the HOA for $562.50 and,

3 contemporaneous with its decision to rescind the sale, ceased

4 making HOA payments.[38]  In addition, the bank let the front yard

5 landscaping die, which triggered a $20,000.00 assessment by the

6 HOA that the Sundquists say is Bank of America's problem.[39]

7 Nor did Bank of America inform the HOA that it was

8 rescinding the trustee's sale and restoring the Sundquists to

9 title.  In April 2011, the HOA was still sending monthly bills to

10 BAC Home Loans Servicing.[40]

11 The HOA issue has festered ever since, with the incidental

12 consequence that the HOA, which consists of individual neighbors

13 in the community, is angry at the Sundquists.  The landscaping is

14 dead.  The Sundquists question the $20,000.00 as an unwarranted

15 penalty and contend that, if owed, Bank of America should pay.[41]

16 The Sundquists have insisted that Bank of America should

17 _____

18 [38]Sundquist Exs. 76 & 81 & 89.  Internal Bank of America payment request dated 9/17/2010 to pay $562.50 HOA invoice dated

19 8/11/2010.

20 [39]Sundquist Ex. 89.  Bank of America Servicing Activities History entry dated 11/19/2010: "Received correspondence from

21 Verdera community assoc regarding Bal due $20498.50 dated Oct 19, 2010."

22

23 [40]On April 22, 2011, Bank of America received a $22,633.50 HOA bill for assessments for April and May 2011 ($235.00/mo) plus

24 late fee ($15.50) plus balance carried forward ($22,168.00). Sundquist Ex. 29.

25 [41]The Sundquists' state of mind is revealed by the following

26 from Renée Sundquist: "[HOA] told our neighbors the dollar amount we owed, and that we were embarrassing in a board meeting! My

27 neighbor emailed me to let me know they were planning an ambush had we attended the meeting/hearing.  It is in dispute exactly

28 what maintenance is done on a dead lawn? And, all the dead scrubs and trees." Sundquist Ex. 100, p. 8.

1  hold them harmless and compensate for the losses directly
2  attributable to the period that the bank was in title and for the
3  three months after December 30, 2010, during which Bank of
4  America failed to disclose rescission of the foreclosure sale.

5      They have been asking, and still are asking, what the
6  correct payoff amount of the loan is after the adjustments that
7  they believe are appropriate.  This court believes their
8  testimony (and finds as fact) that they still intend to pay their
9  mortgage debt once the legitimate amount is determined.

10      In June 2011, at loggerheads with Bank of America over the
11  correct loan balance, the Sundquists filed a lawsuit in a
12  California superior court naming as defendants the original loan
13  broker, his loan brokerage, the original lender, its loan
14  officer, Bank of America, ReconTrust (foreclosure agent for Bank
15  of America), and BAC Home Loans Servicing, LP ("BAC").  As
16  against the Bank of America entities, the complaint alleged
17  causes of action for deceit, breach of fiduciary duty, aiding and
18  abetting breach of fiduciary duty, negligence, assumed liability,
19  civil conspiracy, promissory estoppel, wrongful foreclosure, and
20  unfair competition in violation of California Business and
21  Professions Code § 17200.[42]

22      In November 2011, the state trial court dismissed the action
23  as to all counts on the motion of Bank of America (acting for
24  itself, ReconTrust, and BAC) on the theory that the complaint did
25  not state any cause.  The Sundquists appealed.

26      While the state-court appeal was pending, the Sundquists

27  _____

28      [42]Sundquist v. Bank of America, N.A., Memorandum Opinion,
No. C070291 (Cal. App. 3d Dist. 9/5/13) at p. 5.

22

1   ended their tenancy in the leasehold premises and re-occupied

2   their residence in January 2012. They did so because their

3   leasehold was expiring and their attorney advised them that they

4   should mitigate damages by not incurring unnecessary rent.

5       Returning to the house was a difficult experience for Mrs.

6   Sundquist.[43] The personal items that she came across after

7   returning triggered even more trauma.[44]

8   _____

9       [43]From the Renée Sundquist Journal:

10      "January 2012 the attorney told us to move back into the
    home since our lease is ending soon. I can't even imagine
11  returning to that house with all the pain I suffered. I took
    medicine just to get to our driveway in Lincoln. Erik helped me
12  walk in the front door. I couldn't even look at the yard it is
    al[l] dead. The front door is ruined. The antique door knocker
13  was still hanging on the door. We had to move so fast. They
    damaged the door and the locks when they changed the locks. I
14  just started shaking. Next it turned into anger when I saw that
    our appliances, window coverings carpet [are missing] that is
15  after walking past everything dead in our front yard. All that
    sadness came flooding back all that pain of leaving, losing,
16  sickness and pain. I am stuck and my life will never be the
    same. My head hurts so bad, I am so sick."
17

18  Renée Sundquist Decl. ¶¶ 269-83. The court believes, and so
    finds as fact, the events and reactions related in this
19  testimony.

20      [44]From the Renée Sundquist Journal:

21      "[On finding personal items that had been left behind when
    they moved in September 2010] Sometimes it is like I am living
22  outside my body, I can't pull it together to be a wife or mother
    or daughter! How can I let a bank steal my life? I am too smart
23  for this. I am crying so hard right now, I keep trying to
    convince myself it was just material things I left, but it wasn't
24  really, it was a card from my dying mother and it could never be
    replaced had I not found it again. And, even more startling, I
25  didn't miss it because I am so messed up over this horrid bank
    crap. That is horrible how side tracked I am all the time! I
26  also found my childhood stuff animal boogsie, that stuff animal
    was with me when I won the Italian National Championships and
27  earned a spot on the World Team. I didn't miss that either?
    [Son's] entire top shelve of his closet was filled with his
28

23

1   The return to the house led to frustrating discussions with

2   Bank of America, which refused to take responsibility for the

3   damage and missing property.  The Sundquists wanted the missing

4   property restored, including appliances, and a determination of

5   what the correct adjusted amount of the mortgage should be after

6   adjusting for all the stay violation damages.  And, Bank of

7   America still was threatening foreclosure.

8       Bank of America's hard-line stance in February 2012 denying

9   responsibility for damages resulting from its stay violations

10  came at a particularly fragile moment in Mrs. Sundquist's life.

11  Her mother lay dying.[45]

12  ───────────────────

13  stuff, I didn't notice that either.  I actually though I checked
    the house when we left, guess not well enough!  OMG ... I won't
14  sleep tonight."

15  B of A Ex. RRR; accord, Renée Sundquist Decl. ¶¶ 292-97.

16      [45]From the Renée Sundquist Journal:

17      "[February 2012] I hate that any second of my life is spent
    thinking about a lawsuit or the bank right now when my Mother is
18  dying!  What a horrid waste of time.  The fact that one second is
    spent worrying about the bank horridness and unethical behavior
19  is not why I am on earth.  My Mom is so certain I need to fight
    the bank, but, what if I can't.  Bad, bad, bad, day!  More stupid
20  letters that make no sense from the bank of holy hell.  Like does
    anyone read in that bank office?  More importantly, do they hire
21  anyone that can read?"

22      "Today I spent the day watching my Mom labor every breath, I
23  can barely write tonight.  Some b/a jerk CEO representative tells
    me I need to list the items stolen from my home.  I am thinking
24  why waste the time, your office loses EVERYTHING.  Like isn't 3
    years of paperwork enough for you all.  I hate the bank.  I know
25  I am going to look back and regret being side tracked by the bank
    while my Mom is dying.  Who am I kidding, I am already regretful
26  about today!  God help me.  Please don't let my Mom go.  I need
27  her..."

28      "Today I hit an all-time low with b/a because I typed a
    letter at my Mom's hospital bed on my ipad listing all the items

                                  24

1      At trial, counsel for Bank of America asked Mrs. Sundquist

2 why, if this was so upsetting, did she not just walk away and let

3 the house be foreclosed.  She stammered incoherent.  Her real

4 answer lies in Bank of America's Exhibit RRR-001 – it was her

5 mother's dying wish that she not give in to Bank of America.[46]

6      For a brief moment after their return, there was a glimmer

7 that the bank was willing to pay for the stolen items.  But that

8

9

---

10 taken from our house after we moved out.  She actually had a
moment of clarity, and got really mad when she figured out what I

11 was doing.  I started to cry so hard, even when she is dying I
can't hide anything from her.  I hope I can be as great as her

12 someday.  She touched my face, and said she was going to miss me.
OMG!  I wonder why my mom is dying and the bank goes on!  I need

13 my Mom, I can't do this without her.  She was clear to say she

14 didn't want me to lose my inheritance that went into the house.
Ugh!  This is what we are going to think about during her last

15 days?  NO, it can't beeeeeeeeeeeee!!!"

16    "The wors[t] day of my life, I watch for hours my Mom barely
breathing.  I can barely write, or breathe myself, she is dead.

17 I will never get back all the hours, days, years I have spent
fighting this f'ing bank, all the time wasted where I couldn't

18 even think straight to not waste time with my Mom.  No one cares.
No one cares.  I promised her I wouldn't quit fighting the bank,

19 I might not make it!  She was so strong always, and it is so very

20 dark now.  My life will never be the same.  How does one journal
their Mother has died.  I feel so sick.  Please God take care of

21 my mother, let her fly free and have no more pain.  Speechless
gratitude for her, she was the bone of my spine, keeping me

22 straight and true.  My Mother is irreplaceable."

23 B of A Exs. RRR & SSS; <u>accord</u>, Renée Sundquist Decl. ¶¶ 301-05.

24    [46]From the Renée Sundquist Journal:

25    "[Late January 2012] My Mom so very sick, wish she was well

26 enough to talk, I miss and need her so much.  She had very few
words today, but did make it a point to remind me to never give

27 up on the lawsuit because the 'the bank was wrong'.  This was one
of her last coherent thoughts.

28

B of A Ex. RRR-001; <u>accord</u> Renée Sundquist Decl. ¶ 299.

1   was too good to be true.  The offer was quickly withdrawn.[47]

2       The reality is that Bank of America did not intend to

3   negotiate with the Sundquists in good faith.  The evidence

4   includes an internal Bank of America document in which it

5   concedes that its loan modification process dating back to before

6   the filing of their chapter 13 case had been a charade in which

7   Bank of America sent loan modification request packages to the

8   Sundquists intending to deny them when submitted.[48]

9

10      [47]From the Renée Sundquist Journal:

11      "Not even a day has passed since my Mom died, and more
    stupid letters from the bank.  I ripped the asinine letter up in
12  so many pieces today, it stated that the bank would pay for my
    lost house items.  Like that will ever happen!  Better chance of
13  my Mom coming back!  I had this amazing thought today, my Mom is
    somewhere where she doesn't have to worry about our family and
14  what the bank is doing any longer.  That makes me quiet.  Some
    b/a CEO, managers, and representatives are going home tonight,
15  overlooking their dishonesty when they look in the mirror,
    clearly, they didn't have a great mother like mine to teach them
16  right from wrong.  The dishonesty makes me crazy, but I WIN,
    cause I don't lie like the bank of holy hell!  The world is
17  upside down.  I am trying to plan a funeral, I mean really?  Go
    to hell b/a!."
18

19      "A call today from the bank's CEO office, they are
    retracting their offer for our lost items, they told us to 'file
20  an insurance claim and to replace our own yard'.  In years past I
    would have tried to reason, today I just write another letter and
21  hope they rot in hell.  I hate them.  If I could I would spit on
    them.  I hate them.  I am not a daughter, I am not a wife, I am
22  not a mother, and I am invisible with pain, pain, pain!  A house,
    not really, it is so much more, it is our lives they took!  Rot
23  in hell, rot in hell, rot in hell.  And ... who ever stole my
    window coverings can rot in hell too!"
24

25  B of A Ex. SSS; accord, Renée Sundquist Decl. ¶¶ 306-10.

26      [48]On June 13, 2012, Bank of America made the following two
    entries in its "HomeSaver - Workout Notes":
27

28      "Note ID: 87
    Reasearch[sic]- customer filed bk 6/14/2010, fcl sale date

26

1    In September 2013, the California Third District Court of

2 Appeal ruled in favor of the Sundquists, holding that their

3 complaint stated claims against Bank of America for deceit,

4 breach of fiduciary duty, aiding and abetting breach of fiduciary

5 duty, assumed liability, promissory estoppel, and unfair

6 competition (but not negligence and conspiracy).[49]

7    As to the claim for wrongful foreclosure, however, the

8 appellate court invoked what is known in federal practice as

9 "conflict preemption."[50]  It ruled that Bankruptcy Code

10 § 362(k)(1) preempts state-law wrongful foreclosure claims that

11 are based solely on violation of the automatic stay, which it

12 ────────────────

13 was 6/15/2010 we didnt [sic] get the bky till 6/16/2010 and
foreclosed on the home.  It was recinded [sic] and the bky was
14 dismissed 9/25/2010. [C]ustomer is stating that we illegally
foreclosed on the home. [T]he customer says that the amount that
15 is due is incorrect. [A]nd state they have a lawsuit in process
with litegations [sic]. [T]hey want to try a modification but the
16 loan is fha and becuase [sic] its over 12 months due no mha is
available."
17

18    "Note ID: 88
11/2009 declined mod Surplus income will not support a
19 repayment plan and a mod will not get approved becuase [sic] the
amount has gotten larger with no payment and will agin [sic] be
20 declined but we are more than happy to resubmit but it will be
declined."
21

22 Sundquist Ex. 73 (emphasis supplied).

23 [49]Sundquist v. Bank of America, N.A., Memorandum Opinion,
No. C070291 (Cal. App. 3d Dist. 9/5/13); the Ninth Circuit has
24 likewise held that a loan modification charade can yield a viable
cause of action under California's unfair competition statute.
25 CAL. BUS. & PROF. CODE § 17200;  Oskoui v. J.P. Morgan Chase Bank,
N.A., ___ F.3d ___, ___ (9th Cir. 2017), 2017 Westlaw 957206,
26 slip op. at 10-13.

27    [50]Conflict preemption was applied in connection with a § 362
stay violation and a California tax foreclosure sale.  40235
28 Washington St. Corp. v. Lusardi (In re 40235 Washington St.
Corp.), 329 F.3d 1076, 1083-86 (9th Cir. 2003).

1  deemed to be a matter of exclusive federal jurisdiction.  Hence,

2  the state court sent the Sundquists to federal court for relief

3  on that count.

4      Accordingly, the Sundquists filed this § 362(k)(1)

5  proceeding as a civil action in the United States District Court,

6  which referred the matter to this bankruptcy court.

7      The Sundquists continued to attempt to negotiate and reason

8  with Bank of America, even while the litigation was pending.

9  They complained to the Office of the Comptroller of the Currency

10  (OCC), which declined to intervene.  And they complained to the

11  federal Consumer Financial Protection Bureau (CFPB).

12      The Bank of America response to CFPB is noteworthy for two

13  false statements made by the Office of the Bank of America CEO

14  and President.  It falsely asserts that there was no foreclosure

15  of the Sundquist residence.[51]  And, it falsely asserts that the

16

17

---

18      [51]Bank of America's CEO's office wrote in response to the
19  Consumer Financial Protection Bureau inquiry:

20  "According to our records, on June 14, 2010, the borrower filed a
    voluntary petition under Chapter 13 of the United States
21  Bankruptcy Code in the United States Bankruptcy Court.  The
    account was flagged for bankruptcy and any foreclosure
22  proceedings were placed on hold."

23  Bank of America Office of the CEO and President, Executive
    Customer Relations, ltr to CFPB in CFPB case no. 130304-000049
24  (Erik and Renée Sundquist), May 23, 2013.  Sundquist Ex. 84.

25      It is beyond cavil that Bank of America's statement to CFPB
26  that the "account was flagged for bankruptcy and any foreclosure
    proceedings were placed on hold" was false.  There was an actual
27  foreclosure on June 15, 2010, which violated the automatic sale
    and was, as a matter of law, void ab initio.  This litigation is
28  about that foreclosure and everything else thereafter that was
    not placed on hold.

1  Sundquists are not in active litigation with Bank of America.[52]

2  Both statements were materially false.[53]

3      Throughout the dispute between the Sundquists and Bank of

4  America, interest has been continuing to accrue on the

5  $584,893.97 principal balance at the contract rate of 6 percent,

6  or $35,093.64 per year ($96.15 per day).

7      The Sundquists entered their ordeal with Bank of America as

8  physically strong people.  Throughout the chapter 13 phase of the

9  ordeal, a significant emotional and physical toll debilitated

10  them.  They had been elite athletes.  He had been a member of a

11  NCAA National Championship Soccer Team.  She was an ice skater on

12  Italy's Olympic team and was teaching ice skating.  He emerged

13  from the ordeal restricted to exercising only on an elliptical

14  trainer and had attempted suicide.  She was hospitalized with

15  _____

16      [52]Bank of America's CEO's office wrote:

17  "Additional research shows that the borrower's [sic] are not in
   active litigation therefore we cannot supply you with the
18  requested documents from the courts."

19  Bank of America Office of the CEO and President, Executive
   Customer Relations, ltr to CFPB in CFPB case no. 130304-000049
20  (Erik and Renée Sundquist), May 23, 2013.  Sundquist Ex. 84.

21
       At the time that Bank of America made that statement to CFPB
22  on May 23, 2013, there was pending in the Court of Appeal of the
   State of California, Third Appellate District, case no. C070291,
23  Sundquist v. Bank of America, N.A., which was not decided until
   September 5, 2013.  There were numerous court documents that
24  could have been supplied to CFPB.

25      [53]Cf. 18 U.S.C. § 1001; Hubbard v. United States, 514 U.S.
   695, 699-708 (1995) (history of false statement statute
26  explained).  The maximum fine for a corporate violator of 18
   U.S.C. § 1001 is $500,000.00.  18 U.S.C. § 3571(c)(3).
27  Regardless of how prosecutors may exercise their discretion, Bank
   of America's false statements to CFPB regarding the Sundquists
28  are probative of its bad faith regarding the Sundquists.

1  heart attack symptoms that were found to be stress-related, has

2  been diagnosed with post-traumatic stress disorder, and was left

3  with near-daily debilitating migraine headaches that persist into

4  the present and that constrain her ability to engage in a wide

5  range of activities.

6      Throughout, the conduct of Bank of America has been

7  intentional.

8      Further findings of fact are stated in the ensuing analysis

9  of the violations of the automatic stay.

10

11                          Jurisdiction

12      Federal subject-matter jurisdiction is founded on 28 U.S.C.

13  § 1334.  Enforcement of the automatic stay arises under

14  Bankruptcy Code § 362 and is a core proceeding that may be heard

15  and determined by a bankruptcy judge.   28 U.S.C.

16  § 157(b)(1)(G).[54]

17

18      [54]There is also federal subject-matter jurisdiction by way
    of 28 U.S.C. § 1367 over the state-law causes of action (deceit,
19  promissory estoppel, breach of fiduciary duty, aiding and
    abetting breach of fiduciary duty, assumed liability of mortgage
20  brokers, unfair competition, and negligence) as to which the
    California Third District Court of Appeal ruled that the
21  Sundquists had stated claims and remanded to the trial court.
    The state-court action was dismissed without prejudice.  Such
22  causes of action, if they were to be alleged in this federal
    civil action in an amended complaint (which could happen if this
23  litigation were to become prolonged as a result of being vacated
    or reversed on appeal) would constitute non-core proceedings that
24  would be subject to 28 U.S.C. § 157(c) and potentially subject to
    trial by jury.  The state appellate decision may be viewed as law
25  of the case as to whether state-law claims have been stated.  If
    this court's § 362(k)(1) judgment were to be vacated on appeal as
26  to remedy, there would not be a final judgment eligible to
    trigger claim preclusion, and it could be argued that this action
27  is amenable to amendment of pleadings to assert those other
    causes of action.
28

                                    30

1    Jurisdiction over automatic stay violation remedies survives

2    dismissal or closing of the case. <u>Carraher v. Morgan Elecs.,</u>

3    <u>Inc. (In re Carraher)</u>, 971 F.2d 327, 328 (9th Cir. 1992); <u>Davis</u>

4    <u>v. Carrington (In re Davis)</u>, 177 B.R. 907, 911-12 (9th Cir. BAP

5    1995). Hence, the bankruptcy case has not been reopened.

6    To the extent that this proceeding may ever be determined to

7    be a matter that cannot be heard and determined of right by a

8    bankruptcy judge, the parties are nevertheless agreed that it may

9    be heard and determined by a bankruptcy judge. 28 U.S.C.

10    § 158(c)(2).

11

12    <u>Discussion</u>

13    First, the law. Then, application of the facts to the law.

14    The Second Amended Complaint alleges two counts: automatic stay

15    violation on account of foreclosure and automatic stay violation

16    on account of unlawful detainer action.

17

18    I

19    The legal effect of an act in violation of the automatic

20    stay is well-understood in this circuit.

21

22    A

23    The fundamental rule is that any act done in violation of

24    the automatic stay is void from the outset, not merely voidable.

25    <u>Schwartz v. United States (In re Schwartz)</u>, 954 F.2d 569, 570-72

26    (9th Cir. 1992).

27    The court's statutory power to annul the automatic stay

28    under § 362(d) does not make a stay violation merely voidable.

31

1    _Schwartz_, 954 F.2d at 572-73.  Rather, the offending act is void

2    from the outset for all purposes unless and until annulled.  _Id_.

3         Subsequent dismissal of the case does not vitiate a stay

4    violation.  _40235 Washington St. Corp._, 329 F.3d at 1080 n.2 (tax

5    sale in violation of automatic stay remains void despite

6    subsequent dismissal of chapter 11 case as bad faith filing).

7         Nor is § 549(c) an exception to the rule that the act in

8    violation of the stay is void ab initio.  _40235 Washington St._

9    _Corp._ 329 F.3d at 1080.

10        The automatic stay arose with the filing of the Sundquist

11   chapter 13 case on June 14, 2010.  The conclusion is inescapable

12   that, under _Schwartz_ and _40235 Washington St. Corp._, the

13   foreclosure by Bank of America on June 15, 2010, violated the

14   automatic stay and was void ab initio.

15

16                                  B

17        Cognizable effects of a violation of the automatic stay may

18   linger after the formal expiration of the stay.  For example, the

19   stay with respect to an individual debtor expires upon entry of

20   discharge or dismissal of the case.  11 U.S.C. § 362(c)(2).

21        Nevertheless, consequences directly attributable to the

22   violation of the stay before its expiration may continue to be

23   visited upon a debtor for an additional period of time.  _Snowden_

24   _v. Check Into Cash of Wash., Inc. (In re Snowden)_, 769 F.3d 651,

25   659 & 662 (9th Cir. 2014).

26        Hence, liability for a stay violation continues at least

27   until full restitution is actually made or, if after the

28   expiration of the stay, the court orders full restitution.

1   Snowden, 769 F.3d at 659 & 662 (ambiguous settlement offer does

2   not terminate accrual of liability for stay violation).

3

4                                   II

5        The consequences for violating the automatic stay are,

6   first, contempt, and, second, statutory damages for individuals

7   injured by any willful violation of the automatic stay.  Havelock

8   v. Taxel (In re Pace), 67 F.3d 187, 191-94 (9th Cir. 1995).

9        General civil contempt remedies are available to all victims

10  of stay violations, individuals and non-individuals alike.  Pace,

11  67 F.3d at 193-94.

12       Concurrent with the restructuring of bankruptcy courts in

13  1984 to resolve Constitutional issues,[55] Congress supplemented

14  the automatic stay provision by adding a new subsection § 362(h)

15  providing that any individual victim of a willful stay violation

16  may recover actual damages, including costs and attorneys' fees,

17  as well as punitive damages:

18           [A]n individual injured by any willful violation of a stay
             provided by this section shall recover actual damages,
19           including costs and attorneys' fees, and, in appropriate
             circumstances, may recover punitive damages.
20
21  11 U.S.C. § 362(k)(1), first enacted as § 362, Pub. L. 98-353,

    § 304, 98 Stat. 333 (July 10, 1984); Pace, 67 F.3d at 191-92.
22
23       This case primarily implicates the § 362(k)(1) damages

    remedy and its boundaries.
24

25

26

27  ─────────────────────

28       [55]Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S.
    50, 87-89 (1982).

                                   33

A

A settled body of the law of this circuit covers the key elements of the § 362(k)(1) (formerly § 362(h)) damages remedy.

1

A "willful violation" does not require specific intent to violate the automatic stay. Rather, the "willfulness" question is whether Bank of America knew of the automatic stay and whether actions in violation of the stay were intentional actions. Pace, 67 F.3d at 191; Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir. 1989).

Willfulness is a question of fact, reviewed for clear error. Eskanos & Adler, P.C. v. Leetien (In re Leetien), 309 F.3d 1210, 1213 (9th Cir. 2002).

2

A good faith belief that an actor has a right to the disputed property is (with an exception not pertinent here[56]) not relevant to whether an act offending the stay is "willful" or whether compensation should be awarded. Bloom, 875 F.2d at 227; 11 U.S.C. § 362(k).

---

[56]The exception is for a good faith belief that the stay has terminated with respect to personal property because the debtor has not timely redeemed such personal property from a lien, reaffirmed such personal property debt, or assumed an unexpired personal property lease. 11 U.S.C. § 362(h), Pub. L. 109-8, § 305, 119 Stat. 41 (April 20, 2005). This case does not involve personal property debt.

B

Actual damages under § 362(k)(1) include both physical damages and economic damages. <u>Dawson v. Washington Mut. Bank, F.A. (In re Dawson)</u>, 390 F.3d 1139, 1149 (9th Cir. 2004).

There are numerous examples of items of damages that have been awarded on account of automatic stay violations. <u>See generally</u>, Remedies and Damages for Violation of the Automatic Stay Provisions of the Bankruptcy Code by Parties Other Than the Federal Government, 153 ALR Fed. 463 (1999 & 2016 Supp.).

Readily ascertainable damages items commonly include value of personal property lost, payment improperly taken, cost of towing, cost of replacement vehicle, lost wages, lost vacation, travel expenses, value of inventory and fixtures sold, alternative transportation expense, alternative housing expense, value of items stolen while dispossessed, mileage to and from attorney's office, and state-court litigation expenses. <u>Id</u>.

More speculative damages have included lost business, loss of promotion in business workplace, and loss of business opportunity. <u>Id</u>.

Emotional distress damages are also commonly the subject of awards of actual damages. <u>E.g.</u>, <u>Dawson</u>, 390 F.3d at 1146.

The common element in actual damages awards appears to be the "but for" analysis familiar in tort law. If a consequence would not have occurred "but for" the automatic stay violations, then courts make awards based on that consequence.

C

Damages for emotional distress are available as actual

1  damages under § 362(k)(1), regardless of whether there are

2  financial damages.  Dawson, 390 F.3d at 1149.

3       Three elements are required for emotional distress damages:

4  (1) significant harm; (2) clearly established; and (3) with a

5  causal connection between the stay violation and the harm (as

6  distinct from anxiety and pressures inherent in the bankruptcy

7  process).  Snowden, 769 F.3d at 656-57; Dawson, 390 F.3d at 1149.

8       Evidence probative of the elements of emotional distress

9  damages may come from a wide variety of sources assessed on a

10  case-by-case basis, limited only by the genius of counsel and the

11  Federal Rules of Evidence.

12       There is the testimony of the individual victims.  Medical

13  evidence may be helpful.  In addition to experts, family members,

14  friends, or coworkers may testify to manifestations of mental

15  anguish consistent with significant emotional harm.  Egregious

16  conduct (such as a gun held to one's head) that logically

17  triggers mental anguish may speak for itself.  Or, less-than-

18  egregious circumstances may nevertheless make it obvious that a

19  reasonable person would suffer significant emotional harm.

20  Dawson, 390 F.3d at 1149-50.

21       In the end, it all adds up to a question of proof for the

22  trier of fact.  If the court, in its capacity as trier of fact,

23  is persuaded that significant harm has been clearly established

24  and that there is a causal connection between the stay violation

25  and the harm, then § 362(k)(1) damages are appropriately awarded.

26

27                              D

28       Attorneys' fees and costs are a mandatory component of the

36

1  § 362(k)(1) remedy and encompass fees reasonably incurred in

2  prosecuting a damages action for automatic stay violation and

3  defending it on appeal. <u>America's Servicing Co. v. Schwartz-</u>

4  <u>Tallard (In re Schwartz-Tallard)</u>, 803 F.3d 1095, 1099-1101 (9th

5  Cir. 2015) (en banc), <u>overruling</u> <u>Sternberg v. Johnson (In re</u>

6  <u>Johnson)</u>, 595 F.3d 937 (9th Cir. 2010).

7      The limiting principle is a rule of reason: the court has

8  discretion to reject fees and costs not reasonably incurred.

9  <u>Schwartz-Tallard</u>, 803 F.3d at 1101.

10

11                              E

12      "Appropriate circumstances" for a punitive damages award,

13  also assessed on a case-by-case basis, entail "some showing of

14  reckless or callous disregard for the law or the rights of

15  others." <u>Bloom</u>, 875 F.2d at 228.

16      This "reckless-or-callous-disregard" standard may be

17  established by proof of conduct that is malicious, wanton, or

18  oppressive. <u>Snowden</u>, 769 F.3d at 657.

19      Since the "reckless-or-callous-disregard" standard is a

20  lesser degree of conduct than actual bad faith, it follows that

21  proof of <u>Bloom</u> actual "bad faith" conduct suffices as

22  "appropriate circumstances" for § 362(k)(1) punitive damages.

23      An award of punitive damages is a matter of discretion

24  reviewed for abuse of discretion. <u>Snowden</u>, 769 F.3d at 657.

25

26                             III

27      Other general considerations applicable in this case are

28  also noted.

A

As the Ninth Circuit explained in <u>Dawson</u>, the choice of Congress to limit the § 362(k)(1) damages remedy to individuals signals a special interest in "redressing harms that are unique to human beings." <u>Dawson</u>, 390 F.3d at 1146.

Harms that are unique to human beings are normally the subject of tort law. There is a rich body of primarily state common law regarding tort damages. But those common law principles merely inform the analysis of § 362(k)(1) damages, which are a creation of federal statute and, hence, a matter of federal law.

Where, as here, damages are a question of federal law and there is not controlling formal precedent as to fine points, federal courts commonly find influential the tort damages principles articulated in the American Law Institute's <u>Restatements of Torts</u>.

Thus, for example, the Supreme Court in addressing the question of punitive damages in the context of 42 U.S.C. § 1983 looked to the <u>Restatement (Second) of Torts</u> and to Professor Prosser's treatise on torts to note that punitive damages are intended to punish the wrongdoer for intentional or malicious acts and to deter that wrongdoer and others from similar extreme conduct. <u>Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 266-67 (1981), <u>citing</u> RESTATEMENT (SECOND) OF TORTS § 908 (1979) and W. PROSSER, LAW OF TORTS 9-10 (4th ed. 1971).

Accordingly, it is appropriate in this case to construe <u>Dawson</u> and its progeny through the matrix of the Restatements and to apply tort damages principles.

B

Emotional harm refers to impairment or injury to a person's emotional tranquility. RESTATEMENT (THIRD) OF TORTS: PHYSICAL & EMOTIONAL HARM § 45 (2012).

Emotional harm covers a variety of mental states, including fright, fear, sadness, sorrow, despondency, anxiety, humiliation, and depression. Id. cmt a. As will be seen, the evidence in this case clearly establishes all seven of those mental states in each of the plaintiffs.

Emotional harm that produces bodily harm may lead to compensable physical injury. Id. cmt b. Bodily harm resulting from emotional harm is implicated in this case.

C

One of the risks that a willful stay violator assumes is that an individual victim will be abnormally vulnerable to emotional distress and to abnormal consequences.

The tort-like nature of damages provided by Congress for injured individuals under § 362(k)(1) means that the so-called "thin-skull" or "eggshell plaintiff" rule applies. That rule means that the willful stay violator takes the victim as found.

This concept is in the mainstream of the law of torts. Formally stated, when an actor's conduct causes harm to a person that, because of a preexisting physical or mental condition or other characteristics of the person, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the person. RESTATEMENT (THIRD) OF TORTS: PHYSICAL AND EMOTIONAL HARM § 31.

1    Here, the stay violations were visited upon individuals who

2    had already endured eighteen months of trying to deal with Bank

3    of America in an effort to obtain a mortgage modification.

4    Throughout that period, Bank of America was playing, in bad

5    faith, a "dual tracking" game of talking loan modification while

6    actually moving towards foreclosure. That process was so trying

7    that it produced in the Sundquists a state of battle-fatigued

8    demoralization.

9    The battle fatigue existing at the time of the stay

10   violation is relevant to assessing the magnitude of the emotional

11   distress inflicted by Bank of America after the stay violations

12   occurred. While the cause of the Sundquists' preexisting

13   conditions are not relevant, there is irony and justice inherent

14   in the fact that Bank of America itself caused those fragile

15   states of mind that did not respond well to the bank's stay

16   violations.

17

18                                    D

19   The nature of the evidence adduced at the trial of this

20   adversary proceeding is worthy of separate comment.

21   Although there are medical aspects to the plaintiffs' case

22   regarding their physical and mental condition as to which one

23   ordinarily would expect corroborating expert medical opinion

24   testimony and evidence of medical bills, such corroborating

25   medical evidence was not provided.

26   Instead, the plaintiffs' case consisted of their testimony

27   in open court corroborated by a 494-paragraph declaration by

28   Renée Sundquist that recited the contents of a journal that she

                                    40

1 maintained in which she articulated deeply personal thoughts,[57]

2 introspections, and embarrassing facts, as they were occurring.[58]

3     The medical aspects are but one example of thin evidence

4 regarding damages.  Another example of sparse evidence relates to

5 lost business.

6     While experienced litigation lawyers would regard the

7 incomplete evidentiary presentation as risky, <u>Dawson</u>

8 unambiguously permits proof of significant harm to be established

9 by testimony alone and by reference to egregious conduct.

10 <u>Dawson</u>, 390 F.3d at 1149-50.  In such circumstances, everything

11 turns on the degree to which the trier of fact is persuaded by

12 the evidence that is presented.

13     Here, the court, in its capacity as trier of fact, found

14 Renée Sundquist to be an exceptionally credible witness.  She

15 displayed considerable courage in revealing her very private

16

---

17     [57]If this case ultimately needs to be re-tried following an

18 appeal, the evidentiary presentation regarding damages likely
would be more thorough.

19     [58]The 494-paragraph Renée Sundquist Declaration, which the

20 court has in its discretion made part of the record, is presented
in a more complete and readable form in Defendant's exhibits OOO-

21 VVV, because it is in the format in which it was originally
written on a computer.  Before oral argument commenced, the court

22 noted that those exhibits had not been admitted and proposed
admitting them and offered Bank of America an opportunity to

23 cross examine her further.  Bank of America's counsel agreed to
their admission and declined the court's offer of further

24 examination.  They were admitted.  An hour later, after hearing
the plaintiffs' closing argument, Bank of America changed its

25 mind and attempted to renege on admitting its exhibits, saying
that they had only been intended as rebuttal exhibits and that no

26 rebuttal was needed.  Too late; the exhibits remain part of the
evidentiary record.  In any event, any error in this respect is

27 likely to be harmless as the subject exhibits do not contradict
the less-readable extracts in the 494-paragraph Renée Sundquist

28 Declaration, which the court has elected to admit in evidence.

1   journal and exposing herself to cross-examination and public

2   exposure of her all-too-human traits.  The journal, which squares

3   with other objectively ascertainable facts in a manner that

4   confirms its veracity, corroborates her testimony in a manner

5   that permits one to follow her state of physical and emotional

6   distress as the relevant events transpired.[59]  The court believed

7   her testimony.

8        Likewise, the court believed the testimony of Erik Sundquist

9   regarding his physical and mental state.

10       Bank of America did not, with the exception of testimony

11  about the term and rate of the lease executed when they moved,

12  call into question the credibility of the Sundquists' testimony

13  and did not present evidence to counter their testimony.

14       In short, although the evidence is lacking in specifics as

15  to such special damages as medical bills and legal bills, the

16  evidence is adequate to enable resolution of the overall stay

17  violation dispute, albeit that some components of actual damages

18  will be less than what might have been proved with more precise

19  evidence.

20

21                                    E

22       Why on Earth would Bank of America be so passive aggressive

23  with the Sundquists and so reluctant to reach closure with them?

24       First, a finance professional would point out that the 6

25  percent contract interest rate on the note that keeps accruing at

26  _____

27       [59]At this time [January 2010], I began Journaling as a way
    to deal with the insanity of the communications with Bank of
28  America.  Renée Sundquist Decl. ¶ 22.

                                    42

an annual pace of $35,093.64 on the $584,893.97 principal balance is higher than what would result if the note were to be paid in full and the funds lent to another borrower.

Second, the collateral is in a premium location in a gated community and is likely to be sufficient to cover the full debt indefinitely. When Bank of America foreclosed in 2010, it bid the full amount of the debt as if it believed the residence was worth at least $584,893.97; property values have since rebounded to a level that likely is greater than the debt.

Bank of America has little financial incentive to kill a goose that keeps laying 6 percent golden eggs when the federal funds rate is 0.39 percent[60] and the average mortgage rate is 3.45 percent for a 30-year fixed rate.[61]

## IV

The "willful violation" predicate for an award of actual damages under § 362(k)(1) has been satisfied. This court is persuaded by the preponderance of evidence that Bank of America acted willfully in all of its actions, beginning June 15, 2010, and also is persuaded that all such actions were intentional.

## A

Every act by Bank of America taken after June 14, 2010, was

---

[60]Board of Governors of the Federal Reserve System (US), Effective Federal Funds Rate [FEDFUNDS], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/FEDFUNDS, August 17, 2016.

[61]Primary Mortgage Market Survey, U.S. Weekly Average, Aug. 11, 2016. http://www.freddiemac.com/pmms/.

43

1  taken with notice of the chapter 13 case.  Bank of America
2  concedes that it received verbal notification of the case on June
3  14.  Its computer records reflect that on June 16 it coded the
4  loan as in bankruptcy as of June 14.  It even filed in the case a
5  Request for Service of Notice.  Dkt. # 14 (July 1, 2010).

6      Notice of the chapter 13 case filing equates with notice of
7  the automatic stay.  <u>Leetien</u>, 309 F.3d at 1215.

8      "Internal disorder" does not excuse noncompliance with the
9  automatic stay.  <u>Leetien</u>, 309 F.3d at 1215 (creditor blames its
10 process server).

11     Bank of America's explanation that it took 48-hours for it
12 to enter into its computer a code indicating that the Sundquists
13 had filed a bankruptcy case is unavailing and not persuasive.

14     The my-computer-made-me-do-it excuse is merely a form of the
15 sort of "internal disorder" that is no defense.  <u>Assoc. Credit</u>
16 <u>Servs., Inc. v. Campion</u>, 294 B.R. 313, 317 (9th Cir. BAP 2003).

17     A business organization that elects to use computers to
18 control acts that are in the line of fire of the automatic stay
19 is no less exposed to damages for "willful" stay violations than
20 entities that rely on real people to direct action.  In other
21 words, Bank of America is responsible for (1) the structure of
22 its software and procedures, (2) the accuracy and timeliness of
23 data entry and implementation, and (3) the efficiency and
24 accuracy of its personnel.

25

26                              B

27     Nor is this an instance of a single willful stay violation.
28 The record teems with stay violation.  There was a string of more

                              44

1   than six willful stay violations over a period of more than two

2   months, each of which exacerbated its predecessors.  There comes

3   a point at which this case is reminiscent of Watergate: the

4   denial and cover-up becomes worse than the crime.

5

6                                   1

7        The first stay violation – the June 15, 2010, trustee's sale

8   the day after the June 14 chapter 13 bankruptcy case filing –

9   might, if promptly and voluntarily reversed as a mere oversight

10  or mistake, have yielded only negligible damages.  But that is

11  not what happened.

12       Everything that follows is the fruit of the poisoned

13  foreclosure.

14       On June 16, 2010, Bank of America ordered counsel to

15  initiate eviction proceedings in violation of the automatic stay.

16       On June 23, 2010, Bank of America's agent executed the

17  trustee's deed effectuating the June 15 foreclosure sale to

18  itself.

19       On June 25, 2010, Bank of America's agent recorded the

20  trustee's deed in the Placer County records.

21       On July 8, 2010, Bank of America caused a Notice to Quit the

22  premises to be sent to the Sundquists.

23       On July 23, 2010, Bank of America caused an unlawful

24  detainer action to be filed in Placer County Superior Court.

25       On or about August 19, 2010, Bank of America caused a three-

26  day Notice to Quit to be served at the premises.

27       These are six separate and distinct "willful" violations of

28  the automatic stay.  Each of these acts were intentional.

1                                      2

2       In addition, on multiple occasions throughout July, August,

3   and September, Bank of America caused its agents to enter without

4   permission the gated community in which the premises are located

5   to trespass, surveil, and harass the Sundquists in a fashion that

6   so thoroughly spooked them that they felt compelled to move.

7       In this respect, Bank of America crossed the line from

8   passive "inspection" that does not ordinarily offend the

9   automatic stay to active intimidation that does violate it.

10      The behavior of Bank of America's agents in overtly tailing

11  the Sundquists' vehicle in a threatening manner and beating on a

12  sliding door adjacent to a child who was practicing piano goes

13  far beyond what is appropriate for the usual monthly "drive-by

14  inspection" checks on properties in default.

15      Rather, Bank of America's agents were treating the

16  Sundquists as criminals.  That conduct is consistent with Bank of

17  America acting as if it were the owner of the residence as a

18  result of the June 15, 2010, foreclosure and that the Sundquists

19  were illegal squatters who deserved to be intimidated.

20      Bank of America's program of intimidation and unlawful

21  detainer succeeded in driving the Sundquists out of the property.

22  Having been surveilled, tailed, and harassed, they were

23  frightened into a precipitous move in fear that the sheriff

24  really was about to throw them onto the street.

25      In short, the court is persuaded that the actions by Bank of

26  America during each of its "inspections" between the time the

27  Sundquist chapter 13 case was filed on June 14, 2010, and the

28  time it was dismissed on September 20, 2010, were intentional

                                    46

acts in furtherance of the June 15, 2010, foreclosure that helped frighten the Sundquists into moving into a rented residence.

These "willful" violations of the automatic stay were intentional and are separate and distinct from the six violations previously identified.

Thus, the stay violations were "willful" within the meaning of § 362(k)(1) so as to be eligible for a damages award, which subdivides into actual damages and punitive damages.

3

As a matter of procedure, the pleadings are amended to conform to the evidence adduced at trial in accordance with Federal Rule of Civil Procedure 15(b)(2).

The Second Amended Complaint alleges only two counts of stay violation – the foreclosure in violation of the automatic stay and the filing of the unlawful detainer action in violation of the automatic stay. But the evidence presented by both parties focused on the entire course of events that includes all of the other stay violations identified above.

While these other stay violations are arguably capable of being subsumed within the two counts in the Second Amended Complaint, the reality is that they are separate stay violations that deserve to be treated as such.

All of them were litigated by the parties in the context of the § 362(k)(1) stay violation remedy. There was no objection to evidence of any of the stay violations. Hence, it is fair to infer that they were tried by implied consent. Fed. R. Civ. P. 15(b)(2), as incorporated by Fed. R. Bankr. P. 7015.

V

As noted above, actual damages include both physical damages and economic damages, all of which must be established by a preponderance of evidence persuasive to the trier of fact.

A

In light of the focus by Congress on damages to individuals, damages for individuals who are victims of automatic stay violations are assessed in accordance with tort damage principles, which primarily are addressed to injuries suffered by people. Here, one is looking for the fruit of the poisoned foreclosure. The useful shorthand is "but for" causation.

In the context of automatic stay violations, many of the harms compensable as actual damages are "economic" damages.

By "economic" damages this court applies the definition of "economic loss" adopted by the American Law Institute in its current project to revise the Restatement of Torts to address liability for economic harm: "'economic loss' is pecuniary damage not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property." RESTATEMENT OF THE LAW (THIRD) TORTS: LIABILITY FOR ECONOMIC HARM, § 2 (Tentative Draft No. 1, approved 2012).

B

Actual economic damages for a wrongfully displaced victim of an automatic stay violation include alternative housing expense.

The Sundquists rented alternative housing for eighteen months at a net rental expense exceeding $4,000.00 before they

48

1    moved back into their home.

2    They testified that the term of the rental was hastily
3    arranged over the internet, that the net rental expense exceeded
4    $4,000.00,[62] that they agreed to stay for more than one year, and
5    that they ultimately returned to their home out of a sense of a
6    duty to mitigate damages.

7    Bank of America questions the accuracy of the testimony
8    regarding rent.  It unearthed a twelve-month lease for $3,900.00
9    per month.  The lease included extension provisions for
10   subsequent years with a 5 percent escalator (to $4,095.00).

11   The lease also required the Sundquists to maintain the pool
12   and garden and have a professional do the work and required them
13   to water garden, landscaping, trees, and shrubs.  It reflects
14   that the Sundquists also purchased a one-year home warranty.
15   These items easily account for the difference between the nominal
16   rent in the lease and the net rental expense asserted by the
17   Sundquists.

18   Hence, the court (finding the Sundquist testimony credible)
19   concludes that the net monthly rental expense was $4,000.00 for
20   the first year and $4,200.00 thereafter.

21   Bank of America questions the extent to which the Sundquists
22   mitigated damages.  It argues that the one-year initial term of
23   the lease means that they could have vacated the rental and moved
24   back into their home six months earlier than they did.

25   The duty to mitigate damages in the context of § 362(k)(1)

26

27

---

28   [62]Erik Sundquist testified the rent was $4,200.00; Renée
     Sundquist testified the rent was $3,900.00 for the first year and
     $4,200.00 for the second year.

49

1  recognizes that it is not appropriate to exploit a stay-violation
2  liability situation merely to pocket a higher recovery.  Eskanos
3  & Adler v. Roman (In re Roman), 283 B.R. 1, 12 (9th Cir. BAP
4  2002); cf. Dawson, 390 F.3d at 1152 (stay violation attorney's
5  fees must be reasonable); Computer Commc'ns, Inc. v. Codex Corp.
6  (In re Computer Commc'ns, Inc.), 824 F.2d 725, 731 (9th Cir.
7  1987) (stay violation contempt damages must be reasonable).

8      The § 362(k)(1) mitigation obligation is a duty to act
9  reasonably under the circumstances.  Roman, 283 B.R. at 12.  The
10 court determines what is reasonable as a matter of discretion.
11 Dawson, 390 F.3d at 1145 & 1152; Roman, 283 B.R. at 7.  It
12 normally is not reasonable to exploit a stay violation primarily
13 as a profit-making opportunity.

14     The relevant circumstances here include the on-going threats
15 by Bank of America to foreclose, the unresolved arrearage with
16 the HOA and the $20,000 penalty that the HOA imposed for events
17 that occurred while Bank of America held title to the property,
18 and Bank of America's unwillingness to provide any relief for the
19 personal property stolen during its watch.  These problems
20 created a cloud of uncertainty about whether the Sundquists could
21 prudently return to the house.

22     This court is persuaded that not returning to the premises
23 until nine months after first learning that the foreclosure had
24 been rescinded was reasonable under the circumstances.  The duty
25 to mitigate § 362(k)(1) damages was not offended.

26     The calculation of the alternative housing component of
27 actual damages is straightforward.  The court finds as fact that
28 the actual monthly expense was $4,000.00 for the first twelve

1  months and $4,200.00 for the next six months.

2      Moving expenses incurred vacating the foreclosed property

3  and later moving back in are a component of alternative housing

4  expense.  The Sundquists assert that moving expenses were

5  $10,000.00.  That sum is credible and was not questioned.

6      Hence, actual damages for alternative housing expense are

7  $73,200.00 in rent, plus $10,000.00 in moving expenses, for a

8  total of $83,200.00.

9

10                              C

11      Section 362(k) designates attorneys' fees as an element of

12  damages, rather than an item separate from damages.

13      Such fees are regarded as "mandatory." <u>Schwartz-Tallard</u>,

14  803 F.3d at 1099-1101; <u>Snowden</u>, 769 F.3d. at 657.

15      While there are a variety of ways to determine attorney's

16  fees, the common denominator regarding fees in bankruptcy courts

17  is that fees should not exceed the "reasonable" value of services

18  rendered.  <u>See, e.g.</u>, 11 U.S.C. §§ 328(a), 329(b), 330(a)(1)(A),

19  502(b)(4), 503(b)(4) & 506(b) ("reasonable").

20      The "reasonable" value of services, of necessity, is

21  determined on a case-by-case basis in light of the peculiar

22  circumstances of each case, as modulated by the sound discretion

23  of the bankruptcy court.

24

25                              1

26      This case is atypical because there were successive state

27  and federal actions.  This invites inquiry into whether the

28  multiple actions were necessary.

1    The key circumstance is Bank of America's institutional
2  obstinance and dishonesty (including lying to the CFPB regarding
3  the status of the state-court litigation) in refusing all
4  recompense after the Sundquists discovered that Bank of America
5  had secretly restored them to title after they moved and was
6  demanding that they pay for damages resulting from Bank of
7  America's incompetent stewardship of its illegally-acquired
8  property.

9    The Sundquists' general practice lawyer recognized that the
10 overall situation implicated several state-law causes of action
11 and elected to sue in state court on multiple theories, including
12 the automatic stay violation, on the theory that more
13 comprehensive relief would be available in the state forum.

14    Twenty-twenty hindsight reveals that the state appellate
15 court deemed the automatic stay violation theory to be a matter
16 of exclusive federal jurisdiction, which would have permitted
17 immediate resort to federal court.  But it is also significant
18 that other causes of action stated in the state-court action were
19 deemed meritorious.

20    The Sundquists would not have commenced that state-court
21 action "but for" the actions of Bank of America regarding the
22 automatic stay.  The evidence is that they did not consult the
23 counsel who filed the state-court lawsuit for them until after
24 Bank of America had secretly rescinded the foreclosure and
25 started sending them bills and notices of delinquency.  What
26 finally provoked them to sue was Bank of America's refusal to
27 make amends for the stolen appliances and window coverings and
28 for the HOA expenses after it had belatedly and secretly

1   rescinded its illegal foreclosure.

2       The assertion of the wrongful foreclosure action in state

3   court premised on Bank of America's violation of the automatic

4   stay was merely the first step in obtaining the § 362(k)(1)

5   remedy.  As such, the legal fees associated with that cause of

6   action qualify as § 362(k)(1) damages.

7       While reasonable legal professionals might disagree as to

8   the efficacy of the initial strategy, it was reasonable to pursue

9   state-law causes of action against Bank of America that

10  potentially encompassed damages greater that what might be

11  anticipated from a mere § 362(k) stay violation.

12      Hence, this court cannot say that the fees paid by the

13  Sundquists to state-court counsel for the state-court phase of

14  the litigation exceeded the reasonable value of services under

15  the circumstances.  In any event, Bank of America is in no

16  position to complain because its conduct necessitated the fees.

17

18                              2

19      Federal Rule of Bankruptcy Procedure 2016(b) implements 11

20  U.S.C. § 329 by requiring that every attorney for a debtor,

21  regardless of whether the attorney plans to apply for

22  compensation, must file a statement of compensation paid or

23  agreed to be paid in connection with a bankruptcy case.  11

24  U.S.C. § 329(a); Fed. R. Bankr. P. 2016(b).

25      As § 329(a) applies to all agreements or payments "made

26  after one year before the date of the filing of the petition,"

27  the requirement applies to post-bankruptcy enforcement of

28  bankruptcy law and extends even to services rendered in state

1   court that bear a nexus to enforcing bankruptcy law.

2       If the compensation exceeds the reasonable value of

3   services, then the court has the power to cancel the agreement

4   and to order the return of payments.  11 U.S.C. § 329(b).

5       Here, the key cause of action in the state-court was

6   premised on violation of 11 U.S.C. § 362, which is at the heart

7   of enforcement of bankruptcy law.  Accordingly, the Sundquists'

8   state-court counsel was required to file his Rule 2016(b)

9   statement.

10      Likewise, the Sundquists' counsel in this adversary

11  proceeding also must comply with Rule 2016(b).[63]

12

13                              a

14      The Sundquists' state court counsel filed a Rule 2016(b)

15  statement (after this court called the requirement to his

16  attention) in which he reported having received $17,882.00.[64]

17      This court has reservations about the quality of performance

18  by that counsel and the wisdom and efficacy of his strategy.

19  Nevertheless, it cannot say, in the face of the nature of the

20  litigation strategy of Bank of America, that $17,882.00 exceeded

21  the reasonable value of services within the meaning of § 329(b).

22      Those services led to a state appellate determination of the

23  theretofore open question whether California's remedies for

24  _____

25      [63]These requirements imposed by § 329(a) and Rule 2016(b)
    also apply to counsel representing the debtor in a bankruptcy
26  appeal.  Hence, an appellate counsel representing the debtor in
    any appeal from the judgment rendered in this adversary
27  proceeding will need to comply.

28      [64]Disclosure of Compensation of Attorney for Debtors, No.
    10-35624, Dkt. #68.

1 | wrongful foreclosure can be premised on nothing other that a
2 | violation of the federal bankruptcy automatic stay.  That, at a
3 | minimum, clarified the law in a murky area and redirected the
4 | Sundquists to this court.  In addition, the Sundquists were
5 | provoked to consult state court counsel because Bank of America
6 | secretly rescinded its illegal foreclosure and tried to leave the
7 | Sundquists holding the bag for expenses attributable to its
8 | incompetent stewardship of the Sundquists' residence.

9 | It follows that the services rendered in the state court
10 | litigation have a sufficient nexus to the § 362 stay violation to
11 | qualify as § 362(k) damages.

12 | Hence, the component of § 362(k)(1) attorney's fee damages
13 | attributable to the state-court litigation is $17,882.00.

14 |

15 | b

16 | The Sundquists engaged different counsel to prosecute this
17 | adversary proceeding.  That attorney, who was also their counsel
18 | in the chapter 13 case, complied with 11 U.S.C. § 329 by filing
19 | the supplemental statement required by the last sentence of Rule
20 | 2016(b) for any payment or agreement not previously disclosed.
21 | Her initial statement had been made contemporaneous with the
22 | filing of the chapter 13 case in 2010.

23 | In the subsequent statement, she reported having taken the
24 | stay violation case on a contingency fee basis.[65]

25 | A copy of the actual contingency fee agreement was filed

26 |

27 | _____

28 | [65]Disclosure of Compensation for Attorney for Debtors, No.
10-35624, Dkt. #69.

55

1  pursuant to court order.[66]

2      The agreed contingency fee is the higher of 30 percent of

3  the total recovery or the amount of fees that the court orders

4  paid by the other side.[67]

5

6                                    i

7      If the agreed compensation for debtors' counsel exceeds the

8  reasonable value of services, the court may cancel the agreement.

9  11 U.S.C. § 329(b).

10      In principle, contingent fees are permissible in bankruptcy

11  cases.  Trustees and committees are expressly authorized to

12  employ professionals on a contingency fee basis.  11 U.S.C.

13  § 328(a).  There may even be scenarios in which contingency fees

14  are appropriate for counsel representing a debtor.

15      Contingency fees for debtor's counsel in § 362(k)(1) stay

16  violation disputes, however, present logical difficulties.

17  Attorneys' fees are an element of § 362(k)(1) damages.  A simple

18  contingency fee agreement in a situation in which attorneys' fees

19  are an element of damages leads to contingency fees on

20  contingency fees, which would set up a repetitive loop in which

21  fees would increase to infinity.

22      While it may be possible to draft a debtors' counsel

23  contingency fee agreement that might solve the problem described

24  here, the specific contingency fee agreement in this case does

25  _____

26      [66]Order that Dennise Henderson File Copy of Contingency Fee
    Agreement and Justify Agreement under 11 U.S.C. §§ 329(b) and
27  362(k)(1), No. 10-35624, Dkt. #70.

28      [67]Attorney-Client Retainer and Fee Agreement, No. 10-35624,
    Dkt. #74.

1  not do so.

2      It follows that the agreement between counsel and the

3  debtors calls for fees that exceed the reasonable value of

4  services.  Accordingly, pursuant to § 329(b) the portion of the

5  Attorney-Client Retainer and Fee Agreement calling for a

6  contingency fee is cancelled to the extent that it calls for

7  excessive compensation.  11 U.S.C. § 329(b).

8

9                              ii

10      The consequence of the § 329(b) cancellation of the

11  excessive portion of the fee agreement means that the court must

12  determine the portion of the fee that is not excessive.

13      In response to this court's order to justify the contingency

14  fee under §§ 329(b) and 362(k)(1), the Sundquists' counsel

15  restated her fees on the hourly lodestar basis commonly used in

16  fee award cases.

17      Lodestar fees consistent with § 330 are presumptively

18  reasonable for purposes of § 329 so long as they are proportional

19  in terms of time, rate, and the nature and amount of the

20  controversy.  11 U.S.C. §§ 329(b)-330.

21      Here, the statement of lodestar fees in the hourly fee

22  application documents 207.56 hours devoted to representation of

23  the Sundquists in the stay violation matter and uses an hourly

24  billing rate of $300.00, the product of which is $62,268.00.

25  Counsel also has documented costs of $6,606.55.

26      This court, having presided over the entire stay violation

27  litigation, is persuaded that $68,874.55 does not exceed the

28  reasonable value of services rendered within the meaning of

57

1  § 329(b).  If anything, as implied by comments elsewhere in this

2  opinion, counsel could have taken more time, effort, and expense

3  to prepare a more complete evidentiary presentation.

4      The component of § 362(k)(1) damages based on attorney fees

5  is $70,000.00, which sum includes the documented fees and

6  expenses, together with an additional sum to compensate for the

7  time spent preparing the statement of fees.[68]

8

9                                D

10     Lost income is another element of § 362(k)(1) economic

11  damages, which subdivides into the income of the respective

12  plaintiffs.

13

14                                1

15     Renée Biagi Sundquist has a bachelor's degree in marketing

16  and finance.  She stopped working in the finance industry about

17  1999 when her twin sons were born.

18     She is an ice skater.  As a youth, she competed in the

19  United States, was National Champion of Italy, and qualified for

20  the 1980 Italian Olympic Team but was unable to compete because

21  of illness.  This background matters in this case because it

22  connotes the mental toughness inherent in individual performance

23  athletes who are able to compete at national and Olympic levels.

24     In January 2010, she was working as a figure skating coach

25

26  _____

27     [68]If there is an appeal of this court's order in which the
    Sundquists prevail, they will be entitled to fees reasonably
    incurred in defending the appeal.  The Best Service Co. v. Bayley

28  (In re Bayley), No. 15-55142 (9th Cir. Feb. 27, 2017), slip op.
    at 3, citing Schwartz-Tallard, 803 F.3d at 1099 (en banc).

                                58

1  at Skatetown (Roseville Sportworld Inc.) in Roseville,

2  California, at $20.00 per hour.  In addition, she taught private

3  lessons for $79.00 to $100.00 per hour.

4       In August 2010, she accepted employment as Skating Director

5  at Skatetown on a job-share basis in which her share of the job's

6  annual salary was $37,500.00.  And she was able to teach private

7  lessons.  Her IRS Form W-2 for 2010 reflects compensation from

8  Roseville Sportworld Inc. of $22,732.29.  The court infers that

9  her lesson-based income was about $7,100.00 in 2010.[69]

10      She found the work increasingly difficult because the stress

11 of dealing with Bank of America was draining her physical and

12 emotional resources.  Migraine headaches, diagnosed by her

13 neurologist as stress-induced,[70] interfered with her ability to

14 work.

15      In August 2011, she was offered the Skating Director

16 position at Skatetown on a full-time basis with an annual salary

17 of $80,000.00.  But the effect of the stress of dealing with Bank

18 of America and concomitant migraine headaches prevented her from

19 accepting the job.[71]

20      Her IRS Form W-2 for 2011 reflects compensation from

21 Roseville Sportworld Inc. of $47,491.68.

22      By 2012, her income as skating instructor dwindled as her

23

---

24      [69]Five months of income at an annual rate of $37,500.00 is

25 $15,625.00.  The remaining $7,107.29 probably reflects hourly
   income.

26

27      [70]The court believes her testimony regarding headaches and
   diagnosis.

28      [71]The court believes her testimony about the offer and
   rejection of the full-time position.

1  physical reactions to the situation with Bank of America

2  worsened.

3      Her IRS Form W-2 for 2012 reflects compensation from

4  Roseville Sportworld Inc. of $7,397.00.

5      Tax returns for 2013 and 2014 reflect that she had no income

6  during those years.

7      She testified that her health is now "terrible" and that she

8  is unable to work and has insufficient prior work credits to

9  qualify for Social Security disability.  Migraine headaches are

10  near daily occurrences.  Multiple rounds of migraine medication

11  make her slow.  Anti-seizure medication makes it hard for her to

12  speak.[72]

13      The court is persuaded that Renée Sundquist was unable to

14  accept the $80,000.00 Skating Director position in August 2011

15  because of the stress induced by the difficulties resulting from

16  the stay violation by Bank of America and its refusal to redress

17  the stay violation by eliminating inappropriate charges.  It is

18  further persuaded that, "but for" the conduct of Bank of America

19  regarding its stay violation, she would have been successful in

20  that job and would still be employed in that position.

21      The court is not persuaded that she actually lost a material

22  amount of income in 2010 due to the stay violation.

23      Nor is the court persuaded that lost income should be

24  projected beyond the date of trial without the benefit of expert

25  medical opinion evidence regarding her long-term prospects.

26      Her lost income proximately caused by Bank of America's stay

27

28

_____

[72]The court believes, and so finds as fact, this testimony.

60

1   violation and its aftermath is: 2011 $8,908;[73] 2012 $72,603;[74]

2   2013 $80,000; 2014 $80,000; 2015 $80,000; 2016 $80,000.[75]  Hence,

3   her total lost income for purposes of § 362(k)(1) actual damages

4   is $401,511.00.

5

6                                    2

7        After Erik Sundquist graduated from the University of

8   California at Berkeley, he joined, and eventually succeeded to

9   ownership of, the construction company founded by his father in

10  the 1960s.  He also formed some development-related businesses.

11       A downturn in construction business led him to wind up the

12  construction firm.  The development businesses, Finn-Am, Inc.,

13  Sundquist Custom Design Build, Sundquist Associates, and

14  Chandelle, LLC, fizzled out during the Great Recession.

15       On the downslope, his earnings were $154,238.00 in 2007,

16  $87,178.00 in 2008, and $20,125.00 in 2009.[76]

17       He also has engaged in professional acting, but that

18  endeavor produced negligible income during the period relevant to

19

20

21  _____

22       [73]Eight months of $37,500 ($25,000) as job-sharing Skating
    Director + 4 months of $80,000 Skating Director ($26,667) + eight
23  months of $7,100 teaching income ($4,733) - Actual W-2 income
    ($47,492) =
24
         [74]$80,000 - Actual W-2 income ($7,397) = $72,603.
25
         [75]The court is not persuaded that, in the absence of expert
26  testimony that her inability to work will persist, it should
    award future damages after 2016.
27

28       [76]B of A Ex. AAA & B of A Request for Judicial Notice of
    Filed Documents for Trial, Ex. A, p. 36.

                                   61

1 | this stay violation matter.[77]

2 | In 2012, he developed a consulting business based on his
3 | status as a Reserve Specialist certified by the Community
4 | Associations Institute.  That business, SMA Reserves, LLC,
5 | advises homeowner associations on the reserves that need to be
6 | established in light of long-term maintenance and construction
7 | needs.  These so-called reserve studies are then used by the
8 | client HOA for budget purposes.  Tax return documents in evidence
9 | reflect that through SMA Reserves, LLC, he earned $39,776.00 in
10 | 2012, $67,931.00 in 2013, and $85,899.00 in 2014.[78]  SMA
11 | Reserves, LLC, is taxed as a partnership in which Erik Sundquist
12 | has a 60 percent share.

13 | He testified that his HOA clients have primarily been in the
14 | San Francisco Bay market area and that he has found himself
15 | frozen out in the Sacramento market area.

16 | Erik Sundquist asserts that Kocal Management Group: A
17 | Division of The Management Trust,[79] the large management company
18 | that manages the HOA for the Sundquist residence and a number of
19 | other HOAs in the Sacramento area, has blackballed him on account
20 | of the dispute between the Sundquists and Bank of America.

21 | This explanation rings true.  The record reflects
22 | considerable hostility directed by the HOA towards the Sundquists

23 |

---

24 | [77]His 2011 IRS Form 1040 reflects $32.00 from the Screen
Actors Guild.

25 | [78]According to its website, SMA Reserves, LLC, performs
26 | reserve studies according to the National Reserve Study Standards
published by the Community Associations Institute.  Erik
27 | Sundquist is certified as a Reserve Specialist by the Community
Associations Institute.  www.smareserves.com.

28 | [79]Sundquist Ex. 29.

62

1  because of their stance that Bank of America is responsible to

2  pay the HOA monthly charges and the $20,000.00 fine that accrued

3  during the time that Bank of America owned their residence.  The

4  issue has festered because it is about more than money.  The

5  eyesore of the dead landscaping has been an annoyance because the

6  standoff with Bank of America has made the Sundquists reluctant

7  to invest in landscaping if they are going to be unable to keep

8  the house.  That, in turn, infuriates the HOA leadership.[80]

9      The court concludes that Bank of America's refusal to pay

10  HOA charges during the time that it owned the residence in 2010

11  has had the consequence of reducing the number of engagements by

12  HOAs for reserve studies that Erik Sundquist's firm is asked to

13  do.

14      The problem becomes how to determine the amount of loss

---

16      [80]From the Renée Sundquist Journal:

18      [July 2015] "I worried all day, and was so mad about our
homeowners association calling a hearing to discuss our lawn.
19  After the bank sold our home, they forgot to water, now we are
supposed to pay the association penalties and replace our lawn
20  and s[h]rubs.  How will all this wrong be right?"

21      "Really excited we were given an opportunity for a lynch mob
Association meeting to discuss, oh, I mean embarrass us into
22  paying fees we don't owe.  We found out that man recently
blocking my garage and pounding on our door for 20 mins is from
23  the association board.  Life is good.  Still dealing with my
children's fear and my pounding heart.  So upset tonight, the
24  bank takes no responsibility and the board is run by crazy folks.
How I really wanted to respond to the board emails was, hey
25  stupid, my husband's name is spelt with a 'k' not 'c', and you
parked on private property, blocked my car from leaving, and
26  disrupted my children's life again.  A page right out of the
bank's book."

28  B of A Ex. UUU.

1  caused by Bank of America.  No evidence has been presented
2  regarding the market for reserve studies, the degree of
3  competition, or other logically relevant factors.  Ordinarily,
4  one would expect to see expert testimony on the point.

5      While some might believe that this leaves the court in the
6  uncomfortable position of needing to speculate, that is
7  incorrect.  The court can and, based on the evidence of the
8  business success in the nearby San Francisco Bay area, does have
9  the ability to fashion an award.  But it will be done in a
10  conservative fashion that will award less than what likely could
11  have been proved with a more focused evidentiary presentation.

12      The concrete evidence is the income actually received
13  through SMA Reserves, LLC, for 2012, 2013, and 2014.  These sums
14  are sufficiently modest as to warrant the inference the firm has
15  excess capacity – i.e. the ability to undertake additional
16  reserve studies.

17      The question is how much additional reserve study business
18  would have ensued if Erik Sundquist had not been frozen out of
19  his home market.  While an expert focusing in on the numerous
20  intangibles might be able to make a case for more than an
21  additional 50 or 100 percent, the court concludes that an
22  appropriately conservative number, giving Bank of America the
23  benefit of the doubt, is 25 percent.

24      Although there is a pattern of steady year-to-year increase
25  in business for SMA Reserves, LLC, the court's conservative
26  approach does not assume, in the absence of evidence, any
27  increase for 2015 and 2016.  Similarly, the court regards
28  projection of lost income into years after 2016 as unduly

1  speculative without actual evidentiary support.

2      Accordingly, the computation of lost business damages under

3  § 362(k)(1) is: 2012 - $9,944.00 (= $39,776.00 x .25); 2013 -

4  $16,982.75 (= $67,931.00 x .25); 2014 - $21,474.75 (= $85,899.00

5  x .25); 2015 - $21,474.75; 2016 - $21,474.75.  Total $91,351.00.

6

7                                      E

8      Lost property warrants an award of § 362(k)(1) actual

9  damages.  During the time that Bank of America owned the

10  Sundquist residence pursuant to its stay-violating foreclosure,

11  the major appliances (cooktop, oven, built-in refrigerator,

12  washer, dryer), window coverings, and carpet went missing through

13  no fault of the Sundquists.

14      The court believes the Sundquists' testimony that they left

15  the premises in good order and did not take any of the subject

16  property.

17      The personal property would not have been lost "but for" the

18  actions of Bank of America in violating the automatic stay by

19  foreclosing and thereafter prosecuting an unlawful detainer

20  action that had the effect of driving the Sundquists out of their

21  home and into a rental property.

22      The court also believes the Sundquist testimony that the

23  value of the lost personal property was $24,000.00.

24      Hence, actual damages for lost property are $24,000.00.

25

26                                      F

27      HOA fees are an item for § 362(k)(1) damages.  Those fees

28  are in two categories: monthly assessments and one-time charges.

65

1    The Verdera Homeowners Association assessed a charge of
2    $20,000.00 because Bank of America permitted the landscaping to
3    die while it owned the Sundquist residence pursuant to its stay-
4    violating foreclosure.

5    Bank of America is also liable for all HOA fees that accrued
6    during the time that it owned the Sundquist residence.

7    And Bank of America is liable for all HOA fees - $235.00 +
8    $15.50 late fee per month - that accrued between the time it
9    rescinded the foreclosure sale on December 30, 2010, and the time
10   that the Sundquists moved back in during late January 2012, a
11   total of 13 months.

12   Placing liability on Bank of America for HOA fees between
13   December 30, 2010, and January 31, 2012, is appropriate for two
14   independent reasons.  First, the bank permitted the rescission to
15   remain secret until the Sundquists' curiosity about the resumed
16   billing got the better of them and prompted them to look at the
17   land records on March 21, 2011.  Bank of America was content to
18   permit the rescission to remain secret through January 31, 2012,
19   if the Sundquists had not taken the initiative.  If the bank had
20   foreclosed during that period, it would have been liable for the
21   accrued HOA fees.

22   Second, the Sundquists were locked into a lease for their
23   alternative housing.  The reason they were in alternative housing
24   was Bank of America's activity violating the automatic stay by
25   foreclosing and thereafter prosecuting an unlawful detainer
26   action in order to force the Sundquists to move.  "But for" the
27   stay violations by Bank of America, the Sundquists would not have
28   moved and would have paid their monthly assessments.

66

1     One related item relates to the landscaping.  The HOA

2  assessment of $20,000.00 in 2010 presumably was an approximation

3  of the cost of lawn and landscaping.  Prices have risen nearly 10

4  percent in the interim and likely will be subject to further

5  increases before the Sundquists actually recover.  Accordingly,

6  an extra $2,000.00 will be awarded to enable replacement of the

7  landscaping that Bank of America permitted to die.  This is yet

8  another fruit of the poisoned foreclosure tree; "but for" the

9  stay violations by Bank of America, the Sundquists would not have

10  moved and would not have suffered the landscaping penalty charge.

11     The § 362(k)(1) actual damages attributed to HOA fees,

12  charges, assessments, and penalties total $26,637.50.[81]

13

14                           G

15     The record is replete with descriptions of the many

16  occasions after June 14, 2010, that the Sundquists sent loan

17  modification applications and supporting materials to Bank of

18  America.[82]  These application packages typically consisted of

19  ————————————————————————————————————

20     [81]The accrued balance as of the May 2011 HOA assessment was
$22,633.50.  Sundquist Ex. 29.  Since the monthly assessment and

21  late fee was $250.50, the eight months remaining total through
January 31, 2012, is $2,004.00.  Thus, the HOA total is

22  $22,633.50 + $2004.00 = $24,637.50.  Adding the $2,000.00
increased cost of replacing landscaping yields $26,637.50.

23

24     [82]E.g., From the Renée Sundquist Journal:

25     "[August 2010] Sent another modification packet to b/a, this
has to be over twenty modification packets at this point.  I was

26  fixated on the amount of papers that included over the years!  I
was fixated on the amount of papers that included over the years!

27  OMGosh, the environment!  That times 20 !!!!!!!!!!!!"

28  B of A Ex. OOO; accord Renée Sundquist Decl. ¶ 120.

1  more than thirty pages.[83]

2       A persistent feature of the loan modification situation is

3  that the payoff statements from Bank of America include a demand

4  that the Sundquists pay expenses of $5,696.61 incurred by Bank of

5  America during the time that it was in title to the Sundquist

6  residence in 2010 pursuant to its stay violations.  The

7  Sundquists take umbridge at the demand that they pay Bank of

8  America's expenses incurred when Bank of America owned the

9  property by virtue of its stay-violating void foreclosure.

10       That $5,696.61[84] includes, for example, "HOA fee $562.50,"

11  which was the payment by Bank of America on September 17, 2010,

12  of the HOA invoice dated August 11, 2010.[85]  It includes $450.00

13  for yard maintenance that occurred while Bank of America was in

14  possession of the property.  It includes $120.00 in property

15  inspection fees incurred before the rescission of the foreclosure

16  on account of the stay violations.

17  _____

18       "[2012] Called and left a message for [CEO Representative]
Lexi asked why we needed to sent the modification so many times

19  and asked for the current payoff.

20  Renée Sundquist Decl. ¶ 393.

21       "Today we received another random loan modification packet
to be completed.  There must be a rule to send out a bogus denial

22  or send out a new modification packet."

23  Renée Sundquist Decl. ¶¶ 394-95.

24  The court believes, and so finds as fact, the facts asserted in

25  this testimony.

26       [83]B of A Ex. U (transmittal from Sundquist attorney faxing
32-page modification application).

27       [84]B of A Ex. WWW-002.

28       [85]Sundquist Exs. 76 & 81 & 89.

1    When one compares the payoff statement dated March 3, 2016,

2    with the payoff statement dated June 12, 2012, the additional

3    charges confirm the Sundquists' contention that Bank of America

4    has been continuing to demand to be reimbursed for expenses it

5    ran up during the period it owned the property.[86]  This has been

6    a major sticking point in loan modification efforts from the

7    standpoint of the Sundquists.

8    The court agrees with the Sundquists that it is both wrong

9    and in bad faith for Bank of America to continue to demand that

10    Bank of America be reimbursed for the fruits of its own

11    misconduct.

12    This unreasonable and unconscionable position by Bank of

13    America is the main reason that there has been a six-year

14    standoff with the Sundquists.  During that time, there has been

15    no meaningful effort by Bank of America to atone for its stay

16    violations.  Hence, these are fruits of the poisoned foreclosure

17    and unlawful detainer.

18    The court finds that in the six years since the stay

19    violation there have been twenty loan modification requests and

20    finds that Bank of America's insistence on reimbursement of fees

21    and expenses incurred after its stay-violating foreclosure and

22    stay-violating unlawful detainer is not consistent with its

23    obligation of good faith and fair dealing.  It follows that all

24    of its loan modification invitations to the Sundquists were made

25    with no intention to reach agreement.

26    The Sundquists had the burden of preparing repetitive

27

28

[86]Compare B of A Ex. WWW, with Sundquist Ex. 14.

69

1  applications with extensive documentation that, the court finds,

2  they faithfully completed and submitted, like Sisyphus, hoping

3  that this time would be different.  The fact (which the court

4  finds as fact) that Bank of America had no intention of seriously

5  entertaining the applications that included requests for

6  adjustments on account of Bank of America's stay violations

7  created a burden that appropriately is included as actual damages

8  for stay violation.

9      Actual damages for each incidence of bad faith refusal to

10  entertain loan modification requests adjustments on account of

11  Bank of America's stay violations are $1,000.00 per incidence.

12  Hence, § 362(k)(1) actual damages on this account are $20,000.00.

13

14                                H

15      Medical expenses are also an item for § 362(k)(1) actual

16  damages.

17

18                                1

19      Renée Sundquist testified that after moving to the house in

20  Folsom over Labor Day weekend 2010 she was distracted, confused,

21  and angry at what seemed to her (and to him) as an eviction.  She

22  started having trouble breathing and suffered panic attacks.

23      Erik Sundquist testified that he came home one day and found

24  his wife unable to breathe and rushed her to a hospital emergency

25  room, where she underwent "the full heart attack protocol."

26      Renée Sundquist confirmed that her husband took her to Mercy

27  Hospital Folsom on October 23, 2010.  She had labored breathing.

28  Her heart rhythm was bad.  The hospital kept her two days to

                                70

1  determine whether she was having a heart attack.

2      The ultimate conclusion was that the symptoms resulted from
3  stress.  The prescribed treatment included Xanex and Valium.

4      She had been suffering from occasional migraine headaches
5  that had begun about one year before the move to the rental.
6  Beginning in September 2010, their incidence increased noticeably
7  to about one per week.  Since then, they have become chronic and
8  nearly daily.  Sometimes she has four three-day migraine
9  headaches in a month.  She is under the care of a neurologist and
10  finds that the prescribed medication - Amatrex - has debilitating
11  side effects.  She understands that stress is at the root of the
12  migraines.

13      She testified that she has incurred medical bills totaling
14  $30,000.00.[87]  There is no evidence of medical bills for Erik
15  Sundquist.

16      The court believes her testimony and finds that Bank of
17  America's stay violating activity in 2010 was the "but for" cause
18  of her medical issues that led to $30,000.00 in medical bills.
19  They are fruits of the poisoned foreclosure and unlawful
20  detainer.

21      Once again, however, the problem is that the evidentiary
22  presentation is weak.  One would expect to see, at a minimum,
23  medical bills and medical records and perhaps hear from medical
24  experts.  With such evidence, the award likely would be greater
25  than what can be awarded on this evidentiary record.[88]

26  _____

27      [87]Sundquist Ex. 15.

28      [88]If the case were to need to be retried, the Sundquist
    evidence likely would be considerably more robust.

71

1    The award of § 361(k)(1) actual damages on account of
2    medical bills that would not have been incurred "but for" the
3    automatic stay violations of Bank of America is $30,000.00.

4

5                              2

6    Erik Sundquist testified that he suffered physical injury
7    during the move over Labor Day weekend 2010 – he hurt his back
8    due to the heavy lifting and now suffers from a herniated disc.

9    The treatment for what is now chronic back pain includes
10   steroid injections, ibuprofen and prescription opioids.[89]

11   Although the court is persuaded that at least some of his
12   back condition is attributable to having been propelled by Bank
13   of America to move during Labor Day weekend, the difficulty is
14   that there is no evidence of medical bills that this court can
15   use as a basis for making an award of medical expenses.
16   Accordingly, there is no § 362(k)(1) actual damages award for
17   Erik Sundquist's medical expenses.[90]

18

19                              I

20   Actual damages under § 362(k)(1) may include personal injury
21   when a personal injury is the proximate result of a stay
22   violation.  Erik Sundquist's back injury is eligible for such an
23   award.

24   Previous to the move induced by Bank of America's continued

25

26   _____
27   [89]The court believes, and so finds as fact, the facts
     asserted in this testimony.

28   [90]If the case were to need to be retried, the Sundquist
     evidence likely would be considerably more robust.

                              72

1   prosecution of its stay-violating unlawful detainer action
2   consequent to its stay-violating foreclosure, Erik Sundquist had
3   always been healthy and had no prior back injury.

4        This court believes his testimony and finds as fact that
5   Erik Sundquist hurt his back for the first time in the course of
6   the Bank of America-induced move in September, 2010.  It further
7   finds that the injury is a material factor in his current
8   condition.

9        Before the move, Erik Sundquist was an athlete who played
10  soccer, skied, ran, and cycled.  His athletic history included
11  membership on UCLA's NCAA National Championship soccer team in
12  1985.

13       After the move, he lost the physical ability to play soccer,
14  ski, run, or cycle.  His exercise is restricted to using an
15  elliptical machine.  He cannot sit for long periods of time.  He
16  is in chronic pain from a herniated disc.

17       The court is persuaded that there is a lingering and chronic
18  pain back injury proximately caused by the heavy lifting and
19  twisting that commonly occurs in connection with moving household
20  furniture and that was occasioned by the move induced by Bank of
21  America's stay violations.

22       The injury significantly degraded his ability to continue
23  his habitual athletic activity.  For an athletically-inclined man
24  with 10-year-old twin sons at the time of the injury, the loss is
25  significant.

26       Once again, however, the lack of medical opinion evidence
27  hampers the ability of the court to determine damages.  There is
28  the possibility that other factors — such as the ravages and

1   accretions of the aging process - have also been at work.

2   Without such evidence, the court will adopt a conservative

3   approach and make an award that is less than what would be likely

4   if there were to be a better evidentiary presentation.

5       In these circumstances, actual § 362(k)(1) damages for the

6   back injury to Erik Sundquist is $10,000.00.[91]

7

8                              J

9       Emotional distress is an additional basis for actual

10  § 362(k)(1) damages.

11      As noted, proof of egregious conduct causing emotional

12  distress suffices.  Alternatively, proof of less-than-egregious

13  circumstances suffice if it is obvious that a reasonable person

14  would suffer significant emotional harm.  Dawson, 390 F.3d at

15  1149-50.

16      Here, the relevant proof comes from the testimony of Renée

17  Sundquist, which the court believed, and from her remarkably

18  self-revealing journal that she has had the courage to expose to

19  the world.

20

21                              1

22      Renée Sundquist descended to depths of emotional despair

23  during the six years between Bank of America's illegal

24  foreclosure in violation of the automatic stay and the time of

25  trial.  In later stages of that ordeal, she reacted to the

26

27  _____

28      [91]If this matter were to need to be retried following an
    appeal, the Sundquist evidentiary support likely would be more
    robust.

1  doorbell by hiding under the clothes hanging in her closet,

2  developed suicidal thoughts, and responded to written

3  communications from Bank of America by cutting herself with a

4  razor and bleeding all over the bathroom.

5      The process of how Bank of America drove her into the status

6  of an "eggshell plaintiff" warrants review.

7      By the time that the stay violation occurred in June 2010,

8  her prior dealings with Bank of America had been nothing short of

9  frustrating.  Bank of America had induced the Sundquists to

10  default on their mortgage on the representation that a mortgage

11  modification would be entertained in good faith.  Yet their

12  application papers were repeatedly declared to be "lost" or "not

13  received" or "stale," while Bank of America simultaneously

14  pursued foreclosure.

15      Throughout, the Sundquists were acting in good faith, not

16  realizing that Bank of America had no intention of acting in good

17  faith.  The elimination of business debt concomitant to obtaining

18  a chapter 7 discharge following the closing of Erik Sundquist's

19  construction business was of no moment to Bank of America.  Nor

20  was Bank of America impressed by the fact that Renée Sundquist's

21  mother was in a position, once a modified mortgage was agreed

22  upon, to cure the mortgage default that Bank of America had

23  induced.

24      The chapter 13 case was filed on the eve of a scheduled

25  foreclosure in the belief that the chapter 13 process would

26  enable the bank-induced default to be cured and a mortgage

27  modification agreed upon.

28      She did not anticipate that Bank of America would disregard

1  the automatic stay, pursue an unlawful detainer, drive the

2  Sundquist family out of their home, cause a $20,000 HOA liability

3  while it was in title, permit the home to be looted before

4  secretly restoring them to title and then try to saddle them with

5  liability for Bank of America's conduct.

6      Her journal reveals the central role that Bank of America

7  assumed in her life during those six years.  She kept submitting

8  and resubmitting mortgage information in response to requests by

9  Bank of America.

10     But, unlike Camus' conclusion about Sisyphus,[92] she became

11  increasingly unhappy.  Early entries connote optimism;[93] later

12  entries resignation.[94]

13

---

14

15     [92]"One must imagine Sisyphus happy" ("Il faut imaginer
Sisyphe heureux").  Albert Camus, THE MYTH OF SISYPHUS (Penguin
Books, London, 2000), at 89 (tr. Justin O'Brien).

16

17     [93]From the Renée Sundquist Journal:

18     "[Fall 2009] Bank sends out new modification packet.  The
representative at bank's HOPE department told me that they
are actually modifying loans and we should fill out the

19  modification again.  For some strange reason I felt
hopeful."

20

21   Renée Sundquist Decl. ¶¶ 78-80.  The court believes, and so
finds as fact, this testimony.

22

23     [94]From the Renée Sundquist Journal:

24     "August 2010 sent another modification packet to bank this
has to be over 20 modification packets at this point.

25     . . .
we received an email from our bk attorney today, apparently,

26  the bank says they want to discuss options outside of
bankruptcy.  I try to remain optimistic, however, I am a

27  seasoned loan modification filler outer.  I know better."

28   Renée Sundquist Decl. ¶¶ 120-23.  The court believes, and so
finds as fact, this testimony.

1    She began to realize that Bank of America was animated by

2    bad faith.[95]

3    She started hiding in the closet when there was activity at

4    the door.[96]  As time went by, this reaction to activity and the

5    front door persisted.[97]  Eventually, it was viewed as a symptom

6

7    [95]From the Renée Sundquist Journal:

8    "I realized at 2 am this morning that the letter that our
     attorney received and the modification packet sent out was

9    when they had sold the house and we no longer owned it.  How
     can they do a modification.  I need professional help to get

10   past this.  What a horrid pit in my stomach and my head
     hurts so badly too."

11

12   Renée Sundquist Decl. ¶¶ 174-76; accord, B of A Ex. QQQ-001
     ("when our attorney received a letter from b/a stating they

13   wanted to work with us on a modification, they had already sold
     our house when they sent that email! I hope God is watching!  I

14   predicted they wouldn't work with us, I didn't predict they would
     sell our home while in bk!  Wow, I need professional help to get

15   past this! What a horrid pit in my stomach.  My head hurts so
     badly too! We were just were [sic] instructed by b/a to submit

16   another loan modification. ahhhhhhh really, we don't own the
     house any longer!!!!!!!!!!!!!!!!!! I hate them!").  The court

17   believes, and so finds as fact, this testimony.

18   [96]From the Renée Sundquist Journal:

19   "[August 2010] [Son] noticed someone across the street and
     said 'someone is casing the joint' Where did he hear that.

20   First I wanted to laugh then I ran upstairs to my closet and
     sobbed.  I hate being so scared, but I can't show that to my

21   children."

22   Renée Sundquist Decl. ¶¶ 125-27.  The court believes, and so

23   finds as fact, this testimony.

24   [97]From the Renée Sundquist Journal:

25   "May 2011 the doorbell rings m[y] heart races.  I am in the
     rental and still react with horror.

26   . . .
     March 2012 I am having a hard time living in the house.

27   Every time the doorbell rings I hide in my closet under my
     hanging clothes."

28

of Post-Traumatic Stress Disorder.[98]

Suicidal thoughts began to be articulated in her journal and became more frequent.[99]

The cutting is evident in the journal and worsened as time

---

Renée Sundquist Decl. ¶¶ 254-55 & 313-14.  The court believes, and so finds as fact, this testimony.

[98]From the Renée Sundquist Journal:

"[2015] Met with the doctor today, she says I have PTSD and its not weird that when the doorbell rings I hide in the closet"

Renée Sundquist Decl. ¶¶ 489.  The court believes, and so finds as fact, this testimony.  If there needs to be another trial following an appeal, the medical evidence is likely to be robust.

[99]From the Renée Sundquist Journal:

"[Feb. 2012] Thought of driving off a cliff toady [today] as I went to pick up [sons]"

"Strange day; could not talk to anyone I have lost my life."

"[2013] My life is stuck like I am in quicksand but not going under to die and finally done with this pain."

"I thought a long while about killing myself tonight.  I feel so sad, I would miss my family so much, I just don't know how to get through this bank crap, it seems it won't ever end."

"[June 2014] There was blood all over the bathroom.  Erik tried to help, I feel my life is gone."

"If I were to die tonight I know I would regret all the time lost worrying about this stupid house, and how wrong the situation is, but we are so broken."

Renée Sundquist Decl. ¶¶ 312, 325, 408, 412, 442 & 468; accord, B of A Ex. SSS-001 ("Thought about driving off the cliff today as I went to pick up [sons] from school.  I will never be okay that the bank took moments from me while my Mom died.  I will never forgive myself that my Mom worried one second about what the bank of holy hell was doing.  At least my Mom doesn't have to deal with hearing about their crap anymore.").  The court believes, and so finds as fact, this testimony.

1    passed.[100]  And, was corroborated by Erik Sundquist in his

2    _____

3        [100]From the Renée Sundquist Journal:

4        "[Dec. 2012] Trying not to cut myself."

5        "July 2013 My head and the cutting is so bad I need a
6        break."

7        "Sometimes getting a migraine and sadly cutting myself is
         the only relief from this horrible bank pain."

8        "So very sad, I cut myself after the doorbell rang and the
9        delivery of this paperwork.  I hate that this is happening.
         Cutting is the only way the pain from the bank stops and all
10       [of] the sudden I have physical pain from the cutting.  This
         cannot be my life.  It's almost like [I] am looking at
11       myself from afar.  My arm stings in the shower.  The cuts
         are bad.  Blood everywhere."

12
13       "[Nov. 2013] Lots of cutting today, crumbling under bank
         pressure."

14
15       "[Dec. 2013] took [?] upset the cutting is awful our family
         is falling apart."

16       "[Jan. 2014] Received an email from Trustee Sale, I cut
17       myself so bad today.  The bad news has to stop, I hate all
         my scars, and dream I could have them treated some day.  I
18       am so embarrassed and people judge you, good thing I don't
         see my friends anymore.  I will never wear shorts again."

19       "June 2014 Today was awful I am getting a headache and cut
20       myself so bad it took so long to stop bleeding.  There was
         blood all over the bathroom.  Erik tried to help, I feel my
21       life is gone."

22       "[Nov. 2014] The doorbell rang today, Erik cautiously open
         door it is an orange slip.  I hid in the bathroom and cut
23       myself."

24       "[Jan 2015] The doorbell rang today another orange note.  I
         tried so hard not to cut myself today but after the note
25       came it was too much."

26       "March 2015 the doorbell rang and I ignored it.  Later in
27       the day I got the orange slip off the door, I threw it in
         Erik's office.  Too much too long blood all over the
28       bathroom floor."

                                79

1  testimony, which the court believed.

2     This emotional distress is the human cost proximately
3  resulting from the conduct of Bank of America in stringing out
4  the Sundquists and constitutes § 362(k)(1) actual damages.

5     Nor can Bank of America's conduct be chalked off to low-
6  level employees who were not paying attention.  Rather, the
7  record implicates senior executives.  There are a number of
8  communications to the Sundquists from the office of the Bank of
9  America Chief Executive Officer.  Those communications disclaimed
10 responsibility for its illegal foreclosure in violation of the
11 automatic stay and its refusal to adjust for the ensuing
12 consequences.

13    The Bank of America executive staff even lied to the CFPB in
14 an astonishingly brazen manner, denying the existence of the
15 Sundquist state-court litigation.  Their appeal was then pending
16 at the California Third District Court of Appeal and was soon to
17 be decided in their favor on such questions as whether they had
18 stated a claim for fraud.

19    This court finds as fact that Bank of America's brazen
20 conduct towards the Sundquists, done in a heartless manner and in
21 their plain view, inflicted a significant emotional toll on Renée
22 Sundquist.  This emotional distress would not have occurred but
23 for Bank of America's course of conduct following upon its
24 violation of the automatic stay.

25

26     "July 2015 doorbell rang, I cut."

27
   Renée Sundquist Decl. ¶¶ 328, 365, 385, 399-402, 434, 435, 438-
28 43, 461, 480, 486-87, 490.  The court believes, and so finds as
   fact, this testimony.

1    While evidence probative of the appropriate amount of

2    emotional distress damages is thin, the fact of severe emotional

3    distress is so clear that this court can make an award.  As with

4    other damage components in this case, the amount of the award

5    will be less than what likely would have been awarded if the

6    evidentiary record had been more complete.[101]

7    The emotional distress damages for Renée Sundquist are

8    $200,000.00.

9

10                                2

11    Erik Sundquist ultimately was driven by Bank of America's

12    conduct, and its effect upon his wife, to attempting suicide.

13    In testimony that the court believed, he related how he felt

14    driven to act and how one of his school-age sons helped locate

15    him before it was too late.[102]

16    His wife's journal captures the incident from her

17    perspective.[103]

18    _____

19    [101]If the case were to need to be retried, the Sundquist
      evidence likely would be considerably more robust.

20
21    [102]A plausible case could be made that the two Sundquist
      minor children also suffered emotional distress as a proximate
      result of Bank of America's stay-violating conduct.  However,
22    they are not, at least not as yet, parties.  If this case were to
      need to be retried following an appeal, it is conceivable that
23    they might be permitted to intervene.

24    [103]From the Renée Sundquist Journal:

25    "[2015] Yesterday was worst day Erik sends me a text, I love
      you and the boys goodby.  I freaked, he turned off his
26    phone.  I screamed for [son] to help find him.  He was able
      to find him through his IPAD.  We drove madly to where we
27    would see he was.  We could see he went into a CVS and came
      out.  We get to the car and he is asleep, groggy, alive.  I
28    am screaming and crying, [son] is crying. [Son] gets in car

                                81

1       The court finds as fact that the Bank of America ordeal

2

3

4       with Erik and talks to him for a long time.  I sat on the
     pavement staring."

5   Renée Sundquist Decl. ¶¶ 470-78; accord, B of A Ex. VVV-001
("Yesterday was one of the worst days of my life.  Dear God.

6  Erik and I were just in a horrid place in the morning, too much
stress, were are both so ready to move on from the current state

7  of house and lawsuit limbo.  I texted him awful stuff about the
past five years, at some point, when I can't call up the bank of

8  holy hell and scream, I guess I decided to scream in a text to
Erik.  I received a text from him later in the afternoon where he

9  apologized for our life, and wrote he would always love me and
the boys and then wrote goodbye.  Oh my God! My life stopped.

10  That moment - where you read the word 'goodbye', all of a sudden
I couldn't hear, I couldn't breathe, I couldn't think, and I most

11  certainly couldn't move! After the longest 20 seconds of my life
I screamed for [son] and immediately asked him to text his

12  father.  I knew instinctively this was my only hope for Erik to
read a text message from his son, and my only hope for Erik not

13  to hurt himself.  Oh my God is all I was thinking.  Oh my

14  God!!!!!  I didn't tell [son] much, other than we need to find
Dad quick. [Son] knew I was serious.  What seemed like hours, no

15  response from Erik, we figure out his phone was shut off!!! [Son]
then ran to the car where he started tracking Erik's ipad

16  location, we could see he was in a CVS drug store.  Dear Lord.
Usually Erik and I are always so mad at [Son] with all his

17  technology, yesterday I was so grateful he had the knowledge to
track his dad.  Erik's location started moving, and eventually we

18  could tell he drove and parked nearby, our worst nightmare, what
did he buy in CVS and will we get there in time before he

19  swallows too much? Oh my God!  It is truly so hard to write in
words what that 20 minute car ride felt like while imagining Erik

20  did something horrible to himself.  What seemed like forever, we
finally got to the parking lot and saw Erik's car, as we pull up

21  he was asleep.  I just remember screaming and pounding on his
window, thank God he could open the window, but had taken way too

22  much of something.  I just kept screaming, finally he showed me
the bottle of pills, my god, I am thinking at least he is awake

23  and breathing. [Son] is crying, I am screaming, we ascertain what
Erik has swallowed, oh my god, what a mess.  Just in time, we are

24  unclear just what he was prepared to continue ingesting if we
didn't find him.  I just sat and sobbed.  Really, what can I

25  write, no words can explain what I was feeling, what a complete
mess!!! [Son] jumped in Erik's car and sat there for over an

26  hour, I am not entirely sure of all the [exhibit ends in mid-
sentence])"  The court believes, and so finds as fact, this

27  testimony.

28

1  occasioned by its unrepentant disregard of the consequences of
2  its illegal violation of the automatic stay was a material factor
3  in the emotional state of mind that brought Erik Sundquist to the
4  brink of suicide.  This emotional distress would not have
5  occurred but for Bank of America's course of conduct following
6  upon its violation of the automatic stay.

7      While evidence probative of the appropriate amount of
8  emotional distress damages for Erik Sundquist is thin, the fact
9  of severe emotional distress is so clear that this court can make
10  an award.  As with other damage components in this case, the
11  amount of the award will be less than what likely would have been
12  awarded if the evidentiary record had been more complete.[104]

13      The emotional distress damages for Erik Sundquist are
14  $100,000.00.

15

16                              VI

17      Congress authorized punitive damages under § 362(k)(1) in
18  "appropriate" cases when individuals are victimized by willful
19  violation of the automatic stay.

20

21                              A

22      Unlike most punitive damages situations, this is a federal
23  punitive damages statute.  Congress has given no specific
24  guidance about punitive damage boundaries under that statute
25  other than that they be awarded "in appropriate circumstances."
26  11 U.S.C. § 362(k)(1).

27  _____

28      [104]If the case were to need to be retried, the Sundquist
    evidence likely would be considerably more robust.

                              83

Some threshold basics have been identified.  An "appropriate" case for punitive damages under § 362(k)(1) entails some showing of reckless or callous disregard for the law or for rights of others.  <u>Bloom</u>, 875 F.2d at 228.

Proof of conduct that is malicious, wanton, or oppressive suffices to satisfy <u>Bloom</u>'s "reckless-or-callous-disregard" standard.  <u>Snowden</u>, 769 F.3d at 657.

Beyond these basics, there is comparatively little judicial precedent grappling with complexities of this punitive damages statute.  While there are plentiful small-case decisions, there is a paucity of larger cases that have necessitated probing the depths of punitive damages under § 362(k)(1).

In other words, at this late date there is still much about the law of § 362(k)(1) punitive damages that amounts to writing on a clean slate.

By any measure, this case presents an "appropriate" case for punitive damages as authorized by § 362(k)(1).  The magnitude of the case requires more careful consideration of punitive damages.

B

The leading Supreme Court cases involve common law punitive damages.  <u>Philip Morris USA v. Williams</u>, 549 U.S. 346 (2007); <u>State Farm Mut. Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003); <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. 559 (1996).  None of these cases deal with a federal punitive damages statute.  They are, nevertheless, instructive to the extent that Congress has not dictated a different result.

Three guideposts mark the way: (1) the degree of

1  reprehensibility of the defendant's misconduct; (2) the disparity
2  between the actual or potential harm suffered by the plaintiff
3  and the punitive damages award; and (3) the difference between
4  the punitive damages awarded and the civil penalties authorized
5  or imposed in comparable cases.  State Farm, 538 U.S. at 418,
6  citing Gore, 517 U.S. at 575.

7

8                                   1

9       The first Supreme Court guidepost focuses on degree of
10 reprehensibility.  This case may constitute the paradigm case of
11 the "reckless or callous" disregard for the law and for the
12 rights of others and of malicious, wanton, or oppressive conduct
13 contemplated by Bloom and Snowden in order to present an
14 "appropriate" case for § 362(k)(1) punitive damages.

15

16                                   a

17      Black-letter law provides that § 362 automatically stays
18 foreclosures and stays subsequent acts to implement foreclosures.
19      Case law in this circuit establishes that all acts in
20 violation of the stay are void from the outset, not merely
21 voidable.  E.g., Schwartz, 954 F.2d at 572-73.  Similarly,
22 subsequent dismissal of a case does not ratify an act that was
23 void from the outset.  40235 Washington St. Corp., 329 F.3d at
24 1080 n.2.  And, liability continues until a stay violation has
25 been corrected.  Snowden, 769 F.3d at 659 & 662.
26      It is beyond cavil that Bank of America, as a sophisticated
27 creditor (indeed, one of the most sophisticated creditors
28 operating in the United States economy), knew and knows the

1   black-letter statutory law and the concomitant case law.

2

3                                    b

4       Bank of America's actions, however, tell a story that smacks

5   of cynical disregard for the law when dealing with the

6   Sundquists.

7       Let us enumerate the ways in which Bank of America

8   intentionally disregarded the law in the course of the Sundquist

9   saga.

10      Knowing of the existence of the automatic stay, Bank of

11  America nevertheless foreclosed on the Sundquist residence.

12      Knowing of the existence of the automatic stay, Bank of

13  America nevertheless recorded a trustee's deed transferring title

14  to itself.

15      Knowing of the existence of the automatic stay, Bank of

16  America nevertheless filed an unlawful detainer action in state

17  court.

18      Knowing of the existence of the automatic stay, Bank of

19  America nevertheless conducted open and notorious harassing

20  inspections of the Sundquist residence, including, by way of

21  example, terrorizing one of the Sundquists' minor children by

22  beating on a sliding door in the rear of the house and demanding

23  entry and, by way of further example, openly and notoriously

24  tailing Sundquist vehicles to their garage at the residence.

25      Knowing of the existence of the automatic stay, Bank of

26  America nevertheless gave notices in the state-court unlawful

27  detainer action consistent with imminent eviction that panicked

28  the Sundquists into moving into leasehold premises.

1    Knowing that the foreclosure was void as a violation of the
2    automatic stay, Bank of America nevertheless failed to inform the
3    Sundquists before they vacated the premises in panic that it
4    realized the foreclosure was void and must be rescinded.

5    Knowing that its state-court unlawful detainer action was
6    void as a violation of the automatic stay, Bank of America
7    nevertheless failed to dismiss the unlawful detainer action
8    before the Sundquists vacated the premises in panic.

9    Knowing that the foreclosure was void as a violation of the
10   automatic stay and must under Bank of America's written
11   procedures be rescinded "immediately," Bank of America dallied
12   nearly four months before recording the rescission.

13   Knowing that the foreclosure was void as a violation of the
14   automatic stay and must be rescinded, Bank of America failed to
15   inform either the Sundquists or their counsel that it would be
16   taking such action.  In fact, Bank of America never would have
17   informed them if the Sundquists and their counsel had not
18   inquired of Bank of America about the state of title.

19   Knowing that the foreclosure was void as a violation of the
20   automatic stay and that it had been rescinded, Bank of America
21   failed for approximately three months after recording the
22   rescission of the trustee deed of foreclosure to inform either
23   the Sundquists or their counsel that it had restored them to
24   title.

25   Knowing that the foreclosure was void as a violation of the
26   automatic stay and must be rescinded, Bank of America failed
27   promptly to dismiss the state-court unlawful detainer action
28   seeking to enforce the void foreclosure.

87

1    Knowing that the foreclosure was void as a violation of the
2    automatic stay and had been rescinded, Bank of America failed for
3    an additional two months after recording the rescission of the
4    trustee deed of foreclosure to dismiss the state-court unlawful
5    detainer action seeking to enforce the void foreclosure.

6    Knowing that there was a pending appeal in a California
7    state court, the office of the Chief Executive Officer of Bank of
8    America responded to an official inquiry by the Consumer
9    Financial Protection Bureau by falsely stating that no litigation
10   was pending and that the court papers requested by the CFPB did
11   not exist.

12   Knowing that HOA charges were incurred during the period
13   that Bank of America held title to the residence, Bank of America
14   refused to pay those charges and continues to demand that the
15   Sundquists reimburse it for the HOA charges that it did pay.

16   Knowing that a $20,000.00 charge was levied by the HOA
17   because Bank of America did not water the lawn and shrubbery
18   during the period that Bank of America held title to the
19   residence and that the Sundquists had vacated at the demand of
20   Bank of America and in fear of Bank of America's threatened
21   eviction, Bank of America refuses to make any adjustment and
22   insists that the $20,000.00 charge is the Sundquists' problem.
23   Bank of America's refusal has precipitated a hateful animus of
24   the HOA towards the Sundquists.

25   For these reasons, Bank of America has been acting toward
26   the Sundquists in knowing and reckless disregard of the § 362
27   automatic stay.  Further, this conduct has been callous; nay,
28   cruel.

1    In the calculus of reprehensibility, Bank of America's

2  intentional conduct adds up to reckless and callous disregard for

3  the rights of others.  Bloom, 875 F.2d at 228.  It has been

4  wanton and oppressive.  Snowden, 769 F.3d at 657.  This equates

5  with a high degree of reprehensibility.  State Farm, 538 U.S. at

6  418, citing Gore, 517 U.S. at 575.

7

8                                 2

9    Passing on to the second Supreme Court guidepost, the

10 disparity between actual harm and the punitive damages award,

11 this is a case of substantial actual harm where simplistic ratios

12 are of limited utility.

13    The high degree of reprehensibility, coupled with the

14 significant involvement by the office of the Bank of America

15 Chief Executive Officer, calls for punitive damages of an amount

16 sufficient to have a deterrent effect on Bank of America and not

17 be laughed off in the boardroom as petty cash or "chump change."

18    It is apparent that the engine of Bank of America's problem

19 in this case is one of corporate culture.  The evidence is

20 replete with so many communications from the office of Bank of

21 America's Chief Executive Officer that the oppression of the

22 Sundquists cannot be chalked off to rogue employees betraying an

23 upstanding employer.  This indicates that the engine is driven by

24 direction from senior management.

25    Nor can Bank of America hide behind some alleged fiduciary

26 duty to a third-party investor that constrains its ability to do

27 the right thing.  Bank of America owned the Sundquist mortgage

28 for its own account.  When it foreclosed, it noted that there was

1  no investor to notify.

2      It follows that a sum greater than a modest multiple of the

3  actual damages suffered by the Sundquists is necessary to serve

4  the deterrent function.

5

6                                    3

7      The Supreme Court's third guidepost focuses upon the

8  relationship between the punitive damages awarded and the civil

9  penalties authorized or imposed in comparable cases.

10     It happens that Bank of America has a long rap sheet of

11  fines and penalties in cases relating to its mortgage business.

12  In March 2012, Bank of America agreed to pay $11.82 billion to

13  settle litigation prosecuted by federal and state regulators

14  regarding its foreclosure and mortgage servicing practices.  In

15  June 2013, Bank of America agreed to pay $100 million to settle

16  litigation regarding mortgage loan origination issues.  In

17  December 2013, Bank of America agreed to pay $131.8 million to

18  settle litigation with the Securities Exchange Commission

19  regarding the structuring and sale of mortgage securities to

20  institutional investors.  In March 2014, Bank of America was

21  fined $9.5 billion by the Federal Housing Finance Agency for

22  defrauding Fannie Mae and Freddie Mac regarding mortgage-backed

23  securities.

24     In an environment in which Bank of America has been

25  settling, i.e. terminating exposure to higher sums, for billions

26  and hundreds of millions of dollars, a few million dollars

27  awarded as § 362(k)(1) punitive damages award in a real case

28  involving real people, in which the human element of the

1  consequences of Bank of America's behavior comes to the fore for
2  the first time is appropriate and proportional.

3

4                                    4

5      After <u>Gore</u> and <u>State Farm</u>, the Supreme Court ruled in
6  <u>Williams</u> that adequate notice of punitive damages is essential
7  and that punitive damages awarded under state law must be focused
8  on redressing harm caused to the parties before the court, not to
9  other persons.  Harm to others is relevant mainly to the question
10 of degree of reprehensibility.  <u>Williams</u>, 549 U.S. at 355.

11     Bank of America had ample notice in this case that
12 substantial punitive damages might be awarded.  It was taking the
13 position that any stay violation liability terminated at the
14 dismissal of the Sundquist chapter 13 case and no later than the
15 time of the rescission of the foreclosure sale.  On multiple
16 occasions during pretrial conferences, this court, as prospective
17 trier of fact, noted to counsel for Bank of America that it
18 needed to be mindful that substantial damages, actual and
19 punitive, might be awarded if the facts alleged and the
20 Sundquists' theory of the case were to turn out to be correct.

21     By nevertheless choosing to go to trial, Bank of America
22 knowingly assumed the risk of substantial punitive damages.[105]

23 _____

24 [105]<u>Williams</u> also prompts a clarification of the record.  In
   the course of ruling on evidentiary objections during the bench
25 trial, this court noted that the Sundquists' testimony about Bank
   of America's loss and mishandling of their many loan modification
26 applications was consistent with testimony that this court had
   heard literally hundreds (perhaps thousands) of times regarding
27 various mortgage lenders since the onset of the mortgage crisis
   and the Great Recession.  <u>See, e.g.</u>, <u>In re Roderick</u>, 425 B.R.
28 556, 560 (Bankr. E.D. Cal. 2010) (Wells Fargo Home Mortgage).  In
   context, this court was noting on the record for the benefit of

                                   91

C

A conceptual problem arises at this juncture regarding how punitive damages are awarded.

It is settled that, in addition to extra recompense for plaintiffs, punitive damages serve legitimate governmental and societal interests in punishing unlawful conduct and deterring its repetition. <u>Gore</u>, 517 U.S. at 568; <u>Newport</u>, 453 U.S. at 266-68; <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 350 (1974). But, how are those societal interests to be vindicated?

To the extent that legitimate societal interests are to be served, the remedy needs to fit the wrong. The award should be sufficient to serve those interests, which may be an "eye-popping" sum in the view of bystanders not possessed of great wealth.

When a large award is necessary, the problem arises of why plaintiffs should be allowed to appropriate to themselves unrestricted use of the governmental and societal component of a large punitive damages award - beyond a few multiples of compensatory damages.

---

Bank of America's counsel that the Sundquist testimony about their own experience was not inherently incredible to the trier of fact and needed to be taken seriously as Bank of America cross-examined and presented its defense. It was probative of witness credibility and invited refutation, which was not forthcoming. Mindful of <u>Williams</u>, 549 U.S. at 355, this court emphasizes that it is <u>not</u> punishing Bank of America for what it may have done to other people. This court's knowledge of Bank of America's loan modification practices, gained in open court with Bank of America as a party, served two evidentiary purposes in this trial: (1) relevant to degree of reprehensibility; and (2) probative of credibility.

1

2    This case illustrates the problem. Simplistic damage
3 multiples that are not tied to economic reality would produce
4 punitive damages that do not accurately serve their purposes.

5    In 2015, Bank of America earned net income of
6 $15,900,000,000 and paid its top seven executives $80,500,000,
7 which sum included $50,000,000 to the positions of Chief
8 Executive Officer, Chief Operating Officer, and Head of Global
9 Wealth and Investment Management. 2016 Proxy Statement, Bank of
10 America, at pp. ii & 39 (March 17, 2016).[106]

11    To award punitive damages measured by a conventional
12 multiplier of three to six times of the Sundquist compensatory
13 damages would be laughed off in Bank of America's boardroom as a
14 mere "cost of doing business" payable out of the petty cash
15 account.

16    If the punitive damages award does include an amount
17 sufficient to serve the legitimate societal interests justifying
18 punitive damages but can only be directed to the Sundquists, the
19 award to them would be greater than what principles of fairness
20 would justify.

21    Conversely, why should Bank of America be permitted to evade
22 the appropriate measure of punitive damages for its conduct? Not
23 being brought to book for bad behavior offensive to societal
24 norms merely incentivizes future bad behavior.

25

26

27

    [106]The equity-based compensation is subject to clawback for
28 "detrimental conduct." 2016 Proxy Statement, Bank of America, at
p. 49.

2

Several responses to the problem of economically efficient allocation of punitive damages have emerged in recent years.[107]

The Ohio Supreme Court, dealing with Ohio law, treated society as a de facto party. It recognized that there is a "philosophical void between the reasons we award punitive damages and how the damages are distributed" and ordered a remittitur according to which it reduced a $49 million punitive damages jury award for bad faith denial of coverage to a cancer victim down to $30 million on the condition that the excess over $10 million (plus attorney's fees) be distributed to a cancer research fund sponsored by the State of Ohio. Dardinger v. Anthem Blue Cross & Blue Shield, 98 Ohio St. 77, 102-04, 2002-Ohio-7113, 781 N.E.2d 121, 144-45 (Ohio 2002).

The Ohio judicial innovation redirecting part of a punitive damages award to a public purpose linked to the defendant's bad conduct was a matter of Ohio common law. As such, it was justified by the "common law evolution" rationale. See Li v. Yellow Cab Co., 532 P.2d 1226, 1238-39 (Cal. 1975).

In principle, the realm of federal common law is subject to the same common law evolution doctrine.

Legislatures have also innovated with enactment of so-called split recovery statutes.[108] According to these schemes, which are

---

[107]See Catherine M. Sharkey, Punitive Damages as Societal Damages, 113 YALE L.J. 347 (2003). See also, Note, Uncle Sam and the Partitioning Punitive Problem: A Federal Split Recovery Statute or a Federal Tax, 40 PEPP. L. REV. 785 (2013); Note, An Economic Analysis of the Plaintiff's Windfall from Punitive Damage Litigation, 105 HARV. L. REV. 1900 (1992).

[108]See Note, 40 PEPP. L. REV. at 802-05.

1   designed to ameliorate the perceived problem of the plaintiff
2   windfall, the lion's share of punitive damages are redirected to
3   public purposes for the benefit of society.

4       An example relevant in this judicial circuit is <u>Engquist v.</u>
5   <u>Oregon Dep't of Agriculture</u>, 478 F.3d 985 (9th Cir. 2007).  The
6   Ninth Circuit affirmed, against challenges under constitutional
7   and common law theories, Oregon's statutory allocation of 60
8   percent of a punitive damages award in a tort case to the Oregon
9   Criminal Injuries Compensation Account pursuant to state statute.
10  Or. Rev. § 31.735; <u>Engquist</u>, 478 F.3d at 999-1007.

11      As a matter of procedure, the Ninth Circuit ruled that for
12  purposes of execution under Federal Rule of Civil Procedure 69(a)
13  it was sufficient for the State of Oregon to be identified in the
14  judgment as a judgment creditor without the need formally to
15  intervene as a party.  <u>Engquist</u>, 478 F.3d at 1001.

16

17                             VII

18      Having concluded that punitive damages are "appropriate" in
19  this case and having noted a trend toward calibrating punitive
20  damages to serve their intended purposes, the question becomes
21  how to determine the appropriate amount and allocation under the
22  federal punitive damages statute in Bankruptcy Code § 362(k)(1).

23

24                             A

25      Congress has given no guidance on the question regarding the
26  federal statutory punitive damages authorized by § 362(k)(1),
27  presumably leaving the answer to trial court decisions filtered
28  through the appellate process.

1    Where Congress authorizes punitive damages in a general
2  manner, as in § 362(k)(1), it may be presumed that it intends
3  that punitive damages be in an amount that serves the full
4  panoply of interests, including societal interests, that are
5  vindicated by punitive damages.

6    In the context of the Bankruptcy Code, a key societal
7  interest underlying § 362(k)(1) is to have a self-executing
8  private law mechanism to enforce the automatic stay that is
9  crucial to effective operation of the bankruptcy system.  The
10 statutory punitive damages remedy evinces a public purpose that
11 the automatic stay not be a toothless tiger that can be flouted
12 with impunity.

13    It also may be presumed that Congress meant to tolerate a
14 certain degree of perceived windfall to victims (not always
15 debtors) of willful violations of the automatic stay.  One might
16 say that in the ordinary punitive damages situation the perceived
17 plaintiff windfall implicit in punitive damages functions as an
18 acceptable byproduct of the effort and risk of privately
19 enforcing the mandate of Congress.  One might even say that the
20 plaintiff is being compensated for acting as the equivalent of a
21 private attorney general.

22

23                              B

24    The problem becomes how to deal with the unusual situations
25 in which there is a gap between the large amount of punitive
26 damages that is both necessary and appropriate to serve the
27 purposes intended by § 362(k)(1) as to the wrongdoer and the
28 smaller amount that is appropriate for a plaintiff without

1  conferring an excessive windfall. In other words, how is one to
2  proceed when the punitive damages are not excessive per se, but
3  the windfall to the plaintiff is perceived as excessive?

4

5                                    1

6        To let a defendant escape well-deserved punitive damages
7  that are needed to vindicate the societal interests served by the
8  law authorizing the award merely because a plaintiff would be
9  receiving too much money is not a satisfactory answer.

10       Here, the law is poorly developed. Appellate jurisprudence
11 regarding "excessive" punitive damages tends to conflate the
12 distinct concepts of the appropriate amount of the punitive
13 damages award that the defendant's conduct justifies (i.e.
14 whether the award itself is "excessive" in light of the conduct)
15 and of the amount that the plaintiffs ought to be allowed to
16 receive (i.e. whether the non-excessive punitive damages are
17 nevertheless "excessive" in the hands of the plaintiff). This is
18 a byproduct of our case-law system in which appellate courts are
19 prisoners of the facts determined in the trial court in the
20 particular case on appeal and generally decline to consider
21 issues not raised, and arguments not made, at trial.

22       The "excessive punitive damages" cases that have come before
23 the Supreme Court have not been cases that present the issue of
24 the dichotomy between the deserved amount of punitive damages and
25 the amount that is appropriate to leave in the hands of the
26 plaintiff. Yet that is the nub of the problem at hand.

27       A solution based on common sense is to direct to a public
28 purpose the portion of legitimate punitive damages that exceed

                                    97

1  what private victims ought to be allowed to retain — the societal
2  interest component of punitive damages.  This is what the Ohio
3  Supreme Court did as a matter of Ohio common law.  <u>Dardinger</u>, 98
4  Ohio St. at 102-04, 781 N.E.2d at 144-45.

5      Under such a solution, the relevant public purpose should be
6  rationally linked to redressing the underlying conduct that
7  warrants punitive damages in the first place.

8
9                                    2
10     It is apparent that Bank of America's strategy regarding the
11 Sundquists has been infused with a sense of impunity.  The
12 reasons for this attitude of impunity no doubt are complex and
13 overdetermined.  The governmental regulatory system has failed to
14 protect the Sundquists.  Bank of America held out the Comptroller
15 of the Currency as a source of redress, but that turned out to be
16 a chimera.  The Consumer Financial Protection Bureau was thwarted
17 by Bank of America's bald-faced lie that there was no pending
18 litigation with the Sundquists and that there were no litigation
19 papers that could be sent to CFPB.

20     The flaw in the armor of Bank of America's attitude of
21 impunity is the potential for damages in civil litigation.  Even
22 there, however, the field is unbalanced.  The record reflects
23 that Bank of America has been represented in the Sundquist
24 litigation by first-class law firms.  In contrast, the legal
25 representatives serving the Sundquists have not covered
26 themselves in glory.

27     The Sundquists' testimony about their difficulties in
28 locating competent counsel is believable and demonstrates that

                                   98

1 there is a dearth of consumer lawyers with the resources and
2 skills to be effective when representing consumers against Bank
3 of America.

4

5                                3

6      It follows that the public purpose of the societal component
7 of punitive damages against Bank of America in this case should
8 be focused on consumer law in the form of better education in
9 consumer law and more robust resources for leading public service
10 consumer law organizations.

11      On the education front, the public law schools in the
12 University of California system are the appropriate
13 beneficiaries.  There are five such law schools: Berkeley Law
14 School, Hastings College of Law, UC-Davis Law School, UC-Irvine
15 Law School, and UCLA Law School.

16      On the consumer legal front, the appropriate beneficiaries
17 are the National Consumer Law Center and the National Consumer
18 Bankruptcy Rights Center.  Both are charitable entities qualified
19 under Internal Revenue Code § 501(c)(3).  One is prominent in the
20 field of general consumer rights, the other is prominent in the
21 field of consumer rights in bankruptcy.

22      The problems presented by this case span issues of general
23 consumer law and of consumer bankruptcy law.  By channeling to
24 these public academic and consumer advocacy institutions the
25 societal portion of legitimate punitive damages, to be earmarked
26 for consumer law purposes, this court is able to fashion a
27 punitive damages remedy that addresses the enormity of the
28 situation.

4

The question becomes how to square this remedy channeling a portion of the punitive damages to public purposes with the operative language of § 362(k)(1): "[A]n _individual injured by_ _any willful violation_ of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, _may recover punitive damages_." 11 U.S.C. § 362(k)(1).

At first reading of this statute, one might assume that all damages must go to the injured individual.  The phrase "individual injured ... _shall_ recover actual damages, including costs and attorneys' fees" appears to require all actual damages to be paid to the injured individual.  Yet, few would doubt that Congress expected the attorneys' fees and costs can be channeled to the professionals involved.

The use of the verb form "may" in the phrase "_may_ recover punitive damages" affords more latitude and can be read to connote another element of discretion contemplated by Congress.

It is noteworthy that the language of the statute does not prohibit a court from putting strings on what may be done with a portion of the amount awarded.

It would not offend the statute to make an award of punitive damages to the injured individual, which damages are ordinarily subject to individual taxation, and then to enjoin the injured individual to deliver a portion of the award, net of taxes, to designated entities that stand for the societal interest component of the punitive damages justly attributable to the conduct of the wrongdoer towards the injured individual.

1    This would achieve full vindication of the individual
2  interests and the societal interests that are being vindicated in
3  a substantial award of punitive damages.  From the perspective of
4  the individual, allowing the individual to pocket the societal
5  interest component smacks of too much of a windfall for the
6  individual no matter how deserved the total award may be.  From
7  the perspective of the violator, limiting punitive damages to an
8  amount that is not perceived as too big a windfall to stomach
9  enables the wrongdoer to avoid paying the societal component of
10 punitive damages that are genuinely deserved.

11   This court concludes that § 362(k)(1) permits a portion of
12 punitive damages awarded to an individual injured by willful
13 violation of the automatic stay to be channeled, after receipt by
14 the injured individual and payment of taxes incurred by such
15 receipt, to entities that serve the interests of preventing the
16 willful violator's transgressions in the future.

17

18                                    5

19   It is appropriate, as an alternative, to give the willful
20 violator the opportunity to earn a remittitur of the channeled
21 portion of the punitive damages.

22   Thus, in lieu of the sums that are channeled to the
23 designated public service organizations, Bank of America may have
24 a remittitur of those sums if it contributes to those same
25 organizations 75 percent of pre-tax designated amounts with no
26 conditions attached to those contributions other than the sums
27 must be used only for education in consumer law and delivery of
28 legal services in matters of consumer law.

1    For example, if the Sundquists are enjoined to deliver to
2  National Consumer Law Center the post-tax remainder of $10
3  million of the punitive damages awarded to them, then there would
4  be a remittitur of $10 million on the condition that Bank of
5  America contribute $7.5 million to National Consumer Law Center
6  to be used only for education in consumer law and delivery of
7  legal services in matters of consumer law.

8

9                              VIII

10    The § 362(k)(1) actual damages for the willful stay
11 violation that Bank of America committed and has heretofore
12 declined to remedy total, as described above, $1,074,581.50.

13    Of the $1,074,581.50 in actual damages, the Sundquists are
14 enjoined to deliver to their attorney, Dennise Henderson,
15 $70,000.00 (less sums previously paid to her for this adversary
16 proceeding) on account of attorneys' fees and costs that comprise
17 an item in the actual damages award.

18    The appropriate amount of § 362(k)(1) punitive damages to be
19 awarded to the Sundquists is $45,000,000.00.

20    Of the $45,000,000.00 in punitive damages, the Sundquists
21 are enjoined to deliver to:

22    National Consumer Law Center $10,000,000.00 (minus all
23 taxes, if any, the Sundquists must pay on account of that sum);

24    National Consumer Bankruptcy Rights Center $10,000,000.00
25 (minus all taxes, if any, the Sundquists must pay on account of
26 that sum);

27    University of California, Berkeley School of Law,
28 $4,000,000.00 (minus all taxes, if any, the Sundquists must pay

                              102

1  on account of that sum);

2      University of California-Davis, School of Law, $4,000,000.00

3  (minus all taxes, if any, the Sundquists must pay on account of

4  that sum);

5      University of California, Hastings College of the Law,

6  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay

7  on account of that sum);

8      University of California-Irvine, School of Law,

9  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay

10  on account of that sum);

11      University of California-Los Angeles, School of Law,

12  $4,000,000.00 (minus all taxes, if any, the Sundquists must pay

13  on account of that sum).

14      It is the intention of this court that the six designated

15  entities shall have standing to participate in requests for post-

16  trial relief in this court and to participate in any appeal from

17  the judgment in this adversary proceeding.

18      There shall be a remittitur of the § 362(k)(1) punitive

19  damages to $5,000,000.00 if, and only if, Bank of America

20  contributes:  $7,500,000.00 to National Consumer Law Center;

21  $7,500,000.00 to National Consumer Bankruptcy Rights Center;

22  $3,000,000.00 to University of California, Berkeley School of

23  Law; $3,000,000.00 to University of California-Davis, School of

24  Law; $3,000,000.00 to University of California, Hastings College

25  of the Law; $3,000,000.00 to University of California-Irvine,

26  School of Law; and $3,000,000.00 to University of California-Los

27  Angeles, School of Law.  All such contributions are to be used

28  only for education in consumer law and delivery of legal services

1  in matters of consumer law and be subject to no other condition

2  imposed by Bank of America.

3      As intended beneficiaries of the punitive damages award, the

4  National Consumer Law Center, National Consumer Bankruptcy Rights

5  Center, and the five University of California law schools have

6  standing to appear and participate in all post-judgment

7  proceedings and appeals.

8

9                                IX

10     Finally, there is the question of the Sundquist mortgage,

11  which Bank of America admits that it holds for its own account.

12  The principal balance due is $584,893.97, with interest accruing

13  from February 1, 2009,[109] at the contract rate of 6 percent.[110]

14     Throughout, the Sundquists have maintained that they are

15  prepared to honor their legitimate mortgage obligation, but only

16  after the correct amount is determined.  Bank of America's

17  intransigence in seeking reimbursement of expenses incurred by

18  Bank of America, such as HOA fees and penalties, during the time

19  that Bank of America held title and the Sundquists were ousted

20  from possession has been the impediment to moving forward.

21     It is now appropriate definitively to state the remaining

22  amount due on the mortgage and additional charges amounts that

23  may be included.

24     In view of Bank of America's pattern of failure to deal with

25  the Sundquists in good faith and with fair dealing, as required

26

27  ───────────────

        [109]B of A Ex. WWW.

28
        [110]B of A Ex. L.

                                104

1  by California law, justice requires disapproving all charges and
2  penalties other than interest at the contract rate of 6 percent
3  and reimbursement of taxes actually paid by Bank of America by
4  way of escrow advance.

5       The mortgage is reinstated with the debt fixed at the
6  $584,893.97 owed as of February 1, 2009, plus interest at 6
7  percent simple interest since February 1, 2009, plus
8  reimbursement of property taxes actually paid by Bank of America
9  since February 1, 2009.

10       The court does not regard this measure as inequitable
11  towards Bank of America.  The default occurred solely because
12  Bank of America induced the initial mortgage default as a
13  precondition to discussing mortgage modification.  It ignored
14  information that Renée Sundquist's mother was on the sidelines to
15  provide funds to cure any default upon mortgage modification.
16  Thereafter, Bank of America had no compunction about aggressively
17  pursing foreclosure and unlawful detainer in willful disregard of
18  the automatic stay.  It led the Sundquists on a not-very-merry
19  chase by inviting and entertaining mortgage modification
20  applications that it had no intention of granting.

21       When the Bank of America Chief Executive Officer's office
22  became involved, the misconduct strayed across the civil-criminal
23  frontier when the office of the CEO falsely reported to the
24  Consumer Financial Protection Bureau that there had not been a
25  foreclosure and that no active litigation was pending between
26  Bank of America and the Sundquists.  The fact of the foreclosure
27  was beyond cavil and an active appeal was under submission and in
28  the process of being decided by the California appellate court.

1    In contrast, the Sundquists have clean hands and are not
2  free riders seeking free lodging.
3        Despite all of Bank of America's bad behavior, it is winding
4  up with the benefit of its mortgage bargain.  The mortgage is
5  reinstated with its above-current-marker interest rate.  The
6  secular rise in real estate values in the Sacramento area since
7  2009 assures that Bank of America is not under-collateralized.
8  The is no reason to expect the mortgage will not be paid.
9        The history of Bank of America's dealings with the
10 Sundquists suggests that it might aggressively seek to collect
11 the mortgage debt and miss no opportunity to declare a default,
12 while simultaneously resisting paying any of the damages awarded
13 in this case until every avenue of appeal is exhausted.  That
14 nontrivial possibility warrants supervision by this court of
15 payment of the mortgage until this case ends.
16        Bank of America will be enjoined from requiring payments
17 from the Sundquists (who may make voluntary payments), and
18 enjoined from declaring a default, until 60 days after Bank of
19 America pays the Sundquists the full amount of the actual and
20 punitive damages here awarded.
21        For purposes of enforcing the awards made here, this court
22 retains jurisdiction over the mortgage and related obligations.
23
24                          Conclusion
25        Bank of America willfully violated the automatic stay by,
26 among other things, foreclosing on the Sundquist residence,
27 prosecuting an unlawful detainer action, forcing them to move,
28 secretly rescinding the foreclosure, failing to protect the

1  residence from looting, refusing to pay for Sundquist property
2  lost, and subjecting the Sundquists to a mortgage modification
3  charade.  Pursuant to § 362(k)(1), Bank of America is liable for
4  all damages incurred between the initial violation of the
5  automatic stay and the time the stay violation is fully remedied
6  (which remedy comes in this decision and accompanying judgment).

7      The actual § 362(k)(1) damages are $1,074,581.50.  The
8  appropriate § 362(k)(1) punitive damages are $45,000,000.00.

9      The Sundquists are enjoined to deliver $40,000,000.00 (minus
10 applicable taxes) to public service entities that are important
11 in education in consumer law and delivery of legal services to
12 consumers:  National Consumer Law Center ($10,000,000.00),
13 National Consumer Bankruptcy Rights Center ($10,000,000.00), and
14 the five public law schools of the University of California
15 System ($4,000,000.00).

16     Bank of America may have a remittitur of $40,000,000.00 of
17 the punitive damages if, and only if, it contributes a total of
18 $30,000,000.00 (to be used only for education in consumer law and
19 delivery of legal services to consumers and be subject to no
20 other condition imposed by Bank of America) to National Consumer
21 Law Center ($7,500,000.00), National Consumer Bankruptcy Rights
22 Center ($7,500,000.00), and the five public law schools of the
23 University of California System ($3,000,000.00 each).

24     This opinion contains findings of fact and conclusions of
25 law.  An appropriate Judgment shall be entered.

26

27 Dated: March 23, 2017

28

_____
UNITED STATES BANKRUPTCY JUDGE

107

## INSTRUCTIONS TO CLERK OF COURT
## SERVICE LIST

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Erik J. Sundquist
Renee Sundquist
1321 Feliz Way
Lincoln CA 96548

Dennise S. Henderson
1903 21st St
Sacramento CA 95811

Jonathan R. Doolittle
101 2nd St #1800
San Francisco CA 94105

John Siamas
101 2nd St #1800
San Francisco CA 94105

Justin E. McGuirk
101 2nd St #1800
San Francisco CA 94105

Le T. Duong
101 2nd St #1800
San Francisco CA 94105

National Consumer Law Center
John Rao, Esq.
7 Winthrop Square
Boston, MA 02110-1245

National Consumer Bankruptcy Rights Center
Tara Twomey, Esq.
1501 The Alameda
San Jose, CA 95126

Dean
Berkeley Law, University of California
225 Boalt Hall
Berkeley, CA 94720-7200

Dean
University of California, Davis
School of Law
King Hall
400 Mrak Hall Drive
Davis, CA 95616-5201

Dean
University of California Hastings
College of the Law
200 McAllister Street
San Francisco, CA 94102

Dean
University of California
Irvine School of Law
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000

Dean
University of California, Los Angeles
School of Law
385 Charles E. Young Drive East
1242 Law Building
Los Angeles, CA 90095